UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division



United States ex rel.
Nyle J. Hooper
2335 Bittern Street
Arroyo Grande, California 93420

      Plaintiff/Relator,

      v.

Lockheed Martin Corporation
6801 Rockledge Drive
Bethesda, MD 20817,

      Defendant.

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 9 2008

CENTRAL DISTRICT OF CALIFORNIA
BY

Exempt from ECF

**COMPLAINT**
(For Damages and Other Relief
Under the False Claims Act.
31 U.S.C. § 3729, *et sq.*)

**CV08-00561 DSF FMOx**

DEMAND FOR JURY TRIAL

1.      Relator Nyle Hooper files this action under the False Claims Act, 31

U.S.C. § 3729, et seq. ("FCA" or the "Act") for himself and the United States to

recover treble damages and civil penalties caused when Lockheed Martin

Corporation ("Lockheed") defrauded the United States by selling software that

secretly included freeware.   Lockheed failed to disclose the use of this freeware,

thereby violating the terms of the contract.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a).  Venue in this District is proper pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a).

## PARTIES TO THE ACTION

3.      Nyle Hooper ("Hooper" or "Relator") is the Plaintiff in this action for himself and for the United States.  He resides at 2335 Bittern Street, Arroyo Grande, California 93420.

4.      By letter dated July 15, 2005, Hooper voluntarily provided information on which this action is based to the Government prior to filing this Complaint.  Hooper served his statement of material information regarding this action, § 3730(b)(2), on the Government together with this Complaint.

5.      Hooper was employed by Lockheed on April 29, 1996, as a Senior Research Operations Engineer and later as a Senior Project Engineer to work on the Range Standardization and Automation (RSA) IIA Program.   On July 19, 2002, he was involuntarily terminated after investigating the fraud alleged in this complaint and threatening to report the fraud to the government.

6.      Defendant Lockheed's corporate headquarters is located at 6801 Rockledge Drive, Bethesda, Maryland 20817.  Lockheed's  principal business is

-2-

government contracting to the United States defense and intelligence services. Under the contract at issue here, Lockheed (as described on its current web page) provided Space lift Range System (SLRS) architecture & integration, standard & automated open hardware and software, range safety, range operations, weather, planning and scheduling, digital Comm (ATM), Mobile CMD & TLM, Optics, and GPS for Metrics for the Air Force.

## FACTUAL ALLEGATIONS

**The Contract**

7.    Lockheed was awarded contract F04701-95-C-0029 for the RSA ("Range Standardization and Automation") IIA program.  The objective of the contract is to automate, standardize, and modernize software and hardware used to support our nation's space launch operations (Space lift Range System - SLRS) at Vandenberg Air Force Base (Western Range) and (Cape Kennedy), while also providing continued support for and transition from legacy systems.  Lockheed is paid on the basis of cost plus award fee.  Lockheed describes its task on its website as: "In an effort to modernize the Eastern and Western Ranges, Lockheed Martin is supporting the RSA II program to provide safe mission execution and staunch customer support, standardization of the designs and interfaces, unconstrained

-3-

flexibility, capacity and responsiveness, increased performance and sustainability, unlimited technology insertion opportunities, and increased incentives to adapt to new user needs."

8.      The program was divided into three general segments, Control and Display (CDSEG), Instrumentation (INSEG), and Networking (NETSEG). CDSEG had the bulk of the responsibility for developing software and documentation. The estimated lines of code to be delivered under the contract was approximately 1.5 million, with about 800,000 delivered as of the date of Hooper's termination, July, 2002. The deliverables included modules for Infrastructure, Planning and Scheduling, Weather forecasting and direct monitoring, Flight Analysis, Flight Operations, Data Formatting and Archiving, and DGPS (differential GPS metric tracking system).

9.      Lockheed's performance under the contract has been poor, although award fees have remained high. On information and belief, the contract cost doubled from approximately $400 million to $800 million as of July 2002 with substantial additional increases by 2005. The software development portion of the contract has been inundated with problems, severe scheduling delays, and cost overruns. The software products have not worked well, with the customer (Air Force) becoming increasingly dissatisfied with Lockheed's performance, including

-4-

technical deficiencies, schedule delays, and cost overruns.  The follow-on contract (SLRSC) was awarded to IT&T and Boeing.

**Freeware**

10.    "Freeware" and "shareware" describe software that is available in the public domain.  The difference is that shareware providers ask for a small fee to cover costs, finance future upgrades, and provide documentation.  The functionality of freeware ranges the gamut from fairly routine and mundane tasks (e.g. device drivers), to performing mathematical calculations, to entire operating systems (e.g. Linux).  The quality of freeware ranges from buggy, outdated, and worthless - to well-supported, well-documented, highly reliable software with large and active user base.  Freeware developers range from fly-by-night operators to new companies offering loss leaders in the hope of developing for-pay business, to universities, to government contractors.  Source code is sometimes available, which is at least theoretically capable of being analyzed for bugs, hidden malware, and the required functionality.  In many instances, however, freeware is only available as object, compiled, or machine code, basically unintelligible to human programmers, and incapable of scrutiny and analysis for malware, functionality, etc.

11.   The contract and incorporated regulations and standards, e.g. Mil-Std.498, do not permit the undisclosed inclusion of freeware in software deliverables to the Government.

12.   Paul Usavage, Software Architect/Manager, was a strong advocate for freeware.  He instructed his software engineers to search the internet for freeware solutions that could be incorporated into RSA IIA products.  By the end of 2000, the program had become seriously behind schedule and overrun on costs. Beginning in approximately March, 2001, after being tasked by his manager, Glenn Wilson, to resolve the freeware debate, Hooper put in place written policies designed to ensure compliance with licensing and disclosure obligations, virus checks of freeware, and technical review.  Although considerable freeware had been delivered prior to initiation of this protocol, bundled into all of the RSA IIA products, no new freeware was included after this date, at least until Hooper was terminated in July, 2002.  Hooper's de facto freeze on further use of freeware ultimately led to his pretextual termination.

**COUNT I**
**(Claims for Payment for Software Containing**
**Undisclosed Freeware)**

13.   Plaintiff realleges and incorporates by reference paragraphs 1-12 as though fully set forth herein.

-6-

14.    Lockheed knowingly submitted false or fraudulent claims for payment (in the form of invoices and accompanying documentation) for software deliverables that contained undisclosed freeware in violation of 31 U.S.C. § 3729(a)(1).

15.    The subject of freeware was briefly discussed at the October 10, 2000, CDSEG meeting. Glenn Wilson (Hooper's manager) tasked Hooper to determine if the RSA IIA program had the corporate and contractual authority, and under what circumstances, to use freeware in its software deliverables.

16.    Marsha Bobra (Configuration Management) conceded in an October 31, 2000 email that freeware had been improperly included in deliverables: "There has been a lot of discussion lately regarding the use of freeware and shareware, and the Corporate Policy and various Customer Regulations against its use, or qualifications on its use. To this end, Nyle Hooper has been assigned to conduct an inquiry into the matter. However, the Program marches on and we have to have a defense position to support the products which are currently integrated into our system. For the most part, items in the freeware/shareware class were integrated in without being properly processed through the TRB [Technical Review Board] process to put onto the baseline and approved for use. . . . This email serves as notification to those who were not involved in the discussion to become aware of

-7-

the path set upon to cover us. It at least covers us (as a Program community) as being aware of the existence of these [freeware] products on our Program, and documents their use. The documentation will be available for review by the Customer should push ever come to shove regarding the selection and use of the products. They can read the documentation, and determine for themselves whether to accept the products, perform more strenuous testing on them, or request their removal from the program sacrificing the functionality they provide." Ms. Bobro's email directed all the product teams using freeware to provide documentation on the product to Carolyn Hattrup [Configuration Management] to become part of the permanent record maintained for the software baseline, including vendor name, version number, download path, physical media capture of the freeware in original and/or modified form, the product in which the freeware is used, the functionality provided, the path to its current location, and the justification for its use (e.g., freeware vs. COTS). The email contained a "disclaimer" that this process was suggested by Bobro without opportunity for agreement among or approval by colleagues.

17.     Dave LaJeneusse, an Air Force official at Vandenberg Air Force Base, had advised Software Architect Paul Usavage in an October 20, 1999, email that an Air Force instruction specifically prohibited the use of freeware: "The Air

Force forbids the use of software acquired directly from non-DoD electronic bulletin boards," but that it could be allowed if certain restrictions were met, including certification by an independent software testing facility, distribution of approved software in a way that prevents tampering, and avoid copyright violations. After being reminded of this restriction, Usavage emailed Configuration Management Manager, Evelynn Killitz, on December 1, 2000, as follows: "Whether or not the AFI [Air Force Instruction] applies to us, we probably need to respond to the perception that incorporating Perl [freeware] or something like that might constitute a risk, might make our system less secure or might incorporate virus or malicious code into our system. I don't believe that perception is true, but I've seen it pop up from our own folks as well as some customer folks when it comes to light that we're incorporating certain open-source products into the SLRS [RSA IIA software deliverables]." [emphasis added].

18.    Paul Usavage offered his opinion in a December 18, 2000, email that the prohibition on freeware only applied to binaries and not to source code that can be analyzed, modified, and verified to prevent risk. He also contended that even such freeware had to be disclosed and documented in the software baseline.

19.    Hooper developed a work instruction covering past and future use of freeware. This required that an engineer proposing to use freeware in a software

deliverable to make the request to his product lead, the product lead will in turn

notify the system software architect/manager (Paul Usavage) for his determination

that the freeware meets the needs of the RSA IIA program, and the product lead

will obtain the freeware license and forward to both subcontracts and CDSEG

(Hooper) for review and approval, who will in turn determine whether the license

complies with both Lockheed policy and the Contract.

      20.    Hooper's investigation eventually revealed that freeware had been

used in the following software products:

| Lockheed Software Product | Freeware | Comment |
|---|---|---|
| STAR | XFTP | |
| | XmHTML | |
| | Regexp.c | |
| | VIM | |
| | Xbae | |
| | XPM | |
| | Zlib | |
| | Tcl | |
| | ReplayXt | |
| | PNG | |
| | a2ps | |
| | Ghostscript | |

| | | |
|---|---|---|
| Wx | ImageMagick | |
| | Gmake | |
| | LDM | |
| | Tcl/tk | |
| | Perl | |
| | Netcdf | |
| | ClearCase | |
| RAPT CSU | ACE (Adaptive Communications Environment) | |
| | STL (Standard Template Library) | Hewlett-Packard and SGI/STLPort implementations. |
| FOV1 | OpenGL | Includes freeware Glxads, Glxadb, Gl.ads, and Glu.ADS. |
| | ImageMagick | |
| | Xgrab | |
| | XnTpd | |
| ASW [Tivoli] | PERL v.4 | |
| FO-Fep (FOV1) | GNAT | ADA 95 compiler |
| FO | Java3D | |
| | OpenGL bindings for Ada | |
| | ImageMagick | |
| | XnTpd | |

| System Security | Saint | |
| | Nmap | |
| DGPS [IPC] | sockets code | supplied by OC Systems |
| [KFA] | Swing package | supplied by Sun Microsystems |
| | GUI layout manager | supplied by Borland [Inprise] |
| | PILOT plotting package | supplied by UC Berkeley |

21.     As controversy over the freeware issue intensified, Hooper became increasingly aware that product leads were not fully disclosing their prior and/or intended use of freeware to Hooper according to his work instruction.  For example, Scott Smith, Product Lead for FA, at one time reported freeware was being used.  However, on July 23, 2001, Hooper reported to Xenia Bixler that Smith claimed in an email to Hooper that no freeware was being used in FA.  Hooper checked this claim with FA program analyst Mike Allen, who confirmed that freeware was being used in FA and that Smith was not being truthful with Hooper on this issue.

22.     Hooper did not approve any freeware for use in software deliverables following the time when he was tasked with investigating the freeware issue.  For example, he refused a request by Martin Yohpe, Planning and Scheduling Lead, to use components of cgwin on April 26, 2001.  On May 1, 2001, he refused a

request from Robert Berg, a software engineer, to use a freeware language called Expert, allowing its use only for "proof of concept."

23.     Tension between Hooper and management continued to increase. Management sought to use freeware at will to solve "problems" without formal disclosure to and approval by the Government and without ensuring compliance with license and Government Intellectual Property ("IP") requirements.  Hooper continued to insist on disclosure of prior and any future use of freeware and upon full compliance with licensing and contractual IP restrictions.  Ultimately, Stuart Ballard, Manager, RSA IIA CDSEG, ordered Hooper to "fix" the freeware issue he'd been previously tasked to investigate by adopting management's position.  In a May 2, 2001 email, Ballard directed: "Given your level of information on the subject, I am tasking you to solve the issue.  I fully expect for you to find a way for us to use the required Freeware for the Wx [Weather] product, and implement a process to utilize Freeware in the future where it is applicable to solve design issues.  Please let me know your status of this effort COB Friday.  Please consider the risk to current products vs. the cost of developing this capability ourselves.  Thanks, I appreciate your diligence in this matter."

24.     On May 3, 2001, Hooper was again ordered, this time by Paul Usavage, Software Architect/Manager to adopt management's position.  His email

-13-

to Hooper, Hooper's manager, and several senior officials on RSA IIA directed: "If Nyle is going to keep working this, this is what he should be doing: We've got to 'Get over it.' Not using this software is NOT an answer. Everyone else in the world finds a way to do this. We're going to do the same thing, or else we can't compete in the marketplace. Nyle, find us the way to use it."

25.    Hooper continued to press for full disclosure of the freeware issue to the Government. Hooper cautioned in a July 5, 2001 email to Contracts Administrator Xenia Bixler: "At the bottom of this email is a matrix of products and freeware that in my opinion should be given to IP Counsel Katherine Good along with the freeware license agreements for her review to determine if the RSA IIA program is compliant with the Mission Systems freeware policy. I believe this is more an issue of property rights and liability. After Katherine's review , I suggest full disclosure to the government PCO [Procurement Contract Officer]." He was responding to a July 5, 2001 email from Xenia Bixler asking: "What happened to the list of these situations whereby we were going to provide the Government this information in order to put them on notice and make them a party to whether they wanted to spend the money?"

26.    The Government suffered actual damages by paying for defective software products of unknown reliability that failed to conform to Lockheed's

contractual obligation to disclose any use of freeware.

## COUNT II
### (Claim for Payment for Software
### Delivered With Inadequate Intellectual
### Property Rights)

27.    Plaintiff realleges and incorporates by reference paragraphs 1-26 as though fully set forth herein.

28.    In addition to a general prohibition on the undisclosed delivery of freeware, Hooper was also concerned with the delivery of sufficient IP rights. DFAR 252.227-7014 (Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation) (formerly 7013, Rights in Technical Data and Computer Software), incorporated by reference, provides, *inter alia*, that the Contractor shall provide unrestricted rights with respect to software and documentation developed exclusively with government funds. DFAR 252.227-7014(b)(1) (formerly 7013 (c)(2)). Furthermore, with respect to third-party copyrighted software and/or documentation, which is the case with most freeware, prior disclosure and written approval are required: "The Contractor shall not, without the written approval of the Contracting Officer, incorporate any copyrighted computer software or computer software documentation in the software or documentation to be delivered under this contract unless the

-15-

Contractor is the copyright owner or has obtained for the Government the license

rights necessary to perfect a license or licenses in the deliverable software or

documentation of the appropriate scope set forth in paragraph (b) of this clause

and prior to delivery of such — (1) Computer software, has provided a statement

of the license rights obtained in a form acceptable to the Contracting Officer; or

(2) Computer software documentation, has affixed to the transmittal document a

statement of the license rights obtained." DFAR 252.227-7014(d) (formerly 7013

(e)(2)). The clause also requires that any software or documentation delivered

with any form of restricted rights be marked accordingly and identified in an

attachment to the contract. *See* RFP Section. I § 3.3.6.6. and DFAR 252.227-

7014(e) (formerly 7013 (c)(1)(k)).

  29. Much freeware is covered by a 'general public" (GNU) license.

Freeware covered by such a license could generally not be incorporated in

Lockheed's deliverables. As an example, Hooper determined that use of proposed

freeware (cksum.exe and cygwin1.dll) would violate the GNU license agreement,

as set forth in an April 26, 2001, email to Martin Yohpe . In particular, Hooper

noted the following provisions of the GNU license: "This General Public License

does not permit incorporating your program into proprietary programs." [quoting

from the GNU General Public License]. RSA IIA software is LM proprietary

before the DD 250's (invoices) and thereafter becomes the proprietary property of the Government. The requirement for a "no charge" license to any third parties could not be met because there was no way to segregate the costs of the software covered by the GNU license from the software deliverable as a whole. Any violation of the GNU license results in automatic termination of the license granted Lockheed. This would expose both Lockheed and derivatively the Government to potential financial liability for misuse of licensed software. The GNU software is sold "as is" without warranty of any kind. The lack of any warranty by the author of software is unacceptable under the Contract. Finally, the GNU license contains a waiver of liability for any damages, also an unacceptable restriction under the Contract.

30.    In an April 27, 2001 email to Yohpe and Hooper, Paul Usavage, Software Architect/Manager, approved the inclusion of the requested freeware despite the impossibility of complying with the license restrictions, noting: "[W]e need to address the following: (1) Legal approval, since the legal guidelines ignore the last 10 years of software open source reality."

31.    In a July 5, 2001, email from Hooper to CDSEG Manager Stuart Ballard, Contracts Administrator Xenia Bixler, and others, Hooper again reaffirmed his disapproval for Yohpe to use the cygwin free components based

-17-

upon the same deficiencies in the license agreement.  Hooper advised Jeff Wilson, a CDSEG employee responsible for finding COTS solutions, the same day that "[I]t appears the alternatives are to write the code or find a COTS [Commercial Off the Shelf Software]  product for that functionality."

32.    An example of a freeware license agreement that would prohibit Lockheed from using such freeware and delivering it to the Government is the Sun Microsystems license for Java, incorporated by Lockheed in its DGPS application. The license provides: "Software is not designed or intended for use in on-line control of aircraft, air traffic, aircraft navigation or aircraft communications; . . .. Licensee warrants that it will not use or redistribute the Software for such purposes."

33.    A similar restriction is found in the license agreement from Borland for the GUI freeware used in DGPS.  The license provides: "High Risk Activities: The Software is not fault-tolerant and is not designed, manufactured or intended for use or resale as on-line control equipment in hazardous environments requiring fail-safe performance, such as in the operation of nuclear facilities, aircraft navigation or communication systems, air traffic control, direct life support machines, or weapons systems, in which the failure of the Software could lead directly to death, personal injury, or severe physical or environmental damage

-18-

("High Risk Activities"). Inprise and its suppliers specifically disclaim any express or implied warranty of fitness for High Risk Activities."

34.    The Government suffered actual damages by paying for software that was noncomplying or defective with respect to compliance with licence restrictions and with IP rights required by the Government. Lockheed violated the FCA, § 3729(a)(1), by submitting invoices knowing that it was unable to deliver adequate and required license and IP rights.

**COUNT III**
**(Claim for Software Containing**
**Inflated Costs Due to False Productivity**
**Projections)**

35.    Plaintiff realleges and incorporates by reference paragraphs 1-34 as though fully set forth herein.

36.    Upon information and belief, Lockheed proposed to the government in response to the RFP an overall productivity rate for software development of 2-3 lines of code for all products. This was material to winning the contract as productivity of the programmers (lines of code per hour) directly affects the final cost to the Government of purchasing an estimated "x" lines of code via a contract based upon cost plus award fee.

37.    Hooper attended a meeting on June 6, 2001 during which Business

-19-

Operations Bret Walberg presented a productivity rate for the Weather product of

only .08. Based upon this meeting and followup investigations by Hooper,

Lockheed intentionally used unrealisticly high productivity projections in order to

win this contract, intending that any price increases due to low productivity could

be blamed on the Government (e.g. requirements creep or mission expansion) and

handled through contract modifications, or otherwise explained. Ultimately,

Lockheed went to NOAA to obtain the weather product known as WIPS, as a

COTS alternative to writing the weather software.

38.     Hooper explained in a June 7, 2001 email to Walberg:

> The issues are SLOC and labor hours and I have resolved the SLOC
> issue[,] and I understand the labor hours issue centers on how
> Business Operations tracked actual labor hours. Apparently, the
> management, systems engineering, and support group actual labor
> hours were not segregated by product and therefore, it appears
> impossible to know the total actual labor hours worked to develop
> each product. The productivity metric is based on hours and SLOC
> count and if one part of that equation is erroneous that metric is
> useless. The last issue I raised was the fact that RSA IIA has
> represented and is representing productivity factors in BOEs [Basis of
> Estimate] proposed to the customer to support ECPs [Engineering
> Change Proposals] and other contractual activity that is contradicted
> by productivity factors presented by another group within the RSA
> IIA Program. (emphasis added).

39.     Hooper reported in a June 10, 2002, email to CDSEG Manager

Ballard the results of his investigation into the SLOC count for the Weather

product. Raytheon, the subcontractor used for development, reported SLOC of 1,183,622, whereas the actual SLOC currently shown by the common code counter at Lockheed, after termination of the Raytheon subcontract, was only 231,767.

40.    Hooper noted another example of inflated SLOC in a June 10, 2002, email to Ballard concerning the DGPS product subcontracted to Ball Industries. The actual code count reported by Ball was 72,469, but Lockheed's common code counter reported 189,584 lines of code delivered by Ball. Further, the current code count was only 56,202 lines, according to a June 10, 2002, email from Hooper to Dutton. In a June 20, 2002, email from Hooper to Dutton, he notes that Dutton's SLOC count for DGPS was approximately 67,000. Hooper asked why Dutton's count deviated from the approximately 189,000 SLOC reported by Lockheed's common code counter.

41.    Fearing what Hooper would ultimately discover regarding productivity rate fraud, the responsibility of metrics reporting was taken away from him just prior to termination and assigned to Jeffrey Allen and others. In a June 20, 2002, email to Allen, Ballard, Glenn Wilson and others, Hooper vigorously complained as follows: "First, I have updated by SLOC report, PCDOCS #63673, by the middle of each month since October 1996. Second, you have violated the stated, known, and agreed to process by doing an end run around

-21-

CDSEG [Hooper] and gathering CDSEG metrics that by the way were not accurate. Perhaps this is a good place to say to you that most of your metrics are questionable at best. You have PCDOCS reports on action items that do not match Elaine Rhinchart's reports that also reside in PCDOCS, your SLOC count reports do not reflect CMs [Configuration Management] information or information from the product leads, your risk metrics stopped in 2001, your software productivity numbers are inaccurate because of the wrong SLOC counts and labor hours, your defect density rates are questionable because everything else you use SLOC in the formula has been wrong. Third, I was only at the SLOC 'just do it' first meeting, April 30, 2002, sitting in for Hank Johnston. After that point in time I have not received oral or written meeting notices for 'just do it' continuation meetings but if my presence is missed, why not call or write without the accusations. Fourth, as I said earlier, the correct SLOC information is in PCDOCS #63673 and you can contact Carolyn Hattrup if you question the SLOC counts."

    42.    Previous to 2002, the product leads reported source lines of code (SLOC) completed (actual code written versus estimates and estimated lines of code to completion). These reports were based upon "engineering judgment" and not an actual count of lines of code. Beginning in early 2002, the task of reporting

-22-

actual code to Hooper was assigned to Amber Ford who used a "common code counter" to actually count SLOC. Upon information and belief freeware was included in these SLOC counts as another means of artificially inflating Lockheed's productivity.

43.     Shortly before his termination, CDSEG Manager Stuart Ballard tasked Hooper to look further into the productivity issue. Hooper went to Dave Parsley, Business Operations, who admitted that there was no way to calculate actual productivity by product because labor hours were not kept in a manner that would permit the calculation. Thus, Hooper was never able to provide Ballard with any actual productivity rates as of the summer of 2002.

44.     The Government suffered damages due to Lockheed's productivity rate fraud by paying more for the software deliverables than it would have had to pay in honest competition. Lockheed submitted false claims in the form of invoices, based upon the original inflated productivity rate, knowing that its actual productivity rate would be and was considerably below the inflated rate set forth in Lockheed's proposal, in violation of § 3729(a)(1).

### COUNT IV
### (Wrongful Termination of Plaintiff Hooper)

45.     Plaintiff realleges and incorporates by reference paragraphs 1-44 as

though fully set forth herein.

46.    Hooper had two objectives with respect to freeware.  First, he sought to ensure that all previously delivered freeware was identified, documented, disclosed to the Government, and complied with license requirements.  Second, he sought to ensure that any future freeware delivered to the Government complied with both contract and license requirements.  Hooper's objectives ultimately proved inconsistent with Lockheed management, which opted instead not to disclose the previously delivered freeware and not to seek and ensure compliance with licensing requirements.

47.    Hooper reported his findings concerning the freeware issue to local management, including immediate managers Glenn Wilson, Dennis Mitchell, Lee Owens and Stuart Ballard; Configuration Management Manager, Lynn Killitz; Procurement Manager Larry Machado; Contracts Administrator, Zenia Bixler; Software Architect/Manager, Paul Usavage; Program Director, Ed Butt; Deputy Program Director and Systems Engineering, Integration and Test, Frank Bell; Vice-President, Ralph Tourino; President, Terry Drabant; Intellectual Property Attorney, Kathy Good; Head Counsel, Nattie Horn; Ethics Officer, Sue MacTavish; Human Resources, Barbara Humpton; and Human Resources Vice President, Maureen Liebler.  Other individuals directly involved with the freeware

-24-

issue were Software Procurement, Raquel Rowen; and Configuration

Management, Carolyn Hattrup and Marsha Bobro.

48.    Over the months that followed Hooper's introduction of the freeware

protocol, Xenia Bixler, Contracts administrator, told Hooper repeatedly that she

would contact the government contracting officer regarding the fact that Lockheed

products delivered, installed, and sold to the Government included freeware.  She

admitted on several occasions that she had not done so.  Hooper encouraged and

tried to persuade Lockheed management to report the freeware issues to the Air

Force but as of the date of his termination, July 19, 2002, the Government was

never notified.

49.    Prior to October 2000, Hooper's performance evaluations had been

above average and remarks on his appraisals had been very positive.  As tensions

over the freeware issue increased, management increasingly inflicted a hostile

work environment on Hooper, as retaliation for his refusal to adopt the

management position on freeware and for his continued insistence that prior use of

freeware be fully disclosed to the Government and that all past and any future

freeware use strictly comply with contractual IP and license requirements.  In

2001, Hooper was denied a "skip level" review and an interim performance

evaluation. Hooper's direct manager was changed several times, sometimes

without Hooper's knowledge or reflection in an organization chart.

50. Hooper's final 2001 evaluation rated him "satisfactory" but it contained false and derogatory information and comments. Hooper's job title was changed from Senior Project Engineer to Hardware Engineer without his knowledge or consent.

51. Hooper reported in a June 8, 2001, email to LMMS HR Manager Maureen Liebler that Process Engineering and Metrics Manager Dennis Mitchel warned him not to take this classification matter to HR. Hooper considered this part of the harassment he was receiving for challenging management on the freeware issue. His emails stated: "Some RSA IIA management personnel have not been pleased with issues that I have raised in recent months. Freeware bundled with developed code in RSA IIA Products that will be delivered to the government customer concerns me. I have worked this issue through our Contracts lead, Xenia Bixler [and] with Katherine Good, Mission Systems Intellectual Property Attorney. I believe Katherine Good needs to determine if the RSA IIA Program is in compliance with the Mission Systems Freeware Policy and she needs to review all freeware license agreements for freeware that will be bundled with developed software to be delivered to the government customer. Additionally, I believe the RSA IIA Program should submit the same freeware

package to the customer for their concurrence.  Others disagree." [emphasis
added].  Following an investigation of the change in title, HR ultimately changed
Hooper's title to Project Management and Planning Operations in approximately
late, 2001.

    52.    Hooper also reported the productivity rate fraud to HR in the same
email: "Another issue surfaced at a metrics meeting on June 6, 2001, where a chart
represented that the software productivity for the Weather Product was .08.  I
stated that the productivity rate should be in the range of 1 to 3.  I said the reuse
code should not be aggregated with the new and modified code because by
definition reuse code is untouched and is only analyzed.  I suggested that they
subtract out the reuse portion.  Also, it was apparent that the hours used to develop
the productivity rate did not include program management, system engineering
and support functions so as a consequence, the SLOC was too high and the hours
were too low and this combination gave a false productivity rate.  Moreover, the
productivity rates used in their proposals are much higher and I thought that it was
not a good idea to present data that was inconsistent from what is proposed to the
customer.  Comments to me after the meeting were derogatory, e.g. Dennis
Mitchell, 'He is only a hardware engineer.'  Bret Walberg, 'He is trying to disrupt
our pricing activity.'  Bret Walberg, 'He is saying we're doing defective pricing.'

Bret Walberg, 'He is saying we are violating TINA,' (I did not allege defective

pricing or violations of TINA.)  I did say that RSA IIA should not have

productivity rates that conflict because that can be used against the program."

(emphasis added).

   53.   Hooper again complained to Maureen Liebler in an October 23, 2001,

email about management inaction and continued fraud on the freeware issue:

> The RSA IIA program still has responsibility to inform the
> government customer of the undisclosed freeware bundled with
> launch software deliveries that have gone through DD 250.
>
> On October 15, 2001, Nettie Horne and Katherine Good presented the
> LMMS Software Licenses Analysis, Guidelines, and Checklist for use
> by the Procurement Professional.  During the presentations regarding
> freeware, both tried to intimidate, belittle, and personally attacked me.
> For example, Ms. Horne stated publicly that I had a particular agenda
> that was different from the other attendees.  Ms. Horne asked what
> my job was and stated publicly that it was not my business.  Ms.
> Good stated publicly that she would talk to my manager and get re-
> tasked.  Both stated publicly that I am just a tech person.  And, Ms.
> Good stated publicly that it would take years of legal training and
> experience for me to understand.  Both refused to answer questions
> that were RSA IIA freeware examples.  As a matter of fact, my
> management tasked me to resolve freeware issues and furthermore it
> is the right of any employee to bring possible ethics violations to the
> proper authorities. (emphasis added).

   54.   Hooper was not qualified as a "hardware" engineer and evaluating

him as such was totally inappropriate.  Hooper was literally pulled out of a

Program Management course, even though he had prior approval for the complete

curriculum and senior management encouraged employees such as Hooper to complete such curricula as part of essential career development.

55.     Hooper contacted Human Resources ("HR") in approximately June 2001 to request an investigation for retaliation and the false performance and appraisal process.  HR agreed that the performance and appraisal process had not been done properly but was unable to agree that this was retaliation.  Hooper requested HR or management reappraisal but HR settled instead on simply removing the offending remarks from Hooper's record.

56.     Despite increasing pressure from management to keep quiet, Hooper continued to work within the system, working up through higher levels of management to end the fraud and disclose the use of freeware.  He ultimately sought the assistance of Human Resources and protection from the Ethics Office as a "whistleblowers."

57.     In a February 22, 2002 email to Barbara Humpton of Human Resources, Hooper objected to pretextual comments in a performance evaluation concerning his "teaming and interpersonal skills," noting that "I do not believe that playing well people includes propagating deceit."

58.     Stuart Ballard, Manager CDSEG, was the manager who ultimately terminated Hooper.  His 2002 interim appraisal rated Hooper as a "basic

contributor," which is a barely passing mark. Hooper refused to sign this appraisal. It was changed within an hour, not by incorporating changes sought by Hooper but by including more negative comments. Again, Hooper refused to sign. Hooper again refused to sign a third iteration of the interim appraisal three hours later that contained even more negative information, including negative remarks about Hooper's efforts to resolve the freeware issue.

59.    Again Hooper contacted HR to request an investigation for retaliation and an improper performance and appraisal process. HR found no fault but directed Stuart Ballard to meet with Hooper once per week so there would be no surprises when it came to the final evaluation. Ballard only had one of these weekly meetings. Hooper's final evaluation rated him below "basic contributor." Hooper was offered a performance improvement plan ("PIP") and a general release from Lockheed, but refused to sign either. He did follow the PIP guidelines during his remaining time with Lockheed.

60.    Hooper requested an investigation from the Human Resources and Ethics Officer, Sue MacTavish, and claimed "whistleblower" status. She advised to continue following the PIP guidelines and directed Ballard to meet with Hooper once per week to review performance. Ballard made no negative comments during these meetings. Ballard abruptly terminated Hooper on July 19, 2002, verbally

-30-

claiming "no performance." Hooper was aware of what it meant to be a

whistleblower and aware of the False Claims Act. It was his intent to work up

through the chain of management to try and resolve the freeware issue. When this

finally proved unsuccessful, Hooper contacted the Human Resources and Ethics

Office and claimed whistleblowers status. Unresolved internally, it was ultimately

his intent to report Lockheed's fraud to the Government.

61.     Hooper believes that it was the combination of his investigations into

freeware disclosure and license compliance, and later productivity rate fraud, that

led to his ultimate termination. While Hooper's allegations concerning the

freeware fraud were mature and well understood by management as of July, 2002,

Hooper's investigation into the productivity rate fraud was at a much earlier stage.

Hooper understood the nature of the fraud and had reported his allegations to both

management and HR, but his investigation was intensifying. Management feared

that Hooper's zealous insistence on reporting fraud would be potentially far more

devastating to Lockheed than the freeware fraud as his investigation continued.

Hooper believes that it was this realization by management that led to his abrupt

termination on July 19, 2002.

62.     The FCA protects whistleblowers such as Hooper as follows: "Any

employee who is discharged . . . because of lawful acts done by the employee . . .

-31-

in furtherance of an action under this section, including investigation for, initiation

of, testimony for, or assistance in an action filed or to be filed under this section,

shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. §

3730(h). Once tasked with resolving the freeware issue, Hooper first determined

that substantial quantities of freeware had been delivered to the Government, that

the contract prohibited the undisclosed bundling of freeware, and then developed

procedures to ensure that past and future freeware was disclosed and that required

IP rights were transferred to the Government. Hooper encountered increasing

resistance from management to his proposed disclosures. Hooper began

investigating the productivity rate fraud following a meeting on June 6, 2001.

Hooper believed that Lockheed had intentionally inflated its productivity

(SLOC/labor rate) in order to win the contract and then conceal the fraud through

a variety of means. Hooper argued that the actual - much lower - productivity

rates should be disclosed to the Government. It was the combination of Hopper's

zealous insistence regarding the freeware disclosure and licencing issues

combined with the potential risk to Lockheed of disclosure of productivity rate

fraud that finally provoked Hooper's abrupt termination. Management ultimately

retaliated by wrongfully terminating Hooper on July 19, 2002, amidst a pretext of

performance reviews and "improvement" plans.

WHEREFORE, Plaintiff Hooper, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendants Lockheed as follows:

1.    For treble the amount of the United States' damage, plus civil penalties of $10,000 for each false claim;

2.    For all costs of this civil action; and

3.    For prejudgment interest and for such other and further relief as the Court deems just and equitable.

4.    An order of reinstatement with the same seniority and benefits Hooper would have had but for his wrongful discharge, plus double back pay, plus interest on the back pay, plus special damages, plus litigation costs and attorney fees as provided for in § 3730(h);

MOREOVER, Plaintiff Hooper, on his own behalf, demands and prays that an award be made in his favor as follows: for 25 percent (25%) of the proceeds collected by the United States if it intervenes in and conducts this action, or for 30 percent (30%) of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the relator in prosecution of this action; for all reasonable attorneys' fees and costs incurred by the relator; and such other and further relief to which the relator may show himself justly

-33-

entitled.

## DEMAND FOR JURY TRIAL

Plaintiff Hooper demands that this case be tried before a jury.

_____
Daniel E. Cohen (U.S.D.C. MD 16324)
The Cullen Law Firm, PLLC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-8600

Of Counsel:

Paul D. Cullen, Sr. (DC 100230)
Joseph A. Black (DC 414869)
The Cullen Law Firm, PLLC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-8600

James A. Moody (DC 294504)
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-2171

Attorneys for Relator

-34-

ATTACHMENT

Other Attorneys Representing Plaintiff

Paul D. Cullen, Sr. (DC 100230)
Joseph A. Black (DC 414869)
The Cullen Law Firm, PLLC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-8600

James A. Moody (DC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-2171

ATTACHMENT

Other Attorneys Representing Plaintiff

Paul D. Cullen, Sr. (DC 100230)
Joseph A. Black (DC 414869)
The Cullen Law Firm, PLLC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-8600

James A. Moody (DC 294504)
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-2171

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

|  |  |  |
|---|---|---|
| United States ex rel. | ) | **DKC 05 CV 1 94 7** |
| **[UNDER SEAL]**, | ) | **Exempt from ECF** |
| Plaintiff/Relator, | ) |  |
|  | ) | **COMPLAINT** |
| v. | ) | For damages and other relief |
|  | ) | Under the False Claims Act |
| **[UNDER SEAL]**, | ) |  |
|  | ) |  |
| Defendant. | ) | DEMAND FOR JURY TRIAL |
|  | ) |  |

**[FILED UNDER SEAL]**

Paul D. Cullen, Sr. (DC 100230)
Daniel E. Cohen (U.S.D.C. MD 16224)
Joseph A. Black (DC 414869)
The Cullen Law Firm
1101 30th Street NW
Washington, DC 20007
202-944-8600

James A. Moody (DC 294594)
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-2171

Attorneys for Relator