UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division

| | |
|---|---|
| United States ex rel. )<br>Nyle J. Hooper )<br>2335 Bittern Street )<br>Arroyo Grande, California 93420 )<br> )<br> )<br>Plaintiff/Relator, )<br> )<br>v. )<br> )<br>Lockheed Martin Corporation )<br>6801 Rockledge Drive )<br>Bethesda, MD 20817, )<br> )<br>Defendant. ) | **CV08-00561 DSF FMOx**<br><br>**FIRST AMENDED COMPLAINT**<br>(For Damages and Other Relief<br>Under the False Claims Act.<br>31 U.S.C. § 3729, *et sq.*)<br><br>Civil No. DKC-2005-1947<br><br>DEMAND FOR JURY TRIAL |

1.     Relator Nyle Hooper files this action under the False Claims Act, 31

U.S.C. § 3729, *et seq.* ("FCA" or the "Act") for himself and the United States to

recover treble damages and civil penalties caused when Lockheed Martin

Corporation ("Lockheed") defrauded the United States by selling software that

secretly included freeware.  Lockheed failed to properly disclose the use of this

freeware, thereby violating the terms of the contract.  The delivered software was

defective in that it had less than the "unlimited rights" required by the contract.

Lockheed falsely understated software cost estimates used to obtain the contract

1

(and modifications), and falsely claimed to be more productive in writing software. Lockheed falsified tests by not following required test procedure, and changed expected results to conform with actual results. Lockheed made false statements to obtain unjustified award fees. Finally, Lockheed unlawfully terminated Hooper in violation of the whistleblower protection provisions of 31 U.S.C. § 3730(h).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a). Venue in this District is proper pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a).

## PARTIES TO THE ACTION

3.      Nyle Hooper ("Hooper" or "Relator") is the Plaintiff in this action for himself and for the United States. He resides at 2335 Bittern Street, Arroyo Grande, California 93420.

4.      By letter dated July 15, 2005, Hooper voluntarily provided information on which this action is based to the Government prior to filing this Complaint. Hooper served his statement of material information regarding this action, § 3730(b)(2), on the Government together with this Complaint.

2

5.      Hooper was employed by Lockheed on April 29, 1996, as a Senior Research Operations Engineer and later as a Senior Project Engineer to work on the Range Standardization and Automation (RSA) IIA Program.  On July 19, 2002, he was involuntarily terminated after investigating the fraud alleged in this complaint and threatening to report the fraud to the government.

6.      Defendant Lockheed's corporate headquarters is located at 6801 Rockledge Drive, Bethesda, Maryland 20817.  Lockheed's  principal business is government contracting to the United States defense and intelligence services. Under the contract at issue here, Lockheed (as described on its current web page) provided Spacelift Range System (SLRS) architecture & integration, standard & automated open hardware and software, range safety, range operations, weather, planning and scheduling, digital Comm (ATM), Mobile CMD & TLM, Optics, and GPS for Metrics for the Air Force.

## **FACTUAL BACKGROUND**

**The Contract**

7.      Lockheed was awarded contract F04701-95-C-0029 for the RSA ("Range Standardization and Automation") IIA program.  The objective of the contract is to automate, standardize, and modernize software and hardware used to support our nation's space launch operations (Space lift Range System - SLRS) at

3

Vandenberg Air Force Base (Western Range) and Cape Kennedy (Eastern Range),

while also providing continued support for and transition from legacy systems.

Lockheed is paid on the basis of cost plus award fee. Lockheed describes its task

on its website as follows: "In an effort to modernize the Eastern and Western

Ranges, Lockheed Martin is supporting the RSA II program to provide safe

mission execution and staunch customer support, standardization of the designs

and interfaces, unconstrained flexibility, capacity and responsiveness, increased

performance and sustainability, unlimited technology insertion opportunities, and

increased incentives to adapt to new user needs."

      8.     The program was divided into three general segments, Control and

Display (CDSEG), Instrumentation (INSEG), and Networking (NETSEG).

CDSEG had the bulk of the responsibility for developing software and

documentation. The estimated lines of code to be delivered under the contract

were approximately 1.5 million, with about 800,000 delivered as of the date of

Hooper's termination, July, 2002. The deliverables included modules for

Infrastructure, Planning and Scheduling, Weather forecasting and direct

monitoring, Flight Analysis, Flight Operations, Data Formatting and Archiving,

and DGPS (differential GPS metric tracking system).

9.      Lockheed's performance under the contract has been very poor,

although award fees have remained generally high.  On information and belief, the

contract cost doubled from approximately $400 million to $800 million as of July

2002 with substantial additional increases since that time.  The software

development portion of the contract has been inundated with problems causing

severe schedule delays and cost overruns.  The software products have not worked

– with the customer (Air Force) becoming increasingly dissatisfied with

Lockheed's performance, including technical deficiencies, schedule delays, and

cost overruns.  The follow-on contract (SLRSC) was awarded to IT&T and

Boeing.

**Freeware**

10.     "Freeware" and "shareware" describe software that is available in the

public domain.  The difference between the two is that shareware providers ask for

a small fee to cover costs, finance future upgrades, and provide documentation.

The functionality of freeware ranges the gamut from fairly routine and mundane

tasks (e.g. device drivers), to performing mathematical calculations, to entire

operating systems (e.g. Linux).  The quality of freeware ranges from buggy,

outdated, and worthless - to supported and documented software with large and

active user base.  Freeware developers range from fly-by-night operators to new

5

companies offering loss leaders in the hope of developing for-pay business. Source code is sometimes available, which is at least theoretically capable of being analyzed for bugs, hidden malware, and the required functionality.  In many instances, however, freeware is only available as object, compiled, or machine code, basically unintelligible to human programmers, and incapable of scrutiny and analysis for malware, functionality, etc..

11.     The contract and incorporated regulations and standards, e.g. Mil-Std.498 and EWR 127-1, do not permit the undisclosed inclusion of freeware in software deliverables to the Government.

12.     Lockheed failed to comply with Eastern and Western Range (EWR 127-1) Range Safety Requirements, specifically § 3.16, which sets forth specific requirements for software.  "Unless specifically excused and approved by Range Safety, all safety critical computing systems associated with the handling, checkout, test, or launch of missiles or space vehicles at the Ranges shall be designed in accordance with the requirements in this section." § 3.16 (introduction).  Applicable sections are as follows:

3.16.3.  Software Development.

* * *

3.16.3.1.  Software Development Process.

6

a. Desk audits, peer reviews, static analysis, and dynamic analysis tools and techniques shall be used to verify implementation of SSCF [software safety critical function] design requirements in the source code and systems.

b. Reviews of the software source code shall ensure that the code and comments within the code agree.

c. Object code patches shall be prohibited.

* * *

3.16.3.3.  Configuration Control.

a. Configuration control shall be established as soon as a practical software baseline is established.

b. A Software Configuration Control Board (SCCB) shall approve changes to configuration controlled software prior to their implementation.

c. A member from the system safety engineering team shall be a member of the SCCB and tasked with the responsibility for evaluation of all software changes for their potential safety impact.

d. A member of the hardware Configuration Control Board (CCB) shall be a member of the SCCB and vice versa to keep members apprised of hardware/software changes and to ensure that hardware/software changes do

7

not conflict with or introduce potential safety hazards due to hardware/software incompatibilities.

e. All software changes shall be coded into the source code, compiled, and tested prior to being introduced into operational equipment.

\* \* \*

h. All SSCF software and associated interfaces shall be under configuration control.

3.16.3.4. Software Analysis.

a. Internal Independent Valuation and Verification (IIV&V) or similar formal process shall be used to ensure safety design requirements have been correctly and completely implemented for SSCF code.

\* \* \*

3.16.3.6. Software Reuse.

a. Reused software shall be evaluated to determine if it supports an SSCF in accordance with paragraphs 3.16.1 and 3.16.3.3 e.

b. SSCF reused baseline software shall be analyzed for the following:

1. Correctness of new or existing system design assumptions and requirements.

8

2. Changes in environmental or operations assumptions.

3. Impact to existing standards.

4. Introduction of new hazards.

5. Correctness of interfaces with system hardware, software, and operator.

c. Unused or unneeded functionality in SSCF reuse baseline software shall be eliminated.

d. SSCF reused baseline software changes in system design, environment, or operation assumptions shall be requalified or revalidated.

e. SSCF reuse baseline software compiled with a different compiler shall be analyzed and tested.

13. Lockheed promised in the contract to set up a formal process to review any proposed changes to the software baseline. New software was to be incorporated in the baseline by: "the Change Request (CR), usually initiated by a Systems Engineer. The CR is distributed to customer [the Air Force], contractor and associated contractor organizations for review and comment. Comments are collected by the distributing body . . . and incorporated into the changed version of the document. The document is then reviewed by a Change Control Board (CCB)

9

and if accepted, forwarded to CM where the change is incorporated and the baseline updated." Any freeware that Lockheed used in RSA IIA should have been identified through this process in order to be in compliance with the contract.

14.     Paul Usavage, Software Architect/Manager, was a strong advocate for freeware. He instructed his software engineers to search the internet for freeware solutions that could be incorporated into RSA IIA products. By the end of 2000, the program had become seriously behind schedule and overrun on costs. Beginning in approximately March, 2001, after being tasked by his manager, Glenn Wilson, to resolve the freeware debate, Hooper put in place written policies designed to ensure compliance with licensing and disclosure obligations, virus checks of freeware, and technical review. Although considerable freeware had been delivered prior to initiation of this protocol, bundled into all of the RSA IIA products, no new freeware was included after this date, at least until Hooper was terminated in July, 2002. Hooper's de facto freeze on further use of freeware ultimately led to his pretextual termination.

## COUNT I
### (Claims for Payment for Software Containing Undisclosed Freeware)

15.     Plaintiff realleges and incorporates by reference paragraphs 1-14 as though fully set forth herein.

16.    Lockheed knowingly submitted false or fraudulent claims for

payment (in the form of invoices and accompanying documentation) for software

deliverables that contained undisclosed freeware in violation of 31 U.S.C. §

3729(a)(1) and (a)(2).

17.    The subject of freeware was briefly discussed at the October 10,

2000, CDSEG meeting.  Glenn Wilson (Hooper's manager) tasked Hooper to

determine if the RSA IIA program had the corporate and contractual authority, and

under what circumstances, to use freeware in its software deliverables.

18.    Marsha Bobra (Configuration Management) conceded in an October

31, 2000 email that freeware had been improperly included in deliverables:

> There has been a lot of discussion lately regarding the use of
> freeware and shareware, and the Corporate Policy and various
> Customer Regulations against its use, or qualifications on its
> use.  To this end, Nyle Hooper has been assigned to conduct an
> inquiry into the matter.  However, the Program marches on and
> we have to have a defense position to support the products
> which are currently integrated into our system.  For the most
> part, items in the freeware/shareware class were integrated in
> without being properly processed through the TRB [Technical
> Review Board] process to put onto the baseline and approved
> for use. . . .  This email serves as notification to those who were
> not involved in the discussion to become aware of the path set
> upon to cover us.  It at least covers us (as a Program
> community) as being aware of the existence of these [freeware]
> products on our Program, and documents their use.  The
> documentation will be available for review by the Customer
> should push ever come to shove regarding the selection and use

> of the products. They can read the documentation, and
> determine for themselves whether to accept the products,
> perform more strenuous testing on them, or request their
> removal from the program sacrificing the functionality they
> provide.

Ms. Bobro's email directed all the product teams using freeware to provide

documentation on the product to Carolyn Hattrup [Configuration Management] to

become part of the permanent record maintained for the software baseline,

including vendor name, version number, download path, physical media capture of

the freeware in original and/or modified form, the product in which the freeware is

used, the functionality provided, the path to its current location, and the

justification for its use (e.g., freeware vs. COTS). The email contained a

"disclaimer" that this process was suggested by Bobro without opportunity for

agreement among, or approval by, colleagues.

19.     Dave LaJeneusse, an Air Force official at Vandenberg Air Force

Base, had advised Software Architect Paul Usavage in an October 20, 1999, email

that an Air Force instruction specifically prohibited the use of freeware: "The Air

Force forbids the use of software acquired directly from non-DoD electronic

bulletin boards," but that it could be allowed if certain restrictions were met,

including certification by an independent software testing facility, distribution of

approved software in a way that prevents tampering, and avoid copyright

violations. After being reminded of this restriction, Usavage emailed Configuration Management Manager, Evelynn Killitz, on December 1, 2000, as follows: "Whether or not the AFI [Air Force Instruction] applies to us, we probably need to respond to the perception that incorporating Perl [freeware] or something like that might constitute a risk, might make our system less secure or might incorporate virus or malicious code into our system. I don't believe that perception is true, but I've seen it pop up from our own folks as well as some customer folks <u>when it comes to light that we're incorporating certain open-source products into the SLRS</u> [RSA IIA software deliverables]." [emphasis added].

20.     Paul Usavage offered his opinion in a December 18, 2000, email that the prohibition on freeware only applied to binaries and not to source code that can be analyzed, modified, and verified to prevent risk. He also contended that even such freeware had to be disclosed and documented in the software baseline.

21.     Hooper developed a work instruction covering past and future use of freeware. This required that an engineer proposing to use freeware in a software deliverable to make the request to his product lead, the product lead will in turn notify the system software architect/manager (Paul Usavage) for his determination that the freeware meets the needs of the RSA IIA program, and the product lead will obtain the freeware license and forward to both subcontracts and CDSEG

13

| | | Killitz email. |
|---|---|---|
| Xbae | Bellcore and Andrew Lister | Copyright notice and permissions to appear in all copies. |
| XPM | Groupe Bull | Copyright notice and permission notice shall be included n all copies. |
| Zlib | Jean-loup Gailly and Mark Adler | Origin must not be misrepresented. |
| Tcl | University of California | 1. Use, copy, modify, distribute for any purpose. 2. Copyright notice and warranty/liability limits to appear in all copies. 3. No warranty. 4. No liability. |
| ReplayXt | Jan Newmarch, University of Canberra | 1. Use, copy, modify, distribute for any purpose. 2. Copyright notice to appear in all copies. 3. No warranty. |
| PNG | Guy Eric Schalnat, Group 42, Inc. and Andreas Dilger | 1. Beta notice. 2. No warranty. 3. No liability. 4. Permission to use, copy, modify, and distribute for any purpose. 5. Origin must not be misrepresented. 6. Copyright notice may not be removed. 7. Encourage use in commercial products. |
| a2ps | | 1. GNU General Public License, version 2 or later. |

2.  No warranty.

| | | |
|---|---|---|
| | Ghostscript | |
| Wx | Image-Magick | |
| | Gmake | |
| | LDM | |
| | Tcl/tk | |
| | Perl | |
| | Netcdf | |
| | ClearCase | |
| RAPT CSU | ACE (Adaptive Communications Environment) | |
| | STL (Standard Template Library) | Hewlett-Packard and SGI/STLPort implementations. |
| FOV1 | OpenGL | Includes freeware Glxads, Glxadb, Gl.ads, and Glu.ADS. |
| | Image-Magick | |
| | Xgrab | |
| | XnTpd | |
| | GNU Make | |
| | MKISOFS | |
| ASW | PERL v.4 | |

16

[Tivoli]

| | | |
|---|---|---|
| FO-Fep | GNAT | ADA 95 compiler |
| FO | Java3D | |
| | OpenGL | |
| | Image- | |
| | XnTpd | |
| System Security | Saint | |
| | Nmap | |
| DGPS | IPC sockets code | supplied by OC Systems |
| | KFA Swing package | supplied by Sun Microsystems |
| | GUI layout manager | supplied by Borland [Inprise] |
| | PILOT plotting package | supplied by UC Berkeley                     < |

23.    As controversy over the freeware issue intensified, Mr. Hooper became increasingly aware that product leads were not fully disclosing their prior and/or intended use of freeware to Hooper according to his work instruction.  For example, Scott Smith, Product Lead for FA, at one time reported freeware was being used.  However, on July 23, 2001, Hooper reported to Xenia Bixler that Smith claimed in a May 24, 2001 e-mail to Hooper that no freeware was being used in FA.  Mr. Hooper checked this claim with FA program analyst Mike Allen,

17

who confirmed that freeware was being used in FA and that Smith was not being truthful with Hooper on this issue.

24.     Hooper did not approve any freeware for use in software deliverables following the time when he was tasked with investigating the freeware issue. For example, he refused a request by Martin Yohpe, Planning and Scheduling Lead, to use components of cgwin on April 26, 2001. On May 1, 2001, he refused a request from Robert Berg, a software engineer, to use a freeware language called Expert, allowing its use only for "proof of concept."

25.     Tension between Hooper and management continued to increase. Management sought to use freeware at will to solve "problems" without formal disclosure to and approval by the Government and without ensuring compliance with license and Government Intellectual Property ("IP") requirements. Hooper continued to insist on disclosure of prior and any future use of freeware and upon full compliance with licensing and contractual IP restrictions. Ultimately, Stuart Ballard, Manager, RSA IIA CDSEG, ordered Hooper to "fix" the freeware issue he'd been previously tasked to investigate by adopting management's position. In a May 2, 2001 email, Ballard directed: "Given your level of information on the subject, I am tasking you to solve the issue. I fully expect for you to find a way for us to use the required Freeware for the Wx [Weather] product, and implement a

18

process to utilize Freeware in the future where it is applicable to solve design issues. Please let me know your status of this effort COB Friday. Please consider the risk to current products vs. the cost of developing this capability ourselves. Thanks, I appreciate your diligence in this matter."

26.    On May 3, 2001, Hooper was again ordered, this time by Paul Usavage, Software Architect/Manager to adopt management's position. His email to Hooper's manager, and several senior officials on RSA IIA directed: "If Nyle is going to keep working this, this is what he should be doing: We've got to 'Get over it.' Not using this software is NOT an answer. Everyone else in the world finds a way to do this. We're going to do the same thing, or else we can't compete in the marketplace. Nyle, find us the way to use it."

27.    Hooper continued to press for full disclosure of the freeware issue to the Government. Hooper cautioned in a July 5, 2001 email to Contracts Administrator Xenia Bixler: "At the bottom of this email is a matrix of products and freeware that in my opinion should be given to IP Counsel Katherine Good along with the freeware license agreements for her review to determine if the RSA IIA program is compliant with the Mission Systems freeware policy. I believe this is more an issue of property rights and liability. After Katherine's review , I suggest full disclosure to the government PCO [Procurement Contract Officer]."

19

He was responding to a July 5, 2001 email from Xenia Bixler asking: "What

happened to the list of these situations whereby we were going to provide the

Government this information in order to put them on notice and make them a party

to whether they wanted to spend the money?"

28.   Ms. Bixler's July 9 email to Deputy Director Ed Butt and others

revealed her awareness of the ongoing risks:

> Per your request here is the list of freeware that is being utilized on
> RSA IIA.  Although I have known about this for some time, I have
> been trying to get a complete list as well as an analysis of freeware
> that is really embedded in our products vs. freeware that are tools we
> are using for testing or other diagnostics.  I believe we need all the
> facts to scope the magnitude of the problem (if there is one) and
> associated risks.  I have also requested that all of the freeware license
> agreements be compiled and provided to me so I can forward them to
> Kathy Good (Intellectual Property Attorney) who has already
> provided some assessment of the risks associated with the use of
> freeware and corporate related policies.  Below follows one such
> license agreement [Marty Yohpe's April 25, 2001 request to use
> cygwin unix utilities freeware in the DGPS product, covered by a
> GNU general public license] and Kathy Good's interpretation of that
> license agreement in red.  In this particular instance after clarification
> it appears we will not be imbedding this into our products, however,
> the situation gets quite complex when the software available for
> purchase carries the identical license agreement as the freeware.

29.   On March 24, 2003, December 18, 2003, and May 13, 2005, out of an

apparent concern that Hooper would file a False Claims Act action regarding

freeware and in an attempt to make its use of freeware "legal," Lockheed

disclosed to the government contracting officer that it had incorporated certain
freeware into its software deliverables under the RSA IIA contract "with less than
unlimited rights." The partial disclosures are:

| Software Description | Manufacturer | Product in which it is used | Intended Use | Software License Type |
|---|---|---|---|---|
| System info & Process monitor S/W version 9/23/2002 | UCLA Public Domain Software Library for AIX. | P&S | AIX 4.2.1 test utility to evaluate required to validate the newly rebuilt server | Freeware |
| Sudo154 version 1.5.4 | Silicon Graphics Inc. | CTPS | Utility that allows groups to run some commands as root without using a password | Freeware |
| Apache Tomcat v.4.1.27 | Apache Software Foundation | RSA IIA | Web based (centralized) control of telemetry record and playback CSCI for RSA IIA | Freeware |
| QWT | Trolltech | RVT | Code creation | Open Source |
| ANJUTA | Naba Kumar (Source forge.net) | RVT | Provides advanced programming utilities to be used in product development | Open Source |
| V3.17 WIN | NCFTP Software | AWIPS | Allows retrieval of sea surface data required by the AWPIS cluster model | Freeware |
| URLScan Ver 2.5 | Microsoft | Infrastruct-ure | Internet scanner for web server to prevent HTTP trace vulnerabilities | Freeware |
| Symmtime2004 (Ver.2.5) | Synnertricom | Infrastruct-ure | Implements NTP client that maintains accuracy to 2 msec on windows platform | Freeware |
| Apache Tomcat 5.0 | Jakarta Tomcat | RSA IIA | Web based centralized control of the Metric Record CSCI RSA IIA | Freeware |
| ACE 5.4 | Washington University | RVT | RVT operating system and software depends on this product as it is an upgrade from that already used | Freeware |

21

| Ruby v1.8.2 or later | Ruby | AWIPS | This is a scripting tool similar to PERL to assist with text editing | Freeware |
|---|---|---|---|---|
| 0.10.10 | Ehtereal | Security Guard | Captures SMNP packets in support of Security Guard development effort an IS support | Freeware |
| CD Record | Silicon Graphics | CTPS | Device driver which enables one to write file to systems to a CDRW | Freeware |
| MKISOFS | Silicon Graphics | CTPS | Device drive that enables an ISO file system to be written to a CD using a CDRW | Freeware |
| JMATLINK | Held-Mueller | FO/FA | To enable Java programs to access the MATLAB application Program Interface | Open Source |
| XEMACS | Henry Samuel School of Engineering | SITSF | Text editor to be used for development activities in the SITSF | Open Source, GNU |
| LDM(Local Data Mgmt) | UCAR Unidata Program Center | RVT CCP 35 | Unit testing | Open Source |
| CPPUnit C++ port of Junit | VA Software Corp | RVT CCP 35 | Enables Junit framework for unit testing Test output is test format for automatic testing | Open Source |
| Log4CPP | VA Software Corp | RVT CCP 35 | Unit testing | Open Source |
| Graphviz | AT&T | RVT CCP 35 | Provides tools to facilitate code development for processing graphics | Open Source |
| JVMI2 | KC Multimedia Design Group | FA | Converts JAVA applications into Windows services | OEM - Supplier no longer in business |
| Java Package | Stephen Ostermiller | FA | Report generation for database records | GNU |
| Ace v5.3 | Ace | RVT | Utilities and tools for code creation f | Open Source |
| SNARE | InterSect Alliance Pty Ltd. | FOA | Auditing tool for LINUX | GNU |
| XEMACS V21-4-31+ | Xemacs | FOA | Text editor used in product development | Open Source |
| Cygwin | Red IIat | FOA | Used as operating system | Open Source |

| | | | for FOA per government approval | |
|---|---|---|---|---|
| EMACS V1-2-1+ | Emacs | FOA | Self documenting real time display editor used for development | Open Source |
| PROJ-4 | Frank Warmerdam | MARSS | Facilitates software development and avoids reinventing of code for well known map coordinate transformations | Open Source |
| GDAL V1.1.8 | Frank Warmerdam | MARSS | Translator library used in software development/deployment linked with GRASS | Open Source |
| DOSEMU V 1.1.4 | VA Software | MARSS | A DOS emulator required for LATRA one of the basic hazard models in MARSS | Open Source |
| NETCDF v 3.5.0 | UCAR Unidata Prog. Center | MARSS | Facilitate development of array-oriented data access | Open Source |
| LIB-PORTABILITY | Portland Grp Complier Tech | MARSS | Allows programs built with PGI compliers to be run for those who do not have them. Needed for software development | Open Source |
| NCARG v 4.3.1 | SCD/NCAR Graphics | RVT | Library containing FORTRAN/C utilities for drawing contours, metrics, vectors, etc. | Open Source |
| TKHYLAFAX v 3.20 | Andy Moskoff | MARSS | Telecommuting system for UNIX to facilitate FAX trasmission. Code to be used for development and incorporation into MARSS | Open Source |
| GRASS v 5.0.3 | ITC-IRST (Italy) | MARSS | Software development and implementation | Open Source |
| Auto toolset v. 0.11.4 | VA Software | RVT | Automatic generation of various tools need in product development | Open Source |
| Bwidget v4.1 or later | VA Software | MARSS | Used for Tcl/Tk build containing numerous enhancements and fixes | Open Source |
| HYLAFAX | Fax Solutions, Inc. | MARSS | Supports computerized | Open Source |

| | | | faxing | |
|---|---|---|---|---|
| REALPORT | Digi | RVT | Realport is a software driver that makes Digi equipment operate normally | Open Source |
| JSUNIT | Edward Hieatt | FA | Used for testing Java script | Open Source |
| PRCVIEW-EXE | Igor Nys | FA | Used to stop MATLAB and Oracle web services | Freeware |
| Linux | Red Hat 7.2, 7.3, & 8.0 | FO/FA, Wx | Operating system for FOA and Wx services | Open Source |
| Linux | Suse 7.2 Professional Edition | Wx | Operating system for FOA & Wx systems | Open Source |
| JVMi2 | KC Multimedia and Design Group | SITSF | Demo ER/WR and FA development | OEM |
| XEMAXS version 21.5.1 | Henry Samueli school of engineering UCLA | STAR | Text editor for | GNU |
| JMATLINK | Held-Mueller | FA | Publishes MATLAB Applications Program Interface to Java | GNU |
| Sun One Starter Kit (Java 2 Platform standard Edition) | Sun Microsystems | FO/FA | For installing FA COTS on to FA servers | Sun Binary Code License Agreement |
| Perl | Sun Microsystems Comprehensive Perl Archive Network (CPAN) | All | Process, file, and text manipulation | GNU |
| Logical Disk Manager (LDM) LDM | Richard Russon (FlatCap) in 2001Added to Linux Kernel in August 2001 | Wx | Partition Disk space | GNU |
| Tcl (Tool Command Language) | Tcl Developer Xchange including Regents of the University of California, Sun Microsystems, Inc., Scriptics Corporation and other parties | Wx | Tcl (Tool Command Language) a simple and programmable syntax. Tk is a graphical user interface toolkit that makes it possible to create powerful GUIs. | GNU |
| Textpad | Helius Software Solutions | Infrastruct-ure | General purpose editor for plain text files | OEM |
| ImageMagick | ImageMagick Studio | FOV1 | Collection of tools and libraries to read, write, and manipulate an image in any of the more including GIF, JPEG, PNG, PDF | GNU |

24

| | | | | |
|---|---|---|---|---|
| Xgrab | Servio Corporation | FOV1 | Xgrab lets you grab arbitrary rectangular images from an X server and writes them to files or commands in a variety of formats | GNU |
| XnTpd | Copyright (c) David L. Mills 1992-2003 - A collection of work from a body of corporations and Universities | FOV1 | The Network Time Protocol (NTP) is used to synchronize the time of a computer client or server to another server or reference time source | GNU |
| XmHTML | ©Copyright 1996-1997 Ripley Software Development | STAR | XmHTML provides a widget capable of displaying HTML 3.2 conforming text | GNU |
| Regexpic | Copyright © 1997, 1998 Public Flood Software | STAR | Regular expressions allows you to automate the description and parsing of text, including subtle, complex, text processing tasks. | GNU |
| VIM | Bram Moolenar and VI Web community created | STAR | Text editor built to enable efficient text editing. It is an improved version of the vi editor distributed with most UNIX systems | GNU |
| Tcl tool command language | The NeoSoft™ | STAR | Issues commands to interactive programs, such as text editors, debuggers, illustrators, and shells. | GNU |
| Xpm | HP UX Porting and Archive center | STAR | The format defines how to store color images (X Pixmap) in a portable and powerful way. | GNU |
| Zlib | Jean-Ionp Gailly and Mark Adler | STAR | Compression library | Open Source |
| ReplayXt | Jan Newmarch (jan@pandora.canberra.edu.au) | STAR | A library with one entry point that allows an Intrinsics (or Xt) based application to be executed from a script file | Open Source |
| Print Pro 4.2.2 | Easy software Products | FOA | Print Spooler | OEM |
| PAM  login  lim | Comsmith | Core | Provide failed account | GNU |

| -it | | | lockout | |
|---|---|---|---|---|
| ADAPTIVE Communications Environment (ACE) | Douglas C. Schmidt and his research group at Washington University, University of California, Irvine, and Vanderbilt University. Copyright © 1993-2003. | NetMan-ager | An OO Network Programming Toolkit in C++ | Open Source |

30.    Lockheed's disclosure was incomplete.  Comparing Hooper's list of freeware products with Lockheed's disclosure list shows that Lockheed did not include the following 26 products:

| Lockheed Software Product | Freeware |
|---|---|
| STAR | XFTP |
| | Regexp.c |
| | VIM |
| | XPM |
| | PNG |
| | a2ps |
| | Ghostscript |
| Wx | ImageMagick (disclosed in FOV 1) |
| | Gmake |
| | LDM (disclosed in RVT CCP35) |
| | ClearCase |
| RAPT CSU | STL (Standard Template Library) |

26

| | |
|---|---|
| FOV 1 | Open GL |
| | Xgrab |
| | GNU Make |
| | MKISOFS |
| | GNAT |
| FO | OpenGL bindings for Ada |
| | ImageMagick (disclosed in FOV 1) |
| | XnTpd (disclosed for FOV 1) |
| System Security | Saint |
| | Nmap |
| DGPS | IPC   sockets code |
| | KFA Swing package |
| | GUI layout manager |
| | PILOT plotting package |

Upon information and belief, beyond Mr. Hooper's list and Lockheed's partial disclosure, there is more freeware that is currently being used in RSA IIA products developed by Lockheed and delivered to the customer that have adversely effected performance and present safety risks and a danger to national security.

27

31.    The Government suffered actual damages by paying for defective software products of unknown reliability that failed to conform to Lockheed's contractual obligation to disclose any use of freeware.  Lockheed's disclosure of the use of certain freeware to the government after its incorporation in software deliverables does not absolve Lockheed of liability under the FCA.

## COUNT II
## (FAILURE TO TEST)

32.    Plaintiff realleges and incorporates by reference paragraphs 1-31 as though fully set forth herein.

33.    The contract required Lockheed to perform different levels of rigorous testing in accordance with MIL-STD-498 and  EWR 127-1 of all products before delivery to the government.  These testing levels include unit test, Computer Software Configuration Item ("CSCI") test, and system integration test.

34.    Lockheed failed to perform unit test and CSCI test in accordance with standards and processes specified in the contract MIL-STD-498 and EWR 127-1 on products delivered to the government, including FO, FA and FOA.

35.    Lockheed's failure to test all products as required by the contract resulted in Lockheed's delivering defective products to the government.

28

## COUNT III
### (Claim for Payment for Software
### Delivered With Inadequate Intellectual
### Property Rights)

36.     Plaintiff realleges and incorporates by reference paragraphs 1-35 as though fully set forth herein.

37.     In addition to a general prohibition on the undisclosed delivery of freeware, Hooper was also concerned with the delivery of sufficient IP rights. DFAR 252.227-7014 (Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation) (formerly 7013, Rights in Technical Data and Computer Software), incorporated by reference, provides, *inter alia*, that the Contractor shall provide unrestricted rights with respect to software and documentation developed exclusively with government funds. DFAR 252.227-7014(b)(1) (formerly 7013 (c)(2)).  Furthermore, with respect to third-party copyrighted software and/or documentation, which is the case with most freeware, prior disclosure and written approval are required: "The Contractor shall not, without the written approval of the Contracting Officer, incorporate any copyrighted computer software or computer software documentation in the software or documentation to be delivered under this contract unless the Contractor is the copyright owner or has obtained for the Government the license

29

rights necessary to perfect a license or licenses in the deliverable software or documentation of the appropriate scope set forth in paragraph (b) of this clause and prior to delivery of such — (1) Computer software, has provided a statement of the license rights obtained in a form acceptable to the Contracting Officer; or (2) Computer software documentation, has affixed to the transmittal document a statement of the license rights obtained." DFAR 252.227-7014(d) (formerly 7013 (e)(2)). The clause also requires that any software or documentation delivered with any form of restricted rights be marked accordingly and identified in an attachment to the contract. *See* RFP Section. I § 3.3.6.6. and DFAR 252.227-7014(e) (formerly 7013 (c)(1)(k)).

38.    Much freeware is covered by a 'general public" (GNU) license. Freeware covered by such a license could generally not be incorporated in Lockheed's deliverables. As an example, Hooper determined that use of proposed freeware (cksum.exe and cygwin1.dll) would violate the GNU license agreement, as set forth in an April 26, 2001, email to Martin Yohpe . In particular, Hooper noted the following provisions of the GNU license: "This General Public License does not permit incorporating your program into proprietary programs." [quoting from the GNU General Public License]. RSA IIA software is LM proprietary before the DD 250's (invoices) and thereafter becomes the proprietary property of

30

the Government.  The requirement for a "no charge" license to any third parties

could not be met because there was no way to segregate the costs of the software

covered by the GNU license from the software deliverable as a whole.  Any

violation of the GNU license results in automatic termination of the license

granted Lockheed.  This would expose both Lockheed and derivatively the

Government to potential financial liability for misuse of licensed software.  The

GNU software is sold "as is" without warranty of any kind.  The lack of any

warranty by the author of software is unacceptable under the Contract.  Finally, the

GNU license contains a waiver of liability for any damages, also an unacceptable

restriction under the Contract.

39.    In an April 27, 2001 email to Yohpe and Hooper, Paul Usavage,

Software Architect/Manager, approved the inclusion of the requested freeware

despite the impossibility of complying with the license restrictions, noting: "[W]e

need to address the following: (1) Legal approval, since the legal guidelines ignore

the last 10 years of software open source reality."

40.    In a July 5, 2001, email from Hooper to CDSEG Manager Stuart

Ballard, Contracts Administrator Xenia Bixler, and others, Hooper again

reaffirmed his disapproval for Yohpe to use the cygwin free components based

upon the same deficiencies in the license agreement.  Hooper advised Jeff Wilson,

31

a CDSEG employee responsible for finding COTS solutions, the same day that

"[I]t appears the alternatives are to write the code or find a COTS [Commercial

Off the Shelf Software] product for that functionality."

    41.    An example of a freeware license agreement that would prohibit

Lockheed from using such freeware and delivering it to the Government is the Sun

Microsystems license for Java, incorporated by Lockheed in its DGPS application.

The license provides: "Software is not designed or intended for use in on-line

control of aircraft, air traffic, aircraft navigation or aircraft communications; . . ..

Licensee warrants that it will not use or redistribute the Software for such

purposes."

    42.    A similar restriction is found in the license agreement from Borland

for the GUI freeware used in DGPS.  The license provides: "High Risk Activities:

The Software is not fault-tolerant and is not designed, manufactured or intended

for use or resale as on-line control equipment in hazardous environments requiring

fail-safe performance, such as in the operation of nuclear facilities, aircraft

navigation or communication systems, air traffic control, direct life support

machines, or weapons systems, in which the failure of the Software could lead

directly to death, personal injury, or severe physical or environmental damage

("High Risk Activities"). Inprise (Borland) and its suppliers specifically disclaim any express or implied warranty of fitness for High Risk Activities."

43.     The incorporation of the freeware software products described in Paragraphs 41 and 42 into products delivered to the government was not disclosed to the government by Lockheed.

44.     The Government suffered actual damages by paying for software that was noncomplying or defective with respect to compliance with license restrictions and with IP rights required by the Government.   Lockheed violated the FCA, § 3729(a)(1) and (a)(2), by submitting invoices knowing that it was unable to deliver adequate and required license and IP rights.  Lockheed's disclosure of the use of certain freeware to the government after its incorporation in software deliverables does not absolve Lockheed of liability under the FCA.

**COUNT IV**
**(Claim for Software Containing**
**Inflated Costs Due to False Productivity**
**Projections)**

45.     Plaintiff realleges and incorporates by reference paragraphs 1- 44 as though fully set forth herein.

46.     Upon information and belief, Lockheed proposed to the government in response to the RSA IIA RFP an overall productivity rate for software

33

development of 3 to 10 lines of code per hour for all products.  Productivity

(source lines of code per hour) was material to winning the contract, because the

productivity of the programmers directly affected the final cost to the Government

of purchasing an estimated 1.5 million source lines of code via a contract based

upon cost plus award fee.

    47.    In 1995 Lockheed's past performance or historical productivity rate

for software development of similar complexity was generally .5 - 2 source lines

of code per hour.

    48.    Lockheed supported the false proposed productivity of 3 to 10 lines

of code per hour with out-put from the System Evaluation and Estimation of

Resources - Software Estimation Model ("SEER-SEM") developed by Galorath

Associates Incorporated.  SEER-SEM is described by Galorath as a "tool to aid in

the estimation of cost, schedule, risk and maintenance of software development."

    49.    The SEER-SEM program works by taking specified inputs, or

parameters, such as the size of the software program to be produced, the

experience of the personnel, the development support environment, the knowledge

base, the complexity of the project, and time constraints for completing the project

and calculating outputs including the expected productivity of the design team.

50.    Lockheed obtained false productivity estimates by providing false input parameters to Lee Fischman of Galorath who ran the SEER-SEM program for Lockheed for all RSA IIA product deliverables.  Mr. Fischman informed Hooper that he accepted Lockheed's parameters without question.  The Government was never informed of the false parameter settings.

51.    During late 1996 and early 1997 Hooper was tasked by his supervisor, Brian Kelly, to re-run the SEER-SEM model with correct parameter settings to obtain a "should cost" estimate of what the contract should actually cost.  Hooper was considered the resident SEER-SEM expert at the Lockheed Santa Maria facility.  In rerunning the SEER-SEM  program, Hooper compared his correct parameters with the original false parameters.  Based on Hooper's best recollection, the following represents examples of objectively false parameter settings (including the impact of each parameter and the "likely" nominal values) in the original Lockheed SEER-SEM run which had a significant impact on cost and effort:

**Requirements Volatility**

This parameter evaluates the anticipated frequency and scope of change in the requirements once they are baselined (after preliminary design starts.) (Lockheed did not have A-Spec requirements)

Selection:  Low (Essentially no requirements changes)

35

Should have been:  Evolutionary software development with significant user interface requirements

## Modern Development Practices Use

Rates the usage of modern software development practices and methods at the time the software design begins. These include analysis and design, structured or object oriented methods, development practices for code implementation, documentation, verification and validation, database maintenance, and product baseline control.  Only successful incorporation of practices as standard procedures within the organization as well as by this team count as full use.  Just having books, a few experts, or academic courses does not count as experience.  (Lockheed failed a CMMI SEI audit in 1998)

Selection: High (Reasonably Experienced in Most Practices)

Should have been: Low (Beginning Experimental Use of Practices)

## Test Level

Rates the rigor and formality of the software testing.  The test level is usually based on the potential for loss if the software malfunctions during operation.  More reliable systems must be tested more stringently during development to ensure that they are sufficiently reliable to perform within acceptable limits.

Selection: Nominal (Moderate loss, recover without extreme penalty)

Should have been: Very high (High reliability, public safety requirements)

**Quality Assurance Level**

Evaluates the completeness of the Quality Assurance activities.  The Quality
Assurance effort  is usually directly related to the impact that a failure in
the software would have during its operational phase.  More
reliable systems often have more stringent quality assurance to ensure that
they are sufficiently reliable to perform within acceptable limits.

Selection: Nominal (Moderate loss, recover without extreme penalty)

Should have been: Very high (High reliability, public safety requirements)

**Security Requirements**

Rates development impacts of security requirements for the delivered target
system.

Selection:  Nominal (Minimal protection – no security

Should have been:  High Minus:  Users individually accountable via logon
operation, auditing of security relevant events and resource isolation
(Building a typical multi-user operating system such as I VAX VMS)

52.     By using false parameter settings or inputs, Lockheed obtained much

higher estimated productivity rates, lower estimated costs and a very optimistic

schedule, thereby enabling Lockheed to more effectively compete for the RSAIIA

contract.  Therefore, the false parameter settings were material to Lockheed's

ability to obtain the contract.

53.     When Lockheed prepared its cost estimations for contract updates and

modifications, Hooper again was directed to prepare SEER-SEM runs.  He was

asked to perform two sets of runs. He was first asked to perform one run using erroneous and false parameter settings dictated by Brian Kelly, Paul Usavage, Bret Walberg, Stuart Ballard and various product leads. It was this SEER-SEM run that was used to submit a cost estimate to the government. Hooper was then asked to perform a "should cost" run using correct parameter settings to estimate the actual cost of completing the contract, including the modifications. The impact of Lockheed's practice of falsifying productivity (reducing cost) to obtain the original contract and modifications was to deprive the government of a meaningful opportunity to initially select a different contractor, terminate for convenience or cause and rebid the remainder of the contract, and/or to modify the RSA IIA requirements.

54.    The procedure for falsely estimating cost described above was used to estimate costs for Flight Operations Version -1, Flight Operations, Flight Analysis and Flight Operations/Flight Analysis. For example, the "should cost" estimate for FOA was approximately $100 million, but this was falsely cut in half when submitted to the government.

55.    The productivity rate generated by the SEER-SEM runs with erroneous and false parameter settings and used to submit cost estimates to the government by Lockheed were in excess of 3 Source Lines of Code ("SLOC") per

hour. Lockheed knew that this SLOC rate was false because Lockheed's historical productivity rates were generally between .5 and 2 SLOC per hour for this type of code and software development.

56.    Mr. Hooper observed other examples of Lockheed's efforts to inflate its productivity rates. On June 6, 2001, Hooper attended a meeting for a modification to the contract during which Business Operations Manager Bret Walberg presented a productivity rate for the Weather product of .08 hours per source line of code ("SLOC") or 12.5 SLOC per hour. Based upon this meeting and follow-up investigations by Hooper, Lockheed intentionally used unrealistically high productivity projections in order to win this contract, modification and award fees, intending that any cost overruns due to low productivity could be blamed on the Government (e.g. requirements creep or mission expansion) and handled through contract modifications, or otherwise explained. Ultimately, Lockheed went to NOAA in 2001 to obtain the weather product known as WIPS, as a commercial off the shelf ("COTS") alternative to writing the weather software.

57.    Immediately after the meeting, Hooper warned in a widely distributed email:

This memo stems from a June 6, 2001 presentation where a productivity chart showed a .08 (.08 hours per line of code) for Wx that I believe is wrong. First, the SLOC count used to determine the productivity number was an aggregate of new, modified, and NDI or reuse code. Productivity should be measured on new and modified code because NDI or reuse is virtually untouched. The RDI-1product leads should be able to determine the SLOC count for NDI or reuse code and then that number can be subtracted from the aggregate number generated by the common code counter. Second, it appears that the hours used for the .08 productivity were at the product level – missing are the hours for segment management, systems engineering and supports groups such as CM, ILS, Quality, etc. When all this is sorted out, I would expect the labor hours to increase and the SLOC counts to decrease and the net result should be a productivity in the range of 1 to 3 hours per line of code. It is very important to correct the above mentioned issues because it is doubtful that the productivity chart matches the proposal BOE that we have sent or will send to our customer.

58.   Mr. Hooper explained in a June 7, 2001 email to Walberg:

The issues are SLOC and labor hours and I have resolved the SLOC issue[,] and I understand the labor hours issue centers on how Business Operations tracked actual labor hours. Apparently, the management, systems engineering, and support group actual labor hours were not segregated by product and therefore, it appears impossible to know the total actual labor hours worked to develop each product. The productivity metric is based on hours and SLOC count and if one part of that equation is erroneous that metric is useless. The last issue I raised was the fact that RSA IIA has represented and is representing productivity factors in BOEs [Basis of Estimate] proposed to the customer to support ECPs [Engineering Change Proposals] and other contractual activity that is contradicted by productivity factors presented by another group within the RSA IIA Program. (emphasis added).

40

59.    Mr. Hooper reported in a June 10, 2002, email to Control and Display Segment (CDSEG) Manager, Stuart Ballard the results of his investigation into the SLOC count for the Weather product. Raytheon, the subcontractor used for the Weather product development, reported SLOC of 1,183,622, whereas the actual SLOC currently shown by the common code counter at Lockheed, after termination of the Raytheon subcontract, was only 231,767.

60.    Mr. Hooper noted another example of inflated SLOC in a June 10, 2002, email to Ballard concerning the DGPS product subcontracted to Ball Industries. The actual code count reported by Ball was 72,469, but Lockheed's common code counter reported 189,584 lines of code delivered by Ball. Further, the current code count was only 56,202 lines, according to a June 10, 2002, email from Hooper to Dutton. In a June 20, 2002, email from Hooper to Dutton, he notes that Dutton's SLOC count for DGPS was approximately 67,000. Hooper asked why Dutton's count deviated from the approximately 189,000 SLOC reported by Lockheed's common code counter.

61.    The examples listed above show how Lockheed inflated its productivity rate, which were important for competing not only for the RSAIIA contract, but also in the bidding process for modifications and future contracts

where Lockheed's past performance would be used to estimate future productivity and costs.

62.    Fearing what Hooper would ultimately discover regarding productivity rate fraud, the responsibility of metrics reporting, including SLOC reporting,  was taken away from him just prior to his termination and assigned to Jeffrey Allen and others.  In a June 20, 2002, email to Allen, Ballard, Glenn Wilson and others, Hooper vigorously complained as follows:

> First, I have updated my SLOC report, PCDOCS #63673, by the middle of each month since October 1996.  Second, you have violated the stated, known, and agreed to process by doing an end run around CDSEG [Mr. Hooper] and gathering CDSEG metrics that by the way were not accurate.  Perhaps this is a good place to say to you that most of your metrics are questionable at best.  You have PCDOCS reports on action items that do not match Elaine Rhinchart=s reports that also reside in PCDOCS, your SLOC count reports do not reflect CMs [Configuration Management] information or information from the product leads, your risk metrics stopped in 2001, your software productivity numbers are inaccurate because of the wrong SLOC counts and labor hours, your defect density rates are questionable because everything else you use SLOC in the formula has been wrong.  Third, I was only at the SLOC "just do it" first meeting, April 30, 2002, sitting in for Hank Johnston.  After that point in time I have not received oral or written meeting notices for "just do it" continuation meetings but if my presence is missed, why not call or write without the accusations.  Fourth, as I said earlier, the correct SLOC information is in PCDOCS #63673 and you can contact Carolyn Hattrup if you question the SLOC counts.

63.     Previous to 2002, the product leads reported source lines of code
(SLOC) completed (actual code written) and estimated lines of code to
completion).  These reports were based upon "engineering judgment" and not an
actual count of lines of code.  Beginning in early 2002, the task of reporting actual
code to Mr. Hooper was assigned to Amber Ford who used a "common code
counter" to actually count SLOC.  Upon information and belief, freeware was
included in these SLOC counts as another means of artificially inflating
Lockheed's productivity.

64.     Shortly before his termination, CDSEG Manager Stuart Ballard
tasked Hooper to look further into the productivity issue.  Mr. Mr. Hooper went to
Dave Parsley, Business Operations, who admitted that there was no way to
calculate actual productivity by product.  Bret Walberg intentionally kept labor
hours in a manner that would not permit that calculation.  Mr. Hooper was told by
Business Operations personnel, including JP Villedrouin, Dave Parsley and Don
Patree, that Bret Walberg kept multiple labor hour records to disguise the true
performance of the RSA IIA program.  Thus, Hooper was never able to provide
Ballard with any actual productivity rates as of the summer of 2002.

65.     The Government suffered damages due to Lockheed=s productivity
rate fraud by paying more for the software deliverables than it would have had to

43

pay in honest competition.  Lockheed submitted false claims in the form of invoices and  reports for award fees based upon the original inflated productivity rate, knowing that its actual productivity rate would be and was considerably below the inflated rate set forth in Lockheed's proposal, in violation of § 3729(a)(1) & (2).

### COUNT V
### (Falsified Test Procedures and Results)

66.    Plaintiff realleges and incorporates by reference paragraphs 1-65 as though fully set forth herein.

67.    The contract and applicable standards required that software be tested in various stages, including unit tests, CQT (CSCI Qualification Testing), and integration.  Software is first tested in the smallest possible units, and further tested in larger and larger aggregates through final testing and acceptance at the fully integrated system level in the actual operational environment on the ranges. The purpose of testing is to ensure compliance with and conformity to requirements, functionality, and safety, and to identify and fix any problems at the earliest possible time within the smallest units of software.

68.    The Flight Operations (FO) software was supposed to support double redundancy in communicating with the network interface.  This was a safety

measure to ensure continuous operations in the event that one of the interfaces

failed. The software was unable to support the required hardware redundancy. To

conceal this defect, Lockheed secretly disabled one of the interfaces during FO

testing between 2004 and 2006. Lockheed further attempted to cover up this

defect by attempting to get the requirement deleted from the contract.

      69.    Unit tests (lowest level of software disaggregation) were required for

all software, including an early version of Flight Operations(FOV1) to be

delivered to the Eastern Range. These unit tests were required before CQT (CSCI

Qualification Testing). A Problem Report (PR) in approximately 1999 noted

approximately 300 unit tests had to be completed before Lockheed could take the

FOV1 software through CQT. Prior to a final Quality Readiness Review meeting

on FOV1, Lockheed asserted that the software was ready for CQT, concealing its

failure to complete all required unit tests. Upon information and belief, Lockheed

had a general pattern and practice of only completing 30-50% of the required unit

tests and not performing the unit tests according to procedure (e.g. prior to CQT).

      70.    Upon information and belief, Lockheed adopted a practice of

falsifying test results by changing the expected or anticipated results of passing a

given test to conform to the actual results obtained in the test without regard to

whether the actual test results revealed defects in the software. For example,

between 2004 and 2007, Lockheed performed version and regression tests on approximately 11 versions of Flight Operations (FO) software (and in the CTIPS software) installed in the Western Range operations center.  Expected results involving numbers, messages, and calculations were changed to the actual results obtained without properly tracking the reason (e.g. software defect) for the change.

### COUNT VI
### (False Applications for Award Fee)

71.    Plaintiff realleges and incorporates by reference paragraphs 1-70 as though fully set forth herein.

72.    The contract provided for several levels of award fees based upon performance.  Lockheed made false statements in its self-assessments applications for the award fees, thereby earning unjustified award fees.  For example, Lockheed overstated past, present, and future schedule and performance milestones, concealed bad news, claimed nonexistent improvements in the software development process, falsely claimed to be on target for cost and schedule, and falsely stated compliance with and completion of required test procedures.

## COUNT VII
## (Wrongful Termination of Plaintiff Hooper)

73.    Plaintiff realleges and incorporates by reference paragraphs 1-72 as though fully set forth herein.

74.    Mr. Hooper had two objectives with respect to freeware.  First, he sought to ensure that all previously delivered freeware was identified, documented, disclosed to the Government, and complied with license requirements.  Second, he sought to ensure that any future freeware delivered to the Government complied with both contract and license requirements.  Mr. Hooper's objectives ultimately proved inconsistent with Lockheed management, which opted instead not to disclose the previously delivered freeware and not to seek and ensure compliance with licensing requirements.

75.    Mr. Hooper reported his findings concerning the freeware issue to local management, including immediate managers Glenn Wilson, Dennis Mitchell, Lee Owens and Stuart Ballard; Configuration Management Manager, Lynn Killitz; Procurement Manager Larry Machado; Contracts Administrator, Zenia Bixler; Software Architect/Manager, Paul Usavage; Program Director, Ed Butt; Deputy Program Director and Systems Engineering, Integration and Test, Frank Bell; Vice-President, Ralph Tourino; President, Terry Drabant; Intellectual Property

47

Attorney, Kathy Good; Head Counsel, Nattie Horn; Ethics Officer, Sue

MacTavish; Human Resources, Barbara Humpton; and Human Resources Vice

President, Maureen Liebler.  Other individuals directly involved with the freeware

issue were Software Procurement, Raquel Rowen; and Configuration

Management, Carolyn Hattrup and Marsha Bobro.

76.    Over the months that followed Hooper's introduction of the freeware

protocol, Xenia Bixler, Contracts administrator, told Mr. Hooper repeatedly that

she would contact the government contracting officer regarding the fact that

Lockheed products delivered, installed, and sold to the Government included

freeware.  She admitted on several occasions that she had not done so.  Mr.

Hooper encouraged and tried to persuade Lockheed management to report the

freeware issues to the Air Force but as of the date of his termination, July 19,

2002, the Government was never notified.

77.    Prior to October 2000, Hooper's performance evaluations had been

above average and remarks on his appraisals had been very positive.  As tensions

over the freeware issue increased, management increasingly inflicted a hostile

work environment on Hooper, as retaliation for his refusal to adopt the

management position on freeware and for his continued insistence that prior use of

freeware be fully disclosed to the Government and that all past and any future

48

freeware use strictly comply with contractual IP and license requirements. In 2001, Hooper was denied a "skip level" review and an interim performance evaluation. Hooper's direct manager was changed several times, sometimes without Hooper's knowledge or reflection in an organization chart.

78.    Mr. Hooper's final 2001 evaluation rated him "satisfactory" but it contained false and derogatory information and comments. Mr. Hooper's job title was changed from Senior Project Engineer to Hardware Engineer without his knowledge or consent.

79.    Mr. Hooper reported in a June 8, 2001, email to LMMS HR Manager Maureen Liebler that Process Engineering and Metrics Manager Dennis Mitchel warned him not to take this classification matter to HR. Mr. Hooper considered this part of the harassment he was receiving for challenging management on the freeware issue. His emails stated: "Some RSA IIA management personnel have not been pleased with issues that I have raised in recent months. Freeware bundled with developed code in RSA IIA Products that will be delivered to the government customer concerns me. I have worked this issue through our Contracts lead, Xenia Bixler [and] with Katherine Good, Mission Systems Intellectual Property Attorney. I believe Katherine Good needs to determine if the RSA IIA Program is in compliance with the Mission Systems Freeware Policy and

49

she needs to review all freeware license agreements for freeware that will be

bundled with developed software to be delivered to the government customer.

Additionally, I believe the RSA IIA Program should submit the same freeware

package to the customer for their concurrence.  Others disagree." [emphasis

added].  Following an investigation of the change in title, HR ultimately changed

Hooper's title to Project Management and Planning Operations in approximately

late, 2001.

     80.    Mr. Hooper also reported the productivity rate fraud to HR in the

same email: "Another issue surfaced at a metrics meeting on June 6, 2001, where a

chart represented that the software productivity for the Weather Product was .08.  I

stated that the productivity rate should be in the range of 1 to 3.  I said the reuse

code should not be aggregated with the new and modified code because by

definition reuse code is untouched and is only analyzed.  I suggested that they

subtract out the reuse portion.  Also, it was apparent that the hours used to develop

the productivity rate did not include program management, system engineering

and support functions so as a consequence, the SLOC was too high and the hours

were too low and this combination gave a false productivity rate.  Moreover, the

productivity rates used in their proposals are much higher and I thought that it was

not a good idea to present data that was inconsistent from what is proposed to the

customer. Comments to me after the meeting were derogatory, e.g. Dennis

Mitchell, 'He is only a hardware engineer.' Bret Walberg, 'He is trying to disrupt

our pricing activity.' Bret Walberg, 'He is saying we're doing defective pricing.'

Bret Walberg, 'He is saying we are violating TINA,' (I did not allege defective

pricing or violations of TINA.) I did say that RSA IIA should not have

productivity rates that conflict because that can be used against the program."

(emphasis added).

  81. Mr. Hooper questioned Xenia Bixler's role in resolving the freeware

issue in a July 31, 2001 e-mail to Maureen Liebler concerening his ongoing

performance evaluation and management issues:

> You also stated that Xenia Bixler is handling the freeware issue and
> that she will enter a system level risk to put the government on notice
> of this issue.  I have already made a system level risk for freeware and
> Xenia has mentioned since approximately October 2000 that she will
> inform the government PCO of this issue.  So far the government has
> not been informed that RSA IIA has freeware in one of its delivered
> products and is about to deliver more freeware in two other products
> and this lack of disclosure is not in accord with LMMS policies or Air
> Force Instruction 33-114.

  82. Mr. Hooper complained in an August 15, 2001 report to Barbara

Humpton: "You said the freeware issue would not be part of this investigation but

I disagreed because my treatment on the RSA IIA Program has been the result of

my raising tough program issues to management and <u>management avoiding those issues and retaliating.</u>" (emphasis added).

83.    Mr. Hooper again complained to Maureen Liebler in an October 23, 2001, email about management inaction and continued fraud on the freeware issue:

> <u>The RSA IIA program still has responsibility to inform the government customer of the undisclosed freeware bundled with launch software deliveries that have gone through DD 250.</u>
>
> On October 15, 2001, Nettie Horne and Katherine Good presented the LMMS Software Licenses Analysis, Guidelines, and Checklist for use by the Procurement Professional. During the presentations regarding freeware, both tried to intimidate, belittle, and personally attacked me. For example, Ms. Horne stated publicly that I had a particular agenda that was different from the other attendees. Ms. Horne asked what my job was and stated publicly that it was not my business. Ms. Good stated publicly that she would talk to my manager and get re-tasked. Both stated publicly that I am just a tech person. And, Ms. Good stated publicly that it would take years of legal training and experience for me to understand. Both refused to answer questions that were RSA IIA freeware examples. <u>As a matter of fact, my management tasked me to resolve freeware issues and furthermore it is the right of any employee to bring possible ethics violations to the proper authorities.</u> (emphasis added).

84.    Mr. Hooper was not qualified as a "hardware" engineer and evaluating him as such was totally inappropriate. Mr.Hooper was literally pulled out of a Program Management course, even though he had prior approval for the

complete curriculum and senior management encouraged employees such as Mr. Hooper to complete such curricula as part of essential career development.

85.    Mr. Hooper contacted Human Resources ("HR") in approximately June 2001 to request an investigation for retaliation and the false performance and appraisal process. HR agreed that the performance and appraisal process had not been done properly but was unable to agree that this was retaliation. Mr. Hooper requested HR or management reappraisal but HR settled instead on simply removing the offending remarks from Hooper's record.

86.    Despite increasing pressure from management to keep quiet, Hooper continued to work within the system, working up through higher levels of management to end the fraud and disclose the use of freeware. He ultimately sought the assistance of Human Resources and protection from the Ethics Office as a "whistleblowers."

87.    In a February 22, 2002 email to Barbara Humpton of Human Resources, Hooper objected to pretextual comments in a performance evaluation concerning his "teaming and interpersonal skills," noting that "I do not believe that playing well people includes propagating deceit."

88.    Stuart Ballard, Manager CDSEG, was the manager who ultimately terminated Hooper. His 2002 interim appraisal rated Mr. Hooper as a "basic

contributor," which is a barely passing mark. Mr.Hooper refused to sign this appraisal. It was changed within an hour, not by incorporating changes sought by Hooper but by including more negative comments. Again, Mr. Hooper refused to sign. Mr. Hooper again refused to sign a third iteration of the interim appraisal three hours later that contained even more negative information, including negative remarks about Hooper's efforts to resolve the freeware issue.

89.    Again Hooper contacted HR to request an investigation for retaliation and an improper performance and appraisal process. HR found no fault but directed Stuart Ballard to meet with Hooper once per week so there would be no surprises when it came to the final evaluation. Ballard only had one of these weekly meetings. Mr. Hooper's final evaluation rated him below "basic contributor." Mr. Hooper was offered a performance improvement plan ("PIP") and a general release from Lockheed, but refused to sign either. He did follow the PIP guidelines during his remaining time with Lockheed.

90.    Mr. Hooper requested an investigation from the Human Resources and Ethics Officer, Sue MacTavish, and claimed "whistleblower" status. She advised to continue following the PIP guidelines and directed Ballard to meet with Hooper once per week to review performance. However, Ballard met with Hooper only once and Ballard made no negative comments during this meeting. Ballard

abruptly terminated Hooper on July 19, 2002, verbally claiming "no performance."

Mr. Hooper was aware of what it meant to be a whistleblower and aware of the

False Claims Act.  It was his intent to work up through the chain of management

to try and resolve the freeware issue.  When this finally proved unsuccessful,

Hooper contacted the Human Resources and Ethics Office and claimed

whistleblowers status.  Unresolved internally, it was ultimately his intent to report

Lockheed's fraud to the Government.

    91.    Mr. Hooper believes that it was the combination of his investigations

into freeware disclosure and license compliance, and later productivity rate fraud,

that led to his ultimate termination.  While Hooper's allegations concerning the

freeware fraud were mature and well understood by management as of July, 2002,

Hooper's investigation into the productivity rate fraud was at a much earlier stage.

Mr. Hooper understood the nature of the fraud and had reported his allegations to

both management and HR, but his investigation was intensifying.  Management

feared that Hooper's zealous insistence on reporting fraud would be devastating to

Lockheed as his investigation continued.  Mr. Hooper believes that it was this

realization by management that led to his abrupt termination on July 19, 2002.

    92.    The FCA protects whistleblowers such as Mr. Hooper as follows:

"Any employee who is discharged . . . because of lawful acts done by the

employee . . . in furtherance of an action under this section, including investigation

for, initiation of, testimony for, or assistance in an action filed or to be filed under

this section, shall be entitled to all relief necessary to make the employee whole."

31 U.S.C. § 3730(h).  Once tasked with resolving the freeware issue, Hooper first

determined that substantial quantities of freeware had been delivered to the

Government, that the contract prohibited the undisclosed bundling of freeware,

and then developed procedures to ensure that past and future freeware was

disclosed and that required IP rights were transferred to the Government.  Mr.

Hooper encountered increasing resistance from management to his proposed

disclosures.  Mr. Hooper began investigating the productivity rate fraud following

a meeting on June 6, 2001.  Mr. Hooper believed that Lockheed had intentionally

inflated its productivity (SLOC/labor rate) in order to win the contract and

subsequent modifications to the contract and then conceal the fraud through a

variety of means.  Mr. Hooper argued that the actual - much lower - productivity

rates should be disclosed to the Government.  It was the combination of Hooper's

zealous insistence regarding the freeware disclosure and licensing issues

combined with the potential risk to Lockheed of disclosure of productivity rate

fraud that finally provoked Hooper's abrupt termination.  Management ultimately

retaliated by wrongfully terminating Mr. Hooper on July 19, 2002, amidst a pretext of performance reviews and "improvement" plans.

WHEREFORE, Plaintiff Hooper, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendants Lockheed as follows:

1.     For treble the amount of the United States' damage, plus civil penalties of $11,000 for each false claim;

2.     For all costs of this civil action; and

3.     For prejudgment interest and for such other and further relief as the Court deems just and equitable.

4.     An order of reinstatement with the same seniority and benefits Hooper would have had but for his wrongful discharge, plus double back pay, plus interest on the back pay, plus special damages, plus litigation costs and attorney fees as provided for in § 3730(h);

MOREOVER, Plaintiff Hooper, on his own behalf, demands and prays that an award be made in his favor as follows: for 25 percent (25%) of the proceeds collected by the United States if it intervenes in and conducts this action, or for 30 percent (30%) of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by the relator in prosecution

of this action; for all reasonable attorneys' fees and costs incurred by the relator;

and such other and further relief to which the relator may show himself justly

entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff Hooper demands that this case be tried before a jury.

<u>/s/ Daniel E. Cohen</u>
Daniel E. Cohen (U.S.D.C. MD 16224)
The Cullen Law Firm, PLLC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-8600

Of Counsel:

Paul D. Cullen, Sr. (DC 100230)
Joseph A. Black (DC 414869)
The Cullen Law Firm, PLLC
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-8600

James A. Moody (DC 294504)
Suite 300
1101 30th Street NW
Washington, DC 20007
202-944-2171

Attorneys for Relator

Date: August 17, 2007

58