CROWELL & MORING LLP
Mark R. Troy (CSB No. 120418, mtroy@crowell.com)
Jeffery H. Rutherford (CSB No. 181695, jrutherford@crowell.com)
Nathanial J. Wood (CSB No. 223547, nwood@crowell.com)
Mana Elihu Lombardo (CSB No. 228846, melombardo@crowell.com)
515 South Flower St., 40th Floor
Los Angeles, CA  90071
Telephone: 213.622.4750
Facsimile: 213.622.2690

Attorneys for Defendant
LOCKHEED MARTIN CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| UNITED STATES *ex rel*. NYLE HOOPER,<br><br>           Plaintiff,<br><br>    v.<br><br>LOCKHEED MARTIN CORPORATION,<br><br>           Defendant. | Case No. CV 08-00561-DSF (FMOx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT OF CLAIMS**<br><br>Date:      January 10, 2011<br>Time:     1:30 p.m.<br>Crtrm:    840<br>Judge:   Hon. Dale S. Fischer |

CROWELL
& MORING LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................ 1

    A.    False Estimates Not Actionable .............................................. 1

    B.    Disclosure of Free and Open Source Software ("FOSS") ................ 2

    C.    No Evidence of Fraudulent Testing ........................................ 3

    D.    Basis for Summary Judgment ............................................... 3

II.    SUMMARY OF RELEVANT FACTS ............................................ 4

    A.    The Air Force Acknowledged and Accepted the Uncertainties Inherent in the Contract Cost Estimates, Including the Productivity Rates About Which Hooper Complains ...................... 4

        1.    Bid and Award of RSA Contract .................................... 4

        2.    Performance of the RSA Contract .................................. 7

    B.    LMC Made a Full and Timely Disclosure of the Free and Open Source Software About Which Hooper Complains, and the Government Approved It In Accordance with Its Policy Encouraging Contractors to Utilize Such Software ........................ 8

    C.    LMC Established and Followed a Rigorous Testing Regimen With the Air Force's Direct Participation and Oversight ................. 10

III.   STANDARD FOR SUMMARY JUDGMENT IN FCA CASE ................. 11

IV.    AS TO COUNT I, THERE IS NO EVIDENCE OF FALSE STATEMENTS ABOUT PRODUCTIVITY; NOR COULD SUCH ESTIMATES BE ACTIONABLE UNDER THE FCA ............................... 14

    A.    "Underbidding" Is Not Fraudulent Inducement .......................... 15

    B.    Productivity Rates Are Estimates, Not False Statements .................. 16

    C.    There Is No Evidence that False Estimates Were Provided to the Government After the RSA Contract Was Awarded .......................... 19

    D.    Hooper's False Estimates Claim Fails Under the FCA ...................... 21

V.     AS TO COUNTS II & III, THE DISCLOSURE AND APPROVAL OF THE FOSS SHOWS THE ALLEGATIONS ARE MERITLESS ........... 23

    A.    Non-Disclosure Allegation ................................................ 24

    B.    Late Disclosure Allegation ................................................ 25

    C.    Incomplete Disclosure ..................................................... 26

VI.    AS TO COUNT IV, THERE IS NO EVIDENCE OF FALSIFIED TESTS OR FAILURE TO SATISFY TESTING REQUIREMENTS. ........ 27

    A.    Allegation of General Practice of Skipping Tests ........................ 27

    B.    Allegation of Failure to Perform Unit Tests ............................. 28

    C.    Allegations Regarding the Ethernet Interface Card ...................... 29

    D.    Allegations Regarding Changing Test Results ........................... 30

    E.    Hooper's False Testing Claims Fail Under the FCA ...................... 31

# TABLE OF CONTENTS
(continued)

**Page**

VII.   SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL COUNTS BECAUSE HOOPER CANNOT IDENTIFY A SINGLE CLAIM FOR WHICH LMC WAS NOT ENTITLED TO BE PAID. ......... 33

VIII.  CONCLUSION ............................................................................. 35

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

# CASES

*Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008)..................................................................................................13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986)..............................12

*Cormier v. Pennzoil Exploration & Production Co.*, 969 F.2d 1559 (5th Cir. 1992) ....................................................................................28

*Corsello v. Lincare, Inc.*, 428 F.3d 1008 (11th Cir. 2005)....................................33

*Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir. 1999).........................32

*Maxwell v. United States*, 277 F.2d 481 (6th Cir. 1960)........................................18

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099 (9th Cir. 2000) ....................................................................................11

*Tyger Construction Co. v. United States*, 28 Fed. Cl. 35 (1993) ...........................18

*United States ex rel. Aflatooni v. Kitsap Physicians Service*, 314 F.3d 995 (9th Cir. 2002).........................................................................33, 34

*United States ex rel. Berge v. Board of Trustees of the Univ. of Ala.* 104 F.3d 1453 (4th Cir. 1997)..................................................................22

*United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*, 297 F. Supp. 2d 272 (D.D.C. 2004), *aff'd*, 393 F.3d 1321 (D.C. Cir. 2005).............................................................................15, 16, 34

*United States ex rel. Bustamante v. United Way*, No. 98C5551, 2000 WL 690250 (N.D. Ill. May 25, 2000) ........................................................13

*United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995) ...................................................................24, 29, 31, 32

*United States ex rel. Costner v. United States*, 317 F.3d 883 (8th Cir. 2003)..............................................................................................32

*United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295 (4th Cir. 2009)............................................................................22

*United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542 (7th Cir. 1999)........................................................................................13, 20

*United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416 (9th Cir. 1991)..................................................................13

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006)......................................................................................12, 26

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996)..........12, 14, 22

*United States ex rel. Laird v. Lockheed Martin Engineering & Science Co.*, 491 F.3d 254 (5th Cir. 2007)..................................................passim

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

*United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048 (9th Cir. 2001) ....................................................................................... 27

*United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402 (9th Cir. 1995) ....................................................... 4, 29, 33

*United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S. Ct. 379 (1943) ............................................................................................. 15, 16

*United States ex rel. Owens v. First Kuwaiti Gen. Trading*, 612 F.3d 724 (4th Cir. 2010) ................................................................................ 12

*United States ex rel. Phillips v. Pediatric Servs. of Am.*, 142 F. Supp. 2d 717 (W.D.N.C. 2001) .................................................................... 12

*United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375 (5th Cir. 2003) ....................................................... 15

*United States ex rel. Wilson v. Kellogg, Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008) ................................................................................ 12

*United States ex. rel Parvin v. McDonnell Douglas Corp.*, No. CV 92-7474 SVW (C.D. Cal. Jan. 12, 1994) ........................................... 33

*United States v. Intervest Corp.*, 67 F. Supp. 2d 637 (S.D. Miss. 1999) ................ 23

*Wang v. FMC Corp.*, 975 F. 2d 1412 (9th Cir. 1992) .................................. 12, 22, 24

## STATUTES

31 U.S.C. § 3729 ................................................................................... 12, 13, 34

## OTHER AUTHORITIES

John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.04 (3d ed. 2010 Supp.) ............................................................................................. 14

## REGULATIONS

48 C.F.R. § 15.403-1 ........................................................................................... 18

48 C.F.R. § 15.406-2 ........................................................................................... 18

48 C.F.R. § 16.301-1 ........................................................................................... 14

48 C.F.R. § 16.301-2 ...................................................................................... 5, 14, 18

48 C.F.R. § 16.301-5 ........................................................................................... 14

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iv-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

## I.    INTRODUCTION

*Qui tam* relator Nyle Hooper ("Hooper") filed this False Claims Act ("FCA") lawsuit in 2005, purportedly on behalf of the government (which declined the case), attacking his former employer Lockheed Martin Corporation ("LMC") without a shred of support that LMC had deceived the government or otherwise failed to live up to the requirements of the government contract in question.  Hooper's allegations concern LMC's performance of the Range Standardization and Automation IIA ("RSA") contract, which the Air Force awarded in 1995 for the development of software and hardware systems that monitor launches of spacecraft and missiles from Vandenberg Air Force Base and Cape Canaveral.  Hooper alleges, in substance, that LMC provided fraudulent estimates of future software development costs (Count I), used unauthorized software called "freeware" or "free and open source software" (also called "FOSS" or "OSS") (Counts II & III), and falsified tests of software (Count IV).  After several years of discovery, the evidence – obtained from LMC, the principal government personnel who oversaw the RSA contract, and even Hooper's primary witness – conclusively contradicts each of Hooper's allegations, demonstrates that LMC engaged in no wrongdoing, and supports granting summary judgment in favor of LMC.

### A.    False Estimates Not Actionable

Hooper alleges in Count I that LMC estimated its future costs using a "false productivity rate" to create an artificially low bid in order to obtain the RSA contract (Third Amended Complaint ("TAC") ¶¶ 16-21) and continued thereafter to use "unrealistically high productivity projections" (*i.e.* low cost estimates), "in order to win . . . contract modification[s] and award fees" (TAC ¶ 28).  There is no evidence that LMC made false statements and, as a matter of law, estimates cannot form the basis of a FCA cause of action.  While Hooper alleges that LMC charged "inflated costs," (*see* Count I caption and TAC ¶ 35), he admitted in his deposition that there was no overcharging; *i.e.,* that all costs charged by LMC on the contract

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-1-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1    were costs that were actually incurred in performing the contract.  UF 3.[1]  In

2    addition, the evidence establishes that cost estimating in the context of software

3    development is subject to a high degree of uncertainty.  Recognizing this, the Air

4    Force conducted its own estimates and acknowledged that it did not rely on the

5    estimates about which Hooper complains.

6    **B.    Disclosure of Free and Open Source Software ("FOSS")**

7        The evidence fails to establish that LMC defrauded the government by

8    including undisclosed FOSS in products delivered on the RSA contract.

9        First, Hooper completely miscomprehends the meaning of FOSS and, thus,

10   has no understanding of how it was incorporated into RSA products or how it was

11   evaluated and approved by the government.  FOSS is software that can be

12   downloaded by anyone from the internet for no fee.  "Open source" means that the

13   lines of code that underlie the software program are downloaded with the program,

14   so that they can be viewed, analyzed, tested, utilized or modified in the same

15   manner as lines of code that a software developer would write from scratch.  *See*

16   UF 39.  In contrast to Hooper's speculation that FOSS is "unsafe," because FOSS is

17   publicly available for review and constant modification, its reliability and security

18   is typically superior to non-FOSS software.  Further, because FOSS is free to

19   download, the government does not pay for the development of that software code.

20   Therefore, the government strongly advocates that contractors, where possible,

21   include FOSS in their programs to save the government money (UF 41-42), which

22   is precisely what LMC did, with the government's written authorization.

23       Second, Hooper ignores that the FOSS that was, in fact, included in

24   deliverables to the government was *disclosed to* and *approved by* the government.

25   This is not surprising, since Hooper has little personal knowledge regarding FOSS

26   issues and no personal knowledge of FOSS-related matters that post-date his

27   ────────────────

28   [1] Citations to "UF" are to the uncontroverted facts in LMC's Separate Statement of
     Uncontroverted Facts and Conclusions of Law filed concurrently herewith.

Crowell
& Moring LLP
Attorneys At Law

-2-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

termination from LMC in 2002, including the government's approval of the FOSS in question.  This is evident from his original complaint, which was filed in 2005, which alleged non-disclosure of FOSS.  When he later found out this allegation was meritless, he amended his complaint to allege that the disclosure should have been made at some unidentified earlier time and that the disclosure may have been incomplete.  At his deposition, though, Hooper admitted that even this claim was not based on his personal knowledge or any expertise in the field, but on guesswork and Google searches.  UF 60.

### C.    No Evidence of Fraudulent Testing

Hooper fails to establish that LMC engaged in any wrongdoing whatsoever in connection with tests conducted on the RSA contract.  Hooper alleges false testing in three ways: (1) failure to perform all required tests (TAC ¶ 96); (2) "secretly" disabling an "ethernet interface card" on one software item (TAC ¶ 99); and (3) "falsifying test results by changing the expected or anticipated results of passing a given test to conform to the actual results" (TAC ¶ 100).

Given the scope and importance of the project, the Air Force exercised a great deal of oversight, including hiring technical consultants to work side by side with LMC on the development, testing and implementation of the products.  Not only can Hooper present no evidence of false testing, the evidence establishes a transparent process in which the Air Force and its consultants were involved in every step, including maintaining offices in LMC's facility, participating in tests and/or test reviews, and having full access to LMC's documentation database.

### D.    Basis for Summary Judgment

Hooper's premise of non-disclosure and deceit lacks evidentiary support and fails to controvert the material facts that entitle LMC to summary judgment.  A project of RSA's duration and complexity would be expected to encounter challenges, technical problems, good faith errors in judgment (by all parties involved), and customer decisions to change direction.  The facts show that the

CROWELL & MORING LLP
ATTORNEYS AT LAW

-3-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   combined efforts of LMC and the Air Force and its consultants to overcome

2   problems refute any notion that LMC defrauded the government.  *See United States*

3   *ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1412 (9th Cir. 1995)

4   ("Logically, then, any claims for payment based on work that satisfied

5   [contractor's] contractual obligations to the [government] could not have been

6   'false or fraudulent' within the meaning of the FCA").

7           Hooper will, no doubt, obfuscate his evidentiary failings in an attempt to

8   oppose summary judgment by cherry-picking documents and phrases within

9   documents that he believes, without foundation, are critical of LMC's compliance

10  with what he believes are contract requirements or LMC's own procedures for

11  estimating costs and developing and testing software.  Such snippets, even if they

12  could be properly introduced, will not controvert the material facts.  Hooper might

13  also steer away from his meritless allegations and make new claims, as he did with

14  the FOSS allegation.  The Court should not be misled by this effort and should not

15  permit him to raise new claims or continue the trial date.[2]  After rounds of motion

16  practice and years of discovery (including the production of virtually the entire

17  database of RSA program documents), Hooper has no evidence to refute the

18  material facts presented here.

19  **II.     SUMMARY OF RELEVANT FACTS**

20          **A.     The Air Force Acknowledged and Accepted the Uncertainties**
            **Inherent in the Contract Cost Estimates, Including the**
21          **Productivity Rates About Which Hooper Complains.**

22                  **1.     Bid and Award of RSA Contract**

23          The RSA contract was awarded over 15 years ago as part of an ongoing

24  effort to replace the aging software and hardware used to support Air Force launch

25  _____

26  [2] The Court has noted that the TAC's counts "are not models of clear or concise
    pleading," and that LMC may prevail at summary judgment.  Aug. 12, 2008 Order at 4
27  (Docket Item No. 44).  The Court twice granted Hooper's request for six-month
    extensions, but has stated "**No further continuances.**"  Feb. 19, 2010 Order at 2 (Docket
28  Item No. 116) (emphasis in original).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-4-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

operations.  TAC ¶ 7.  The RSA contract is a "cost-reimbursement plus award fee" contract, under which the contractor is reimbursed for its actual costs and receives periodic award fees based on its overall performance, including spending less money than previously estimated.  UF 2.

The Air Force conducted a competition among bidders for the award of the RSA contract.  In the original contract competition in 1995, the Air Force issued to potential bidders a Request for Proposal ("RFP") which contained five factors the Air Force would use to decide the winning bid.  UF 4.  The first four factors (management, systems engineering, systems integration and product development) were first and equal in importance.  *Id*.  The fifth factor – cost – was of lesser importance to the Air Force.  UF 5.  The Air Force "informed the offerors that it may select an offer that is not the lowest priced technically acceptable offer, but may instead select a higher priced offer that represents the 'Best Value' to the Government."  *Id*.  The Air Force specifically informed potential bidders that "[n]o advantage will be given to a [sic] offeror who submits an unrealistically low cost proposal.  In fact, the offeror may be downgraded . . . to the degree that the proposed costs indicate inadequate comprehension of the tasks."  *Id*.

The Air Force determined that the contract would be a cost-reimbursement contract because "[f]ixed-price contract types are inappropriate for this effort because specific requirements cannot be adequately defined in advance" and the "uncertainties inherent in the requirements render attempts to establish a fixed-price unrealistic."  UF 6.  The Federal Acquisition Regulations ("FAR") provide that cost-reimbursement contracts are to be utilized "when uncertainties in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract."  48 C.F.R. § 16.301-2.  Thus, the Air Force knew that estimates, including productivity rates, would be highly uncertain.

Three companies responded to the RFP. UF 7.  Loral Systems Company ("Loral") won the award.  UF 13.  Loral was later purchased by LMC.  UF 13.

Thus, the bid at issue in this case is actually Loral's, not LMC's, and therefore will be referred to as "Loral's bid." Loral did not submit the lowest bid. UF 11. Accordingly, not only did the Air Force's RFP effectively eliminate a motive to underbid, the fact that the winning bid was not the lowest suggests that it was not unusually low.

As might be expected, given the size of the RSA program, the Air Force took steps to ensure that it was getting "realistic" bids at a fair price. First, the Air Force hired independent consultants to create an "Independent Government Estimate" to compare with the three companies' bids. UF 8. Second, the Air Force performed a "cost realism analysis" in which it "evaluated [the bids] to ascertain whether the offeror's proposed costs were complete and realistic . . . and whether the proposed price was reasonable." UF 9. If that analysis indicated that a portion of the bid did not seem to the Air Force to be "complete" or "realistic," the Air Force adjusted the bid to reflect the Air Force's assessment of the "most probable cost." *Id.*

As part of this analysis, the Air Force specifically analyzed Loral's estimates regarding the number of hours it would take for software development. UF 10. The Air Force believed that Loral was too "optimistic" regarding its estimated productivity (*i.e.*, hours per line of code), and adjusted Loral's bid upward. *Id.* Thus, the Air Force relied upon its own opinion of Loral's estimated productivity.

The Air Force still determined that Loral's bid provided the "best overall value" knowing that there were potential "risks" that might "lead to cost growth beyond target cost." UF 11. The Air Force concluded that "the risk potential is acceptable . . . and . . . determined that a fair and reasonable price was obtained without reliance on certified cost or pricing data." *Id.* The Air Force specifically waived any requirement for bidders to submit a certification that their historical costs used in their proposals were accurate, a fact that further undermines Hooper's contention that the bid contained a false statement. UF 12.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-6-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

## 2.    Performance of the RSA Contract

After contract performance began, LMC (now the owner of the Loral division that won the award) was not required to "re-compete" for newly requested components of the RSA program or modifications directed by the Air Force.  UF 14.  LMC continued to provide the Air Force with estimates, not because it was engaged in a competition for the work, as Hooper alleges (*see* TAC ¶ 25), but for a variety of reasons consistent with the management of large, long-term, and complex government contract.  These reasons included the fact that the Air Force (1) revised the scope of the RSA program on a number of occasions, (2) would periodically change requirements for individual components, or (3) simply would have a limited budget for a particular component and would request an up-to-date estimate to forecast what that particular product might cost to develop.  UF 15.  In fact, the Air Force worked side by side with LMC to develop the cost estimates about which Hooper complains and often directed LMC to provide even lower estimates of costs.  UF 16.  Because LMC was not competing for this work, Hooper's speculation that the Air Force would have awarded that portion of the work to a different contractor but for LMC's false cost estimates is unsupported.

Similarly, after contract performance began, LMC received annual fee awards of different amounts.  These award fees were not a product of fraudulently low estimates in the Loral bid or in later estimates.  Rather, these fee awards were determined, in part, on cost savings over estimated costs.  UF 17.  Thus, there was no logical reason to under-estimate costs because doing so could only have lowered the award fee.  *Id.*  In addition, award fees reflect the Air Force's assessment of how well LMC has performed under the contract, and in that regard, LMC has consistently received high ratings from the Air Force.  UF 19.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-7-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

**B.**   **LMC Made a Full and Timely Disclosure of the Free and Open Source Software About Which Hooper Complains, and the Government Approved It In Accordance with Its Policy Encouraging Contractors to Utilize Such Software.**

Software development has traditionally involved engineers writing lines of code to produce a function that meets the contract's performance requirement.  As work began on the RSA contract in 1996, LMC employed hundreds of software engineers for that task.  In the ensuing years, it became apparent to the Air Force – and to LMC – that some of the functions could be met without the need to write new lines of code from scratch by relying instead on open source software available for free over the internet.  UF 31.

As mentioned above, FOSS is freely downloadable "open source software from which the human-readable source code is available for use, study, reuse, modification, enhancement, and redistribution by the users of that software."  UF 39.  The Department of Defense ("DoD") has long promoted the use of FOSS, stating in an official agency memorandum ("Clarifying Guidance Re Open Source Software"), that "the continuous and broad peer-review enabled by publicly available source code supports software reliability and security efforts…" and "the unrestricted ability to modify software source code enables the [government] to respond more rapidly to changing situations, missions, and future threats."[3]  UF 41. The purpose of the DoD Guidance re OSS is to clarify misconceptions of law that have "hampered effective [government] use of OSS" and to emphasize that the government seeks to identify barriers to the effective use of open source software "so we can continue to increase the benefits from the use of OSS."  *Id.*

One such misconception that underlies Hooper's suit is that use of FOSS violated the contract requirement to provide the government with "unlimited data

---

[3] Attachment 2 of the DoD Guidance re OSS "provides clarification and additional guidance on the use and development of OSS.  It does not change or create new policy, but is intended only to explain the implications and meaning of existing laws, polices, and regulations."  Thus, the policies articulated in the guidance applied to the RSA contract well before this latest DoD Guidance re OSS was issued.

CROWELL & MORING LLP
ATTORNEYS AT LAW

-8-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

rights" in any software "developed exclusively with government funds."  TAC ¶ 44 (quoting from a DoD data rights clause).  While FOSS can be downloaded at no charge, FOSS comes with license restrictions that are generally aimed at preserving the free and open nature of the particular FOSS product.  UF 40.  In the early part of the RSA contract, both the Air Force and LMC were working to understand the relationship between FOSS licenses and the government's data rights.  At the time Hooper was tasked to help with this issue he had never heard of FOSS and had never read a FOSS license.  UF 44.  Despite the government's direction to utilize certain FOSS products on the RSA contract (UF 36), Hooper took the unfounded position at that time that FOSS was not permitted because it could not be provided to the government with unlimited data rights.  *See* TAC ¶¶ 55-56.

The DoD has clarified that use of FOSS is compatible with DoD's data rights contract clause because FOSS is, by definition, commercial software, and "the government only expects to get the usual commercial rights to commercial software, and not the 'unlimited rights.'"  UF 38.  In short, because FOSS is not developed with government funds, the clause which Hooper says was violated does not require FOSS to be delivered with unlimited rights.

To address the confusion over the use of FOSS, LMC developed procedures, collected information about what FOSS products LMC was utilizing, and disclosed that information to the Air Force.  UF 33.  In consultation with the Air Force and its technical consultants, LMC utilized FOSS when appropriate to provide needed functionality while minimizing development costs for the Air Force.  UF 35.

Primary among LMC's efforts to deal with FOSS on the RSA contract was LMC's full and formal disclosure of its use of FOSS through a series of letters to the Air Force.  These disclosure letters, the first of which was sent in March 2003 to the Air Force's Contracting Officer, clearly noted LMC's use of FOSS "software to be provided with less than unlimited rights," specifically identified all FOSS components, and requested Air Force review and concurrence.  UF 45, 47.  LMC's

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

*informal* disclosures began much earlier, as LMC discussed including FOSS in RSA products at technical design meetings.  UF 46.

The Air Force, in turn, conducted a detailed process to vet and assess the disclosed FOSS items, requiring both LMC and the government's technical support contractors to provide a thorough written assessment of the items' functionality, security, and flight safety (including Range Safety critical compliance).  UF 49. LMC complied with that request, and the Air Force's technical support contractors also independently validated the use of each of the FOSS items.  UF 51.

On June 2, 2005, the Air Force issued a formal contract letter stating that "the Government hereby acknowledges and approves the use of the subject software by [LMC]."  UF 48.  The letter went on to state that "[t]he Government believes this direction to be within the current contractual requirements estimated costs, and terms and conditions."  *Id.*  Following LMC's submittal of additional and updated information, the Air Force issued another letter on June 14, 2007, approving the use of all FOSS items identified in LMC's spreadsheet.  UF 52-53.  Finally, on July 26, 2007, LMC and the Air Force formally modified the contract to incorporate the list of FOSS items into the RSA contract.  UF 54.

### C.   LMC Established and Followed a Rigorous Testing Regimen With the Air Force's Direct Participation and Oversight.

Loral's winning proposal included a Software Development Plan ("SDP") and a System Engineering Management Plan ("SEMP") outlining the various levels of software tests.  UF 72.  The Air Force approved the SDP and SEMP and participated intimately in the testing process – both directly and indirectly through its independent contractors.  UF 72, 76-79.  The testing conducted on the RSA contract adhered to the SDP.  UF 75.

The SDP test levels were: unit tests, unit integration tests, computer software configuration item qualification tests ("CQT"), system integration tests ("SIT"), and system performance tests (referred to the "Integrated System Test" or "IST").  UF

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-10-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

73.  Once those tests were successfully completed, the Air Force certified that the products met all requirements and the products were transferred to the Air Force, thereby completing LMC's contractual obligations.  UF 74.

The Air Force was intimately involved in the testing process on the RSA contract.  As it does on all major development contracts, the Air Force retained consultants to perform "independent validation and verification" and to monitor and review the tests.  UF 76.  These consultants worked on site with and had unfettered access to LMC personnel and the LMC facility where such testing took place.  UF 77.  The Air Force and its consultants were invited to observe testing of the products – from the testing of individual software units to tests of the integrated systems.  *Id*.  Attendance by either the Air Force or its consultants was routine, if not required, at the CQT, SIT, and IST levels.  *Id*.

The involvement of the Air Force and its consultants started *before* the tests.  For example, starting at the CQT testing level, LMC met with the Air Force and its consultants at a pre-test meeting called the "Qualification Readiness Review" (or "QRR"), at which the Air Force and its support contractors were given the testing plans, evidence of test results from prior stages, and the opportunity to weigh in on how testing would proceed.  UF 79.  At the CQT level and above, the tests lasted many days and began and concluded with debriefing sessions.  *Id*.  Attendance sheets and reports of the entire event were written and kept.  *Id*.  The transparency in the test process undercuts Hooper's baseless allegations.

## III.   STANDARD FOR SUMMARY JUDGMENT IN FCA CASE

Summary judgment should be granted when the defendant either (1) negates or disproves an essential element of each of the plaintiff's causes of action; or (2) demonstrates that the opposing party does not have enough evidence of an essential element of its claims to carry its ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "[A] complete failure of proof concerning an essential element of the

CROWELL & MORING LLP
ATTORNEYS AT LAW

-11-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   nonmoving party's case necessarily renders all other facts immaterial." *Celotex*

2   *Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).

3         In FCA cases, summary judgment is proper where the relator cannot establish

4   with credible evidence these elements: (1) a false claim or a false statement to get a

5   false claim paid, (2) made knowingly, (3) that was material, (4) causing the

6   government to pay out money. *See* 31 U.S.C. § 3729(a)(1)-(2) (2006); *United*

7   *States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

8         ***Falsity.***  Hooper must identify an actual *false* claim for payment.

9   "'[I]nnocent mistakes' and 'negligence' are not offenses under the Act." *Wang v.*

10  *FMC Corp.*, 975 F. 2d 1412, 1420 (9th Cir. 1992).  *See also United States ex rel.*

11  *Phillips v. Pediatric Servs. of Am.*, 142 F. Supp. 2d 717, 732 (W.D.N.C. 2001)

12  (summary judgment for defendant where alleged fraud involved "the type of

13  mistakes commonly encountered in the course of business" because "the claim [at

14  issue] must be a lie").  In that regard, matters of mere contract compliance are not

15  actionable under the FCA.  *See, e.g., United States ex rel. Hopper v. Anton,* 91 F.3d

16  1261, 1265 (9th Cir. 1996) ("It is not the case that any breach of contract or

17  violation of regulations or law . . . automatically gives rise to a claim under the

18  FCA"); *United States ex rel. Wilson v. Kellogg, Brown & Root, Inc.*, 525 F.3d 370,

19  377 (4th Cir. 2008) (allegations of poor management of contractual duties,

20  imprecise statements or differences in interpretation growing out of a disputed legal

21  question are not false under FCA); *United States ex rel. Owens v. First Kuwaiti*

22  *Gen. Trading*, 612 F.3d 724, 726-27 (4th Cir. 2010) (affirming summary judgment

23  for contractor because the "essence of Relator's claim is that defendant failed to

24  live up to its contractual obligations").  *Owens* further noted:  "Allowing [the FCA]

25  to be used in run-of-the-mill contract disagreements and employee grievances

26  would burden, not help, the contracting process, thereby driving up costs for the

27  government and, by extension, the American public." *Id.*

28        ***Claim.***  A "claim" is a request or demand for money under a contract.  31

CROWELL & MORING LLP
ATTORNEYS AT LAW

-12-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

U.S.C. § 3729(b)(2).  False statements, in the absence of a false claim for payment, are not actionable under § 3729(a)(2).  *United States ex rel. Bustamante v. United Way*, No. 98C5551, 2000 WL 690250, at *4 (N.D. Ill. May 25, 2000) (holding that an (a)(2) violation requires proof that both the statement or record *and* the claim were false and that the defendant knew that both were false).  Additionally, a plaintiff must "prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123, 2126 (2008).

*"Knowingly."*  For a *qui tam* action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud. In order to show that a defendant acted "knowingly" under the FCA, a plaintiff must prove "actual knowledge," "deliberate ignorance" or "reckless disregard" of the truth or falsity of the claim. 31 U.S.C. § 3729(b).  What constitutes the FCA offense is the "knowing presentation of what is known to be false." *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991).  The government's knowledge of relevant facts can negate any notion that the defendant *knowingly* submitted any false claim or made any false statement to get a false claim paid.  *Id.* ("As the brief of the United States points out, the knowledge possessed by officials of the United States may . . . show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth"); *see also United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999) ("if the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim").

*Materiality and Causation.*  Liability requires proof (1) that the alleged false statement or claim was essential to the government's funding decision; (2) that the government specifically relied on the falsity; or (3) that the falsity caused the government to pay out sums it otherwise would not have paid.  *See* 1 John T.

CROWELL & MORING LLP
ATTORNEYS AT LAW

-13-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

Boese, *Civil False Claims and Qui Tam Actions* § 2.04 (3d ed. 2010 Supp.) (noting that "materiality" is sometimes equated with "reliance" and "causation"). The "materiality" requirement, as applied in the Ninth Circuit, holds that when a plaintiff alleges that a defendant violated the FCA by knowingly violating the terms of a contract or a law or regulation which governed the contract, he must prove that compliance with the subject provision was a "prerequisite" to the government paying the defendant. *Anton*, 91 F.3d at 1266 (certification of assurances that school district would comply with applicable federal law not a "prerequisite," under facts of that case, to receipt of federal funds). In other words, had the government known of the false claim or statement, it would not have paid the claim.

As explained below, Hooper lacks evidence to establish any of the elements of an FCA claim on any of his counts, and the evidence of government knowledge, approval and lack of materiality as to the matters about which Hooper complains renders his claims meritless.

## IV. AS TO COUNT I, THERE IS NO EVIDENCE OF FALSE STATEMENTS ABOUT PRODUCTIVITY; NOR COULD SUCH ESTIMATES BE ACTIONABLE UNDER THE FCA.

As described above, the RSA contract is a "cost-reimbursement plus award fee" contract, (TAC ¶ 7), under which the government pays the contractor's costs incurred in performance, plus an award fee. *See* 48 C.F.R. §§ 16.301-1, 16.301-2, 16.301-5. Hooper admitted there were no costs charged to the government that were not incurred and that should not have been reimbursed. UF 3. Rather, Hooper alleges that LMC (via the Loral bid) provided false estimates of what its costs might be in the future in order to fraudulently induce the contract award and later modifications to the contract. Count I is premised on the unsupported speculation that had Loral, and later LMC, used different estimates, the Air Force might have awarded the contract to another contractor. TAC ¶¶ 23, 35.

First, as a matter of law, even an intentionally low bid ("underbid") cannot form the basis of a false claim in the absence of actual mischarging of incurred

CROWELL & MORING LLP
ATTORNEYS AT LAW

-14-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

costs.  Second, Hooper has no admissible evidence that any false productivity estimates or cost proposals were knowingly submitted to or relied upon by the government.  *See, e.g.,* UF 27 (Hooper admitted that he had no personal knowledge of secret "books" which he alleges in TAC ¶ 34 were used to hide the true productivity rates).

### A.      "Underbidding" Is Not Fraudulent Inducement.

Fraud-in-the-inducement requires proof that: (1) the contractor had no intention to perform the contract in accordance with the terms of its proposal; and, (2) the contractor obtained payments under the contract to which it was not legitimately entitled.  *United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co*., 491 F.3d 254, 259 (5th Cir. 2007) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S. Ct. 379 (1943)); *see United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 385 (5th Cir. 2003).

The fraud-in-inducement theory of liability under the FCA is limited to situations where the contractor's bid or proposal contains false statements that result in the government paying a higher contract price than it otherwise would have paid.  *See, e.g., Hess*, 317 U.S. at 543-44 (contractors colluded to inflate artificially their bid prices).  Here, in contrast, Hooper alleges that Loral underbid the contract; *i.e.*, that it proposed a lower amount than it should have.  TAC ¶ 23. That allegation cannot support a fraud-in-the-inducement claim or support any other FCA theory.  *See Laird*, 491 F.3d at 262 ("Unreasonable or incorrect cost projections . . . cannot fend off summary judgment").

Without more, a contract underbid is not a false claim.  For FCA liability, there must be a nexus between the underbid and a request for payment that the contractor would not have been entitled to receive.  *Laird*, 491 F.3d at 260.  The same conclusion was reached in *United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*, 297 F. Supp. 2d 272 (D.D.C. 2004), *aff'd*, 393 F.3d 1321 (D.C. Cir. 2005), in which the relator asserted that a fraudulently low bid

CROWELL & MORING LLP
ATTORNEYS AT LAW

-15-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

induced the government to enter into the contract and obligated it to pay the

contractor's subsequent claims.  The court noted the distinction between an inflated

bid – which, under *Hess*, may be actionable even if the subsequent claims are not

false or fraudulent in and of themselves – and an underbid or "deflated" bid.  *Id.* at

282-83.  The court held that for an underbid to be actionable, the relator must show

that one or more requests for payment under the contract induced by the low bid

were themselves fraudulent.  *Id.*  With regard to the relator's argument that all

subsequent claims for payment were automatically tainted by the fraudulently

deflated bid, the court reasoned, "it would be nonsensical and illogical to hold a

defendant liable merely for underbidding a contract, even if at the time the bid had

been submitted the bidder knew or should have known that it could not perform at

the original bid price and it intended to seek an increase at a later date."  *Id.* at 280.

Hooper makes the same allegation as the relators in *Laird* and *Bettis* – that

Loral submitted an artificially low bid in order to win the contract, has since

exceeded its estimates for the project (TAC ¶ 23), but has *not* overcharged the

government (UF 3).  Hooper's underbidding allegation fails as a matter of law.

## B.    Productivity Rates Are Estimates, Not False Statements.

The law draws a sharp distinction between facts and judgments, and exempts

contractors from administrative or civil liability for statements that are judgmental.

The statements at issue in Loral's bid were simply *estimates* of what the costs might

be, and it is undisputed that the Air Force understood that this estimate likely would

not reflect the actual cost of development.  UF 2, 6, 11.  Hooper's First Amended

Complaint titled this count "Inflated Costs Due to False Productivity Projections."

First Am. Compl. at p. 33.  Hooper's TAC changed the phrase "productivity

projections" to "productivity rates" to avoid calling these figures what they really

are – estimates.  *See* TAC ¶ 24.  However, Loral's proposal clearly identifies the

productivity rates as based on engineering "judgment."  UF 10.

Hooper's only "personal" knowledge of Loral's bid is his unsupported

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

LAACTIVE-600710261.1

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

allegation that in late 1996 – a year after Loral won the contract – he reviewed parameter settings of the computer program (called "SEER-SEM") that he alleges Loral used to propose a single productivity rate for the RSA contract. He concluded that some of the settings were "false." TAC ¶¶ 19-22. But the evidence contradicts his allegation. First, Hooper's claim that Loral used a single productivity rate of "3 to 10 lines of code per hour for all products" (TAC ¶ 16) is flatly refuted by the evidence, which shows that the estimated productivity rates varied by product – for example, some products were estimated at 10 lines of code per day and others at 1.1 hours per line of code (far less than the rate Hooper alleges). UF 10. Second, Hooper's recollection of the "parameter settings" is not accurate either. *See* UF 10. While SEER-SEM was used for some portions of the proposal,[4] the parameter settings varied depending on the RSA product at issue. For example, Hooper asserts that the "requirements volatility" setting (the risk that the Air Force might change the scope of requirements on the contract) was set to "low" for all products. TAC ¶ 22. Loral's RFP response shows that it did not set this parameter at "low." *See, e.g.,* UF 10.

To the extent Hooper tries to compare the estimated productivity rates with actual rates after the contract was awarded, it is an apples-to-oranges comparison – it is undisputed that as originally envisioned, the RSA contract was going to be largely based on software that had previously been developed. UF 21. However, due to changes in the scope and requirements for the program implemented by the Air Force *after* the RSA contract was awarded, far less code was "reused," driving down the productivity rate for the program. UF 22.

At most, Hooper's disagreement with Loral's methodology merely illustrates that there are numerous ways to come up with productivity estimates, and engineers differ over which way is best. As former LMC employee Mike Allen (the primary

_____

[4] Contrary to what is alleged in the TAC, Hooper admitted in his deposition that SEER-SEM was not used as the basis for Loral's entire bid. UF 10.

CROWELL & MORING LLP
ATTORNEYS AT LAW

-17-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

witness upon whom Hooper relied) testified, even he and Hooper differ on "how we think about productivity rates, you know, what's a good productivity rate and what's a bad one." UF 20.  Mr. Allen further testified that productivity rates are simply a "rule of thumb" and that "[e]verybody has a rule of thumb that they like." *Id.*

Further undermining Hooper's false statements claim is the lack of any certification associated with Loral's proposal.  Because the RSA procurement was competitive, the Air Force did not require the bidders to provide certifications of historical costs.  48 C.F.R. § 15.403-1(c)(1); UF 12 (Air Force waived certification).  Even if there had been a certification associated with Loral's bid, it is a fundamental principle of government contracts law that such certifications do not pertain to the accuracy of judgmental estimates, because of the inherent uncertainties that underlie estimates.  *See* 48 C.F.R. § 15.406-2 ("certificate does not constitute a representation as to the accuracy of the contractor's judgment on the estimate of future costs or projections"); *Maxwell v. United States*, 277 F.2d 481, 502 (6th Cir. 1960) (statement of proposed costs was not actionable under the False Statement Act where government understood the proposed costs to be estimates); *Tyger Construction Co. v. United States*, 28 Fed. Cl. 35, 56 (1993) (government's suit under FCA could not lie where the purported "false statement" was a judgmental statement of opinion, as opposed to a factual statement).

Consistent with the reality of the unpredictability of estimates, the FAR states that cost-reimbursement contracts are utilized precisely because "uncertainties in contract performance do not permit costs to be estimated with sufficient accuracy to use any type of fixed-price contract." 48 C.F.R. § 16.301-2.  This is exactly why the Air Force decided not to use a "fixed price" contract for the RSA program – because "uncertainties inherent in the requirements render attempts to establish a fixed-price unrealistic."  UF 6.  *See Laird*, 491 F.3d at 257 ("Because the precise level of effort and the nature of the work to be done on a CPAF-type contract are,

CROWELL & MORING LLP
ATTORNEYS AT LAW

-18-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

by definition, both unknown at the outset, neither NASA nor Lockheed Martin knew how much the research contract's labor requirements would cost"). Apart from estimates having no connection with reimbursement of costs, there is no basis to hold a contractor liable for poorly estimating what its future costs might be.[5]

Nevertheless, this is precisely what Hooper seeks to do in this case – impose FCA liability on LMC because, despite the estimating uncertainties recognized by the Air Force, in his opinion, Loral could have made a better estimate of how much the RSA contract was going to cost over a 15-year period of time.

### C.   There Is No Evidence that False Estimates Were Provided to the Government After the RSA Contract Was Awarded.

Hooper's allegation that LMC provided artificially low estimates to the government after being awarded the RSA contract fails for the same reason as his allegation with respect to Loral's bid – such estimates are not actionable. Even if they were, Hooper has no evidence of any false statements. His speculative theory is that if LMC had provided higher estimates, the Air Force might have awarded portions of contract work to a competitor of LMC. *See* TAC ¶ 25.

First, there is no evidence that LMC was required to engage in a competitive bid to continue work on the RSA contract. The evidence is to the contrary. UF 14. Also, Hooper essentially admitted there was no motive for submitting low estimates once the work was underway. He acknowledged that to the extent LMC provided low cost estimates but then spent more money than estimated, it actually *hurt* LMC's ability to earn an award fee. UF 17. *See Laird*, 491 F.3d at 261 (allegedly

_____

[5] In Hooper's *qui tam* suit against his previous employer, Hooper alleged that General Motors submitted inflated labor estimates in proposals for government contracts. He unsuccessfully attempted to show discrepancies between the estimated labor hours (which he claimed were too high) and those which were, in fact, incurred (which were lower), and broadly alleged that contractual claims were false without identifying any particular claims. After substantial discovery, the court granted summary judgment for General Motors, holding as a matter of law that "estimates of future labor costs cannot form the basis of an FCA action." UF 30. In many respects, the instant action presents the same allegation (albeit, in reverse), for which Hooper similarly has no factual or legal basis.

CROWELL & MORING LLP
ATTORNEYS AT LAW

-19-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   false cost projections not actionable when they were unrelated to the contractor's

2   ability to obtain award fees).

3       Second, Hooper's allegations ignore the nature of the relationship between

4   the government and LMC.  Hooper would have the Court believe LMC developed

5   estimates in secret and simply presented a number to the government without

6   explanation.  In fact, LMC and the Air Force collaborated on developing cost

7   estimates for the RSA program.  UF 24.  These estimates were often prepared in

8   conjunction with "engineering change proposals" ("ECPs") pursuant to which the

9   Air Force changed requirements for the RSA products.  *Id*.  As part of the ECP

10  process, LMC and the Air Force would have detailed discussions regarding

11  requirements for the product being proposed, after which LMC would develop a

12  cost estimate.  *Id*.  These estimates would be presented to the Air Force at meetings

13  at which the estimate and its underlying basis would be discussed.  *Id*.  Often, the

14  Air Force would ask LMC to re-run its projections to see if the product could be

15  developed for less money, or to determine how changing the scope of the product

16  could impact the costs.  *Id*.

17      Hooper, apparently unaware of these discussions between LMC and the Air

18  Force, has simply leaped to the conclusion that because a cost estimate was

19  allegedly reduced, it (*i.e.*, the reduced estimate) must have been false.  For example,

20  Hooper asserts that the estimate for the FOA product "was falsely cut in half when

21  submitted to the government" (TAC ¶ 26), but it is undisputed that the *government*

22  directed LMC to reduce the estimate for that product.  UF 24.  Government

23  knowledge and approval of a claim before it is presented for payment negates

24  liability.  *Durcholz*, 189 F.3d at 545.

25      These allegations are further refuted by the individuals who prepared cost

26  estimates.  Mike Allen, identified as a primary witness for Hooper, testified that he

27  did not have any knowledge of any false productivity estimates being submitted to

28  the government.  UF 25.  Mr. Allen further testified that when he had disagreements

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-20-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   regarding what productivity rates to use for a cost estimate, "the management that I

2   was dealing with at the time respected my experience and decided that they would

3   take my input." *Id*. He admitted that he never felt his engineering judgment was

4   compromised regarding the decisions underlying his estimates. *Id*.

5       Greg Braun, the individual with primary responsibility for developing cost

6   estimates from 2002 to 2006, similarly does not believe that his engineering

7   judgment was ever compromised regarding his estimates. UF 26. Nor does Mr.

8   Braun believe that any false or purposefully unrealistic estimates were provided to

9   the government. *Id*. There is simply no support for Hooper's claims.

10      **D.    Hooper's False Estimates Claim Fails Under the FCA.**

11      Not only is there no evidence that a "false" claim was submitted to the

12   government, even if any of the estimates provided by Loral or LMC to the Air

13   Force could be considered "false," Hooper cannot establish that they were

14   "knowingly" false or that such statements were "material" to the Air Force's

15   decisions to make contractual payments to LMC.

16      Hooper's theory appears to be that Loral "knew" that it would not be able to

17   achieve the productivity rate for the RSA program cited in its response to the RFP.

18   TAC ¶ 35. However, there is no evidence whatsoever that Loral did not believe its

19   estimated productivity rates to be realistic. Notably, Mike Allen – who is the

20   purported basis for the majority of Hooper's allegations in the TAC – testified that

21   he had occasion to review some of the draft bids prepared by Loral, and concluded

22   that Loral's employees did *not* intentionally submit false estimates. UF 29.

23      Even if Hooper could show that Loral's and LMC's estimates turned out, in

24   hindsight, to be wrong, he cannot show they were a lie. The Ninth Circuit has

25   characterized such allegations as insufficient:

26          Wang's entire claim is based on an allegedly faulty

27          calculation by another FMC engineer. But Wang's criticism

28          of the engineer's calculations, even if accurate, proves no

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-21-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1    more than an "innocent mistake."  Wang only says that the

2    miscalculation reflected the engineer's "very low level of

3    understanding."  Bad math is no fraud…. Proof of one's

4    mistakes or inabilities is not evidence that one is a cheat.

5    *Wang*, 975 F.2d at 1420-21.

6        In *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 562 F.3d 295, 308-

7    09 (4th Cir. 2009), the relator alleged that defendant's proposal promised that a

8    specific number of personnel would work the contract and that this statement was

9    made to fraudulently induce the award of the contract.  The evidence showed,

10   however, that the government considered this number merely part of a detailed cost

11   estimate.  The court affirmed summary judgment for the defendant on the basis that

12   the relator could not establish a fraudulent inducement claim.  *Id*. at 309.

13       Here, the government had access to Loral's productivity estimates and

14   conducted an independent examination of those estimates.  UF 10.  The level of

15   detail provided to the government for Loral's "Basis of Estimate" eviscerates

16   Hooper's claim of fraudulent conduct.  Loral provided voluminous information to

17   the government regarding its productivity rates as well as the settings and

18   assumptions used in creating the cost estimates.  UF 10.

19       Based on its own evaluation, the government concluded that Loral's

20   productivity rates were "optimistic" and actually *increased* the amount of Loral's

21   bid to account for this alleged "optimism."  *Id.*  Nevertheless, the government still

22   determined that Loral – even if not the cheapest bid – was the "best value" based on

23   the government's assessment of Loral's technical capabilities.  UF 11.  Even if

24   Hooper could show falsity, the undisputed facts demonstrate that the productivity

25   rates did not induce the government to award the contract to Loral.  Thus, Hooper

26   cannot show fraudulent inducement or materiality.  *See Anton*, 91 F.3d at 1266

27   (government's payment decision did not rely on allegedly false information

28   supplied by school district regarding the number of students); *United States ex rel.*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-22-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   *Berge v. Board of Trustees of the Univ. of Ala.* 104 F.3d 1453, 1460 (4th Cir. 1997)

2   (university's allegedly false statements were not material because they were not

3   central to the government's decision to fund the university's research grant); *United*

4   *States v. Intervest Corp.*, 67 F. Supp. 2d 637, 648-49 (S.D. Miss. 1999) (although

5   court presumed that certifications about condition of apartments were false,

6   summary judgment was granted in favor of defendant apartment owner because the

7   government knew of the condition and continued paying housing assistance grants,

8   showing that the government had not relied on the false certifications).

9   **V.   AS TO COUNTS II & III, THE DISCLOSURE AND APPROVAL OF THE FOSS SHOWS THE ALLEGATIONS ARE MERITLESS.**

10

11         Hooper commenced this litigation under the mistaken beliefs that it was

12   improper for LMC to sell the government products containing free and open source

13   software (FOSS) – software code that was not developed from scratch by LMC, and

14   that FOSS had not been disclosed.[6] Hooper's view (which was unsupported even

15   when he worked for LMC), was that because FOSS came from sources available on

16   the internet, it was "buggy" and that the license restrictions that accompany FOSS

17   products make them ineligible for use on DoD contracts. TAC ¶ 52, 74.

18         Although some may have been confused during the early years of this

19   contract as to whether FOSS could be used and how, it is undisputed that the FOSS

20   used here was disclosed to and approved by the Air Force. Further, as noted above

21   in the fact summary, the DoD has debunked Hooper's views and has essentially

22   mandated that its procurement agencies direct contractors to rely on FOSS, not just

23   because of the significant cost savings but because of the enhanced reliability that is

24   inherent in software code that is open and available for widespread analysis, use

25         [6] Although the complaint and some of the documents in this case use the terms

26   freeware and FOSS synonymously (TAC ¶ 39), the difference is that FOSS includes the source code underlying the software (so that it may be analyzed and modified), whereas

27   freeware typically includes only the executable program without the source code. *See* UF 39.

28

CROWELL & MORING LLP
ATTORNEYS AT LAW

-23-

LAACTIVE-600710261.1

1   and improvement.  Hooper's unsupported claims about FOSS were never valid, and

2   apparently are the product of a fundamental misunderstanding of what FOSS is.

3       **A.    Non-Disclosure Allegation**

4       Hooper alleges that LMC failed to disclose its use of FOSS and that LMC

5   failed to meet contract requirements because FOSS was provided to the government

6   without the unlimited intellectual property rights which Hooper believed the

7   contract required.  Hooper has long lacked any evidence to show that LMC failed to

8   disclose to the government its use of FOSS.  The evidence demonstrates, and

9   Hooper has repeatedly admitted in his pleadings and testimony, that LMC disclosed

10  the use of FOSS to the Air Force and disclosed that the FOSS licenses provided the

11  government with less than unlimited rights in the FOSS.  UF 43.  In fact, LMC

12  produced to the government a series of letters and supporting documentation to

13  disclose in detail its use of FOSS and the FOSS licenses.  UF 45, 50.

14      Even more significantly, the responsible government personnel explicitly

15  approved of such use and took the additional step of incorporating the FOSS items

16  into a contract modification.  UF 52-54.  Even if LMC's inclusion of FOSS had

17  been a deviation from contract specifications (which it was not), there was no

18  "knowingly" false statement because the Air Force knew and approved of LMC's

19  inclusion of those products.  UF 43-54.  Major Pike, the Air Force official in charge

20  of coordinating the Air Force's detailed assessment of FOSS use on the RSA

21  contract, stated it was his "duty to assess the functionality, security and flight safety

22  risks associated with the FOSS items . . . ."  UF 49.  The fact that the government

23  knew and approved of the FOSS used on the contract precludes any finding of

24  liability under the FCA for non-disclosure.  *See, e.g., United States ex rel. Butler v.*

25  *Hughes Helicopters, Inc.*, 71 F.3d 321, 328 (9th Cir. 1995) (defendant's

26  representation to Army was not a "knowingly" false statement where Army knew

27  of non-compliant tests);  *Wang*, 975 F.2d at 1421 (relator could not meet scienter

28  element when government was aware of alleged deficiencies identified by relator

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-24-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   and the contractor had openly discussed them with the government).  Accordingly,

2   Hooper's non-disclosure claims are refuted by the evidence and cannot support an

3   FCA claim.

4   **B.     Late Disclosure Allegation**

5       After Hooper learned of the FOSS disclosures, he amended his complaint to

6   allege that the disclosures were late and incomplete.  UF 56.  He has no evidence

7   that FOSS should have been disclosed at some particular time.  The evidence

8   demonstrates that government representatives with the authority and responsibility

9   to address the use of FOSS on the contract had no reason to believe that LMC

10  should have made its disclosures at an earlier time.  UF 66.

11      Hooper admitted that he has no basis for asserting a timing requirement on

12  FOSS disclosure.  UF 57.  He never identified any timing requirement for FOSS

13  disclosure under the RSA contract.  No contractual deadlines are identified, and no

14  software delivery dates are identified.  In fact, Hooper has admitted that he does not

15  know if there was any particular contract provision, Air Force requirement,

16  standard, or any other type of guidance or requirement that dictated the timing of

17  disclosure of use of FOSS on the contract.  UF 57.

18      Further refuting Hooper's claim, the Air Force has explained that "[n]o

19  obligation under the RSA IIA contract required Lockheed Martin to disclose

20  freeware at a given point of time."  UF 58.  Apart from the lack of any false

21  statement or deception, Hooper cannot establish that the timing of the disclosures

22  was material to the Air Force.  To the extent Hooper argues that LMC's "late"

23  disclosure somehow prevented the Air Force from exercising its discretion on

24  whether or not to accept the FOSS products, he is wrong.  Major Pike stated that "at

25  any given point, if the Air Force had opted for any reason not to utilize some or all

26  of the FOSS items that Lockheed Martin had proposed, then the Air Force would

27  not use it or approve its use."  UF 65.  However, the Air Force did not deem it

28  "necessary or important" to exclude the FOSS.  *Id.*

CROWELL & MORING LLP
ATTORNEYS AT LAW

-25-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1    The evidence from the Air Force is clear that LMC's use of FOSS was

2    permissible, involved no false statements or claims, and that the timing of

3    disclosure had no material effect the Air Force's decision to pay for the work

4    performed on the contract.  *See Hendow*, 461 F.3d at 1172.

5        **C.    Incomplete Disclosure**

6        Hooper's final fallback position is that even after LMC's updated FOSS

7    disclosure in 2007, there remained undisclosed FOSS.  TAC ¶ 65.  This assertion,

8    he admitted, is based on pure speculation.  UF 59-64.  Although Hooper purports to

9    identify 71 different undisclosed FOSS items (UF 59), each is without merit.  UF

10   60-64.  As to 45 of those items, Hooper admits he cannot be certain that the items

11   are FOSS.  UF 61.  He concedes that his "methodology" for identifying these items

12   as undisclosed FOSS delivered to the Air Force is based solely on his picking

13   random words out of documents that were produced in discovery by LMC and

14   doing a Google search to determine if the word matched the name of anything

15   downloadable for free on the Internet.  UF 62.

16       Hooper admitted he did not save or print out the web pages associated with

17   these alleged FOSS items, did not test any of them or attempt to download any of

18   them.  UF 62.  For some items, Hooper's basis for asserting it was FOSS was

19   merely that "[i]t seemed like it could be a piece of freeware…" and "seems" or

20   "appeared" "to be downloadable for free."  *Id*.  Often, Hooper's basis for claiming

21   that a certain item was delivered to the Air Force was merely that the word showed

22   up in a test log.  *Id*.  Hooper has no basis to believe that these items were even

23   software, let alone that they constituted freeware or FOSS which LMC personnel

24   downloaded, used in a product, and delivered to the Air Force.  With respect to the

25   other 25 allegedly undisclosed additional FOSS items, Hooper admitted that some

26   or all of them were in fact disclosed to the Air Force.  UF 63.  Hooper cannot show

27   that any undisclosed items were delivered to the Air Force.

28       In fact, none of the 71 items identified by Hooper constitute undisclosed

FOSS that was delivered to the Air Force.  UF 64.  LMC personnel analyzed each item and the documents Hooper said he relied upon.  UF 63-64.  These items were composed of: purchased (not free) software; software that LMC developed from scratch; FOSS that already had been disclosed; freeware tools used internally that were never delivered in a product; and fifteen names that are not even software, including "JSC" (which stands for NASA's Johnson Space Center), two space launch vehicles, and various hardware items.  UF 63-64.   Hooper's claim that these items are undisclosed freeware or FOSS highlight the frivolous nature of this lawsuit.

## VI.   AS TO COUNT IV, THERE IS NO EVIDENCE OF FALSIFIED TESTS OR FAILURE TO SATISFY TESTING REQUIREMENTS.

Hooper's false testing count is a hodgepodge of allegations for which there is no evidence.  As with his other claims, several of the matters about which he complains were known to – even witnessed by – the Air Force (or its authorized representatives) which worked side by side with LMC in finding technical solutions to engineering challenges.  Other matters about which he complains simply did not happen, and he has no evidence suggesting otherwise.

### A.   Allegation of General Practice of Skipping Tests

Hooper claims, on information and belief, that LMC had a "practice" of not performing 30-50% of required tests.  TAC ¶ 97.  Hooper admitted he has no knowledge of such a practice.  UF 87.  Although he claims that he obtained this information from former LMC employee Mike Allen, Mr. Allen has no recollection of providing such information to Hooper, and Mr. Allen was not aware of such a practice.  *Id.*  Fred Herr, a LMC testing engineer on the RSA contract for the past seven years, is unaware of such a practice; to the contrary, all tests have been completed.  *Id.*  Hooper's broad allegation is – simply put – entirely lacking.  *See United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051-52 (9th Cir. 2001) (claim based on falsified test results failed pleading requirement where

CROWELL
& MORING LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   relator did not specify the dates, times or places the tests were conducted).

2   **B.      Allegation of Failure to Perform Unit Tests**

3   Hooper further alleges that LMC stopped performing unit tests without

4   notifying the Air Force.  Again, Hooper admitted he has no personal knowledge

5   supporting his allegation that LMC purportedly failed to conduct tests.[7]  UF 87.  He

6   admitted that all of his testing allegations are predicated on information provided to

7   him by Mr. Allen and a conversation Hooper had with LMC employees Greg and

8   Trish Braun.  UF 81.

9   These witnesses do not support Hooper's false testing allegations.  First, Mr.

10  Allen stated that he did not have any information that LMC failed to complete any

11  of the tests required by the Air Force.  UF 82.  Although Mr. Allen stated that he

12  thought LMC did not always complete tests in their normal order (*i.e.*, sequence),

13  he believed that all required tests were completed.  *Id.*

14  Second, Hooper cannot rely on inadmissible hearsay statements by the

15  Brauns to defeat summary judgment.  *Cormier v. Pennzoil Exploration &*

16  *Production Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (affirming summary judgment

17  for defendant and holding that the district court may not consider hearsay

18  evidence).  In any event, Mr. Braun denies that he ever made this statement to

19  Hooper, and he has no recollection that RSA program management ever ordered

20  testing to be stopped.  UF 83.

21  The only deviation from contract test procedures that Hooper can point to is

22  

23  [7] *See, e.g.,* UF 80, citing Hooper Depo. at 599:6-12 ("[T]esting was not one of your job responsibilities; correct?  A.  Correct.");  602:10-14 ("Q.  Did you ever witness a Unit

24  test being conducted?  A.  No.");  611:2-4 ("Q.  Have you ever witnessed a Unit Integration test being conducted?  A.  No.");  619:19 - 620:9 ("Q.  Have you ever

25  witnessed a CQT test?  A.  No, I haven't been there witnessing the test, but I've been in meetings where these tests are talked -- are discussed.  Q.  But you haven't witnessed the

26  test itself; correct?  A.  No.");  674:24 - 675:4 ("Q.  Have you ever attended an acceptance

27  test?  A.  No.");  726:17-19 ("Q.  Have you been involved personally in either a version or a regression test?  A.  No.").

28  

CROWELL & MORING LLP
ATTORNEYS AT LAW

-28-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-0561-DSF

LAACTIVE-600710261.1

that certain tests were conducted "out of order."  However, it is undisputed that this single instance of "out of order" testing was fully disclosed to, and approved by, the Air Force.  UF 84.[8]  Thus, as a matter of law, this event cannot form the basis of a "false" claim.  *See Lindenthal*, 61 F.3d at 1412 (work that satisfied contractor's contractual obligations could not have been false or fraudulent); *Butler*, 71 F.3d at 328 (no false claim when government knew of out of order testing).

Hooper's allegation that testing was "stopped" does not make any sense.  LMC personnel simply could not have ordered that testing be "stopped" without the Air Force or one of its many consultants finding out and raising an alarm.  UF 85.  The Air Force was intimately involved in the testing process, had representatives present at much of the testing, and hired three separate independent consultants to monitor and audit the software development and testing process.  UF 76-79.  Not only were these consultants invited to tests, some had offices in and/or keys to LMC's facility.  UF 77.  Hooper is unable to identify how LMC could have stopped testing without the government finding out.  UF 86 ("Q.  So how was Lockheed able to conceal UT and UIT test results if they were made available during the CQT testing? . . . . A.  Well, that's not clear to me right now.")

## C.    Allegations Regarding the Ethernet Interface Card

Hooper's allegation that LMC "secretly disabled" an Ethernet interface card is both false and irrelevant.  TAC ¶ 99.  As with all of his testing allegations, Hooper has no personal knowledge to support Count IV.  UF 89.  Hooper bases this allegation on hearsay information learned from Mr. Allen.  *Id.*

Hooper is correct that the contract required "redundancy" (*i.e.*, backup) in the Flight Operations ("FO") system, but he misunderstands how that redundancy was

---

[8] This process was emblematic of the collaborative process between LMC and the government in the RSA program:  the testing issue was raised at a technical meeting prior to the CQT test, discussed among the parties, who settled on the mutually agreeable solution of permitting certain unit and unit integration tests to be performed after CQT.  *See* UF 84.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-29-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

engineered.  Hooper claims that "redundancy" required FO product to have two Ethernet cards, and that LMC's removal of one violated the contract.  TAC ¶ 99.  In fact, the redundancy requirement was for LMC to build two entirely separate FO systems with one as the backup.   UF 90.  Although each system contained two interface cards, two cards were not needed to provide the required redundancy, because even if an interface card failed, there was a wholly separate FO system that would have continued to operate.  *Id.*  Thus, the disabling of one card from one of the two systems did not violate the redundancy requirement.

Most importantly, the issue with the Ethernet card was far from secret – when the issue was discovered during testing, LMC personnel documented it as a problem report ("PR"), bringing it to the attention of the Air Force's consultants.  UF 91.  Indeed, Hooper conceded that the government knew of this issue.  *Id.*

## D.    Allegations Regarding Changing Test Results

Hooper's allegation that test results were "falsified" by changing expected results to conform to actual results, (TAC ¶ 100), is unsupported and reveals a misunderstanding of the testing procedure.

Testing is an iterative process:  software is written, then it is tested, and if problems are identified, fixes are implemented, and the software is tested again.  UF 93.  This process is repeated until the testing no longer identifies problems or remaining issues are at an acceptable level to the government.  *Id.*  This secondary testing of the software is referred to as "PR verification" or "regression" testing.  Although test procedures are prepared prior to the initial round of testing, when software is undergoing regression testing, the procedures must occasionally be revised during the tests because certain conditions regarding the software that is being tested may have changed.  *Id.*  For example, software conditions could change because the software itself has been changed, or because other software, configuration settings or data on which that software relies has changed.  *Id.*  As a result, the "expected" test result in the original test procedures may no longer apply,

CROWELL & MORING LLP  
ATTORNEYS AT LAW  

-30-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LOCKHEED MARTIN'S MOTION FOR SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1  so the test procedures must be revised to account for the revisions to the software.

2  *Id.* There is nothing "false" or "fraudulent" about this procedure.

3       Notably, Mr. Allen, who is the purported basis for Hooper's allegation, does

4  not characterize this alleged practice as "falsifying" a test result. UF 93 ("Q. And

5  did you characterize this as a process of falsifying test results? A. I don't believe

6  so. I simply stated that this was a practice during testing."). Additionally, Mr.

7  Allen testified that LMC personnel "would always document that they changed it

8  because that's how it was done. They would always document the reason they

9  changed it as best they could." UF 94. The government and its consultants were

10  fully aware of this practice, and were provided with documentation regarding any

11  changes made to the test results.

12       **E.    Hooper's False Testing Claims Fail Under the FCA**

13       The fact that the government knew of LMC's testing practices negates any

14  alleged false claim. In *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71

15  F.3d 321 (9th Cir. 1995), the relator claimed that the defendant contractor made

16  false statements and submitted false claims to the Army regarding the testing and

17  performance of navigation systems on the Apache helicopter. *Id.* at 323. The

18  Army decided for strategic and financial reasons to conduct Phase III of testing on

19  the Apache before Phase II was completed. Thus, some of the testing on Phase II

20  was curtailed. *Id.* at 324. The contractor prepared new test plans for the Army's

21  approval. The Army knew that the test plans did not include all of the testing

22  referred to in the contract documents. *Id.* The Army's technical representatives

23  reviewed the test plans and recommended their approval to the Army contracting

24  officer, who approved them without reading them. Later, the Army approved the

25  test reports prepared by the contractor, once again based solely on the

26  recommendation of its technical representatives. *Id.* Based on the Army's

27  knowledge of and access to the testing information, the district court found that

28  relator "did not present legally sufficient evidence that any allegedly false statement

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-31-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   or claim was made with the requisite intent" or that the contractor made any false or

2   fraudulent statements.  *Id.* at 325.  The Ninth Circuit affirmed, finding that there

3   was no "knowingly" false statement when "noncomplying tests were known to and

4   approved by the Army."  *Id.* at 328.

5          *Butler* is directly on point: because the government knew of any alleged

6   deviations from testing procedures, there cannot be a "knowingly" false statement

7   as a matter of law.  Even if any of the testing events Hooper alleges occurred, it is

8   undisputed that the Air Force was privy to LMC's testing procedures and

9   participated in the testing of the RSA products.  UF 76-79.  Such government

10  involvement and knowledge about the events negates any allegation that defendant

11  could have "knowingly" made a false claim.  *See United States ex rel. Costner v.*

12  *United States*, 317 F.3d 883, 888 (8th Cir. 2003) ("the extent of the government's

13  knowledge through its on-site personnel and other sources shows that . . . the

14  'government knew what it wanted, and it got what it paid for.'") (internal citations

15  omitted); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 732-33 (7th Cir. 1999)

16  (affirming dismissal of *qui tam* FCA claims because the relator failed to

17  demonstrate that the omission of the test at issue was material to the buying

18  decision of the United States).  Even if Hooper could establish that there were

19  deviations from testing procedures, there is no evidence that any such deviation was

20  concealed from the Air Force or that the Air Force had materially relied upon the

21  fact that there was no deviation in its decision to pay any particular invoice.  If the

22  Air Force thought there had been a testing impropriety, it could have requested

23  revisions to the testing procedures, or withheld payment and refused to accept the

24  product.  UF 95.  "Where the government and a contractor have been working

25  together, albeit outside the written provisions of the contract, to reach a common

26  solution to a problem, no claim arises."  *Laird*, 491 F.3d at 262-63.

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

**VII.   SUMMARY JUDGMENT SHOULD BE GRANTED ON ALL COUNTS
BECAUSE HOOPER CANNOT IDENTIFY A SINGLE CLAIM FOR
WHICH LMC WAS NOT ENTITLED TO BE PAID.**

"It seems to be a fairly obvious notion that a False Claims Act suit ought to
require a false claim." *United States ex rel. Aflatooni v. Kitsap Physicians Service*,
314 F.3d 995, 997 (9th Cir. 2002) (affirming summary judgment for defendant
where relator's evidence described a scheme but did not identify a single claim for
payment in violation of the FCA).  Although the Court permitted certain of
Hooper's claims to survive the pleading stage, the Court observed that "Relator's
sweeping generalization that every invoice under the Contract must be false is
somewhat problematic . . . . Nevertheless, Defendant should be able to respond to
the claim and obtain more specific detail with a reasonable amount of discovery."
August 12, 2008 Order at 4, Docket Item No. 44.  After two years of discovery and
over 2.7 million pages of documents produced in response to Hooper's extensive
and broad discovery requests, Hooper has never identified a false payment request.
Instead, he clings to the notion that *every* payment request on a 15-year, nearly
$900 million contract (which involved much more than developing and testing the
software about which he complains) is false.  His inability to identify a particular
false claim is fatal.  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)
(underlying improper practices alone are insufficient to state a claim under the FCA
absent allegations that a specific fraudulent claim was in fact submitted to the
government).

Hooper alleges that DD Forms 250 were typical of the false claims for
payment that LMC submitted to the Air Force.  TAC ¶¶10-14, 37.  However, it is
clear that the DD Form 250 examples he cites cannot form the basis for a false
claim.  UF 67.  *See Lindenthal*, 61 F.3d at 1406 n.5 (DD Form 250 is not a claim
for payment and did not constitute a false claim); *United States ex. rel Parvin v.
McDonnell Douglas Corp.*, No. CV 92-7474 SVW, slip. op. at p. 5 (C.D. Cal. Jan.
12, 1994) (DD Form 250 cannot constitute a false claim because "it is not a

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-33-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

1   statement made to the government for purpose of payment" but rather "a statement

2   made by the government upon receipt of materials" for which an individual cannot

3   be held liable under the FCA).  Indeed, this Court rejected Hooper's argument that

4   the two examples of DD Forms 250 represent false claims.  *See* August 12, 2008

5   Order at 6, Docket Item No. 44 ("Relator has not established with the requisite

6   particularity that the Example [DD 250] contained 'a false record or statement <u>to</u>

7   <u>get a false or fraudulent claim paid or approved by the Government</u>.'  31 U.S.C. §

8   3729(a)(2)" (emphasis in original)).

9        In response to this setback, Hooper attached to the TAC a list of "almost all"

10   of the contract invoices.  TAC ¶¶ 68, 88 and Ex. A to TAC.  He also added five

11   paragraphs in which he listed 23 contract line item numbers ("CLINs"), which he

12   asserted somehow link some of the software with the list of the invoices submitted

13   under the 15-year contract.  TAC ¶¶ 68-72, 88-92 and Ex. A to TAC.  However,

14   after ample discovery, Hooper remains unable to identify one single false claim for

15   payment.  Despite LMC's production of each and every one of those invoices

16   (amounting to over 27,000 pages of documents), Hooper still cannot explain how to

17   connect any one of the 27,000+ pages of invoices to a false claim for payment

18   associated with any particular allegation.  UF 68.  Further, when asked to identify

19   claims for payments associated with allegedly defective deliveries, Hooper simply

20   pointed back to all 27,000+ pages of invoices.  *Id.*

21        By referring generally to every invoice and every DD Form 250, Hooper is

22   attempting to litigate every aspect of this 15-year $900 million program – every part

23   of the proposal that led to the contract award, every piece of software, every piece

24   of hardware, and every test that was performed at any level.  Such an overbroad

25   allegation is not permitted in a *qui tam* case.  *See Bettis,* 297 F. Supp. 2d at 280

26   (rejecting allegation that all contract claims were automatically tainted by

27   fraudulent inducement of the contract award); *Aflatooni*, 314 F.3d at 1002

28   ("Evidence of an actual false claim is the '*sine qua non* of a False Claims Act

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-34-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1

violation' and "generalized, speculative suppositions [relator alleged that a quarter of the 10,000 bills submitted each year contained overcharges], fail to detail any particular false claim").  Of course, such a sweeping allegation would make the trial of this matter unmanageable.  Because Hooper has failed to tie his allegations into the specific purported false claims for payment – even after being specifically advised of this deficiency in his complaint – summary judgment should be granted on all counts.

## VIII.  CONCLUSION

For the foregoing reasons, LMC respectfully requests that the Court grant its Motion for Summary Judgment in its entirety, or alternatively, that partial summary judgment be granted.

Dated:        November 22, 2010                Crowell & Moring LLP


                                    /s/    Mark R. Troy
                                    Mark R. Troy
                                    Jeffrey H. Rutherford
                                    Nathanial J. Wood
                                    Mana Elihu Lombardo
                                    Attorneys for Defendant
                                    LOCKHEED MARTIN CORPORATION

LAACTIVE-600710283.2

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-35-

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF LOCKHEED MARTIN'S MOTION FOR
SUMMARY JUDGMENT; CASE NO. CV 08-00561-DSF

LAACTIVE-600710261.1