Mark I. Labaton (SBN 159555)
MOTLEY RICE, LLP
1100 Glendon Avenue, 15th Floor
Los Angeles, CA  90024-3503
Telephone:  (310) 500-3488
Facsimile:  (310) 824-2870
Email:     mlabaton@kreindler.com

Joseph A. Black
Daniel E. Cohen
James A. Moody (Of Counsel)
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone:  (202) 944-8600
Facsimile:  (202) 944-8611
Email:     jab@cullenlaw.com
           dec@cullenlaw.com
           moodyjim@aol.com

*Attorneys for Plaintiff Nyle Hooper*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES *ex rel.* NYLE HOOPER,<br><br>                    Plaintiff,<br><br>        v.<br><br>LOCKHEED MARTIN CORPORATION,<br><br>                    Defendant. | Case No.  CV 08-00561 DSF (FMOx)<br><br>**PLAINTIFF HOOPER'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:      January 10, 2011<br>Time:      1:30 p.m.<br>Crtrm:     840<br>Judge:     Hon. Dale S. Fischer |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................ 1

   A. Lockheed's False Underbids Are Actionable ........................ 2

   B.  Lockheed's Failure to Disclose and Late Disclosure
      Of Freeware Were Materials ................................................ 3

   C.  Lockheed's Improper Testing Was Material ......................... 4

II.  HOOPER'S STATEMENT OF RELEVANT FACTS .................... 5

   A. Hooper's Allegations that Loral Underbid the Original
      Contract and that Lockheed Underbid Subsequent
      Charges to the Contract Have Been Confirmed by
      Testimony and Documentary Evidence ................................ 5

   B. Lockheed Used Freeware and FOSS Items in the Development
      of the RSA IIA Program Without First Disclosing or Fully
      Disclosing Their Use to the Air Force ................................. 8

   C. Lockheed's Failure to Follow Required Testing
      Procedure Resulted in the Delivery of Defective
      Products to the Air Force .................................................. 11

III. SUMMARY JUDGMENT STANDARD ................................... 13

IV. LOCKHEED'S MOTION FOR SUMMARY JUDGMENT SHOULD BE
    DENINED ON ALL COUNTS .............................................. 14

   A. The Invoices and Award Fee Applications Are
      False Claims Because Lockheed Underbid the Contract ....... 14

   B. Lockheed's False Statements Were Material As They
      Had the Potential When Made to Affect the Government's
      Decisions Relating to the Contracts .................................... 23

   C. Invoices and Award Fee Applications Were
      False Claims Because They Were Submitted Prior to
      Freeware Disclosure and Approval ..................................... 27

1

2   CONCLUSION ............................................................................................ 32

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

### Cases

3

4   *Anderson v. Liberty Lobby, Inc.,*
        477 U.S. 242 (1986) ....................................................................... 14

5   *Celotex Corp. v. Catrett,*
        477 U.S. 317 ((1986) ...................................................................... 14

6

7   *Ebeid ex rel. United States v. Lungwitz,*
        616 F.3d 993 (9th Cir. 2010) .......................................................... 31

8   *Harrison v. Westinghouse Savannah River Co.,*
        176 F.3d 776 (4th Cir. 1999) ...........................................2, 15, 18, 21

9

10  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
        475 U.S. 574 (1986). ...................................................................... 14

11  *Neder v. United States,*
        527 U.S. 1(1999). ..................................................................... 24, 26

12

13  *Rouser v. Tilton,*
        2010 WL 2942687 (E.D. Cal 2010) . .............................................. 14

14  *T.W. Elec. Serv., Inc. v. Pacific Elec. Cntractors Ass'n,*
        809 F.2d 626 (9th Cir. 1987). ......................................................... 14

15

16  *United States ex rel Harrison v. Savannah River Co.,*
        352 F.3d 908 (4th Cir. 2003) .......................................................... 22

17  *United States ex rel Longhi v. Lithium Power Technologies, Inc.,*
        575 F.3d 458(5th Cir. 2009) ...............................................15, 24, 25

18

19  *United States. ex rel Oliver v. The Parsons Corporation,*
        498 F. Supp. 2d 1260 (C.D. Cal. 2006)........................................... 27

20  *United States ex rel Compton v. Midwest Specialities, Inc.,*
        142 F.3d 296 (6th Cir. 1998) .......................................................... 26

21

22  *United States ex rel. A+Homecare, Inc. v. Medshares Mgmt. Grp.,Inc.,*
        400 F.3d 428 (6th Cir. 2005) .............................................18, 24, 25, 26, 28

23  *United States ex rel. Alexander v. Dyncorp, Inc.,*
        924 F.Supp. 292(D.D.C. 1996) ...................................................... 15

24

25  *United States ex rel. Becker v. Savannah River Co.,*
        303 F.3d 284 (4th Cir. 2002) .......................................................... 29

26  *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
        297 F.Supp.2d 272 (D.D.C. 2004) ............................................20, 21

27

28  *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
        393 F.3d 1321  (D.Cir. 2005) ......................................................21, 22

*United States ex rel. Durcholz v. FKW, Inc.,*
189 F.3d 542 (7th Cir. 1999) ................................................................28

*United States ex rel. Hagood v. Sonoma County Water Agency,*
929 F.2d 1416 (9th Cir. 1991) ..............................................................28

*United States ex rel. Hendow v. Univ. of Phoenix,*
461 F.3d 1166 (9th Cir. 2006) ................................19, 20, 21, 30, 31

*United States ex rel. Laird v. Lockheed Martin Engineering & Science*
*Services Co.*, 491 F.3d 254 (5th Cir. 2007) ..............................19, 20

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.,*
614 F.3d 1163 (10th Cir. 2010) ............................................................31

*United States ex rel. Main v. Oakland City University*,
426 F.3d 914 (7th Cir. 2005) ........................................................15, 19

*United States ex rel. Marcus v. Hess*,
317 U.S. 537 (1943) ........................................2, 14, 16, 17, 19, 21

*United States ex rel. Mayman v. Martin Marietta Corp.*,
894 F.Supp. 218 (D. Md. 1995) ............................................................16

*United States ex rel. Ubl v. IIF Data Solutions*,
2007 WL 2220586 (E.D. Va. 2007) ......................................................15

*United States v. Bourseau*,
531 F.3d 1159 ..............................................................................24, 25

*United States v. Neifert-White Co.*,
390 U.S. 228 (1968) ................................................................................25

*United States v. President and Fellows of Harvard College*,
323 F. Supp. 2d 151 (D. Mass. 2004)..................................................27

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008) ....................27, 28

*United States v. United Technologies Corporation,*
---- F.3d ----, 2010 WL 4643244 (6th Cir. November 18, 2010) ..............14, 15,
.................................................................16, 17,  21, 22, 24, 25, 28

## **Statutes**

31 U.S.C. §3729(b)(4). .................................................................23

Fraud Enforcement and Recovery Act of 2009 ....................................23

## **Legislative History**

S. Rep. No. 99-345, 1986 U.S.C.C.A.N. 52266 ..............................18, 19

Pub. Law No. 111-21 § 4, 123 Stat. 1617 (2009)..................................24

## I.     INTRODUCTION

Defendant Lockheed Martin Corporation's motion for summary judgment against Plaintiff *qui tam* relator Nyle Hooper ("Hooper") on behalf of the United States should be denied because it misstates the law applicable to the allegations in the Third Amended Complaint ("TAC") under the False Claims Act ("FCA").  It is based on an incomplete, and incorrect, statement of the facts relating to Lockheed's performance under the Range Standardization and Automation Phase IIA contract with the Air Force ("RSA IIA").  Moreover, there are triable fact issues in dispute.

Lockheed's claims for payment under the RSA IIA contract (invoices and award fee applications) are false and therefore actionable under the FCA (for statutory penalties plus treble damages) for three independent reasons: (1) Lockheed underbid the contract (beginning a succession of ongoing underbids) by providing a false cost proposal based upon an inflated productivity rate (lines of code per hour) for developing software, and understated the total lines of code; (2) late-disclosed and undisclosed freeware was included in software in violation of the contract (requiring prior disclosure of "reused" software), incorporated standards (MIL-STD. 498 relating to the software development process, procedures and work instructions issued thereunder, and EWR 127-1 relating to safety), and regulation (requiring prior approval of software with less than unlimited rights); and (3) the software was improperly tested in violation of standards and procedures incorporated in the contract.

Software development was originally scheduled to be completed in 2002, yet is still not complete.  In fact, key components of this system, which were finally delivered in 2008, were rejected by the Air Force as not sufficiently mature for even acceptance testing.

The United States has sustained damages as a result of these false claims, including significant cost overruns.  The original contract was awarded at $ 433

million, but now is approaching $1 billion.  And, the delays have forced the Air Force to continue to use costly legacy software, and to "descope"[1] or transfer several programs to other contractors.

Relator Hooper attempted to correct Lockheed's pattern of false statements internally, for example by insisting on either non-use of freeware, or full and complete disclosure.  His status as an internal "whistleblower" led to his retaliatory termination and to Lockheed's late disclosure of freeware use.  He filed this suit to ensure the required contract compliance, deter false claims that (among other harms) threaten the integrity of the procurement process, and recover damages for the United States.

In short, the parties here have fundamental disagreements as to what the applicable legal standards are under the FCA.  Indeed, these disagreements lie at the very heart of the Motion now before this Court.  As the Department of Justice points out in its *amicus* brief, and as explained below, Lockheed's arguments are based on gross misstatements of applicable law.  When the correct legal standards are applied, all of Lockheed's arguments fail.

## A. Lockheed's False Underbids Are Actionable

Lockheed is wrong in its contention that false statements (underbid of a cost proposal) cannot form the basis for FCA liability.  Liability for false statements made to secure a contract award has been sustained by the Supreme Court in the landmark 1943 case *Marcus v. Hess,* 317 U.S. 537 (1943), and by numerous lower courts since that date.

It is well established that estimates, opinions, and even promises of future performance can form the basis for FCA liability.  *See, e.g., United States ex rel. Harrison v. Westinghouse Savannah River Co*. 176 F.3d 776, 792 (4th Cir. 1999). ("An opinion or estimate carries with it an implied assertion, not only that the

---

[1] This is military jargon for reducing specifications or goals.

speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it.")

All subsequent claims for payment in the form of invoices and award fee applications are actionable under the FCA because they were tainted by the original false bid, regardless of whether they contained new or independently false statements.   Lockheed cannot avoid liability by claiming the false cost proposals were merely "estimates" because cost was undisputedly a material factor in awarding the contract and its subsequent modifications.[2]

### B. Lockheed's Failure to Disclose, and Late Disclosure of, their Use of Freeware Were Material.

Lockheed is wrong in its statement as to the standard for materiality under the FCA.  There is no government reliance or causation requirement.  A materially false statement that is actionable under the FCA is one that has the potential to affect the United States' decision-making process.  It is an objective standard, not a subjective one.

Under the "natural tendency" standard -- adopted in the Ninth Circuit and now by Congress -- Lockheed's concealment of the use of freeware for years; false statements regarding its inclusion of freeware; failure to follow the procedures for analyzing, obtaining advance approval of and using freeware; and failure to disclose all its various uses of freeware in the delivered product; were each material because the conduct had the potential *at the time* to affect the United States' decisions relating to the contract.

Lockheed did not propose the use of freeware in its original contract, which banned such use by requiring that all software be delivered with "unlimited" rights. Lockheed actively concealed its use of freeware and only began actively disclosing

---

[2] Lockheed had boasted of their precision by including three and sometimes four digits for accuracy.

its use *after* Hooper (a self-described internal "whistleblower") was terminated. The Government could have refused the inclusion of freeware, could have refused specific packages, or could have terminated the contract for convenience or non-performance.  The Government's acceptance of the freeware-including software products does not preclude liability under the FCA because there is no requirement that the Government actually relied on the false statements; nor is the Government's later acceptance a waiver of previous or ongoing violations.

### C. Lockheed's Improper Testing Was Material.

The contract and its incorporated standards and work instructions set forth precise procedures for testing and quality assurance, with especially heavy requirements for safety-critical software used to analyze and launch missiles.   The evidence demonstrates that Lockheed failed to perform required tests, performed tests out of order (increasing the costs of detecting and fixing errors), altered some test results without proper documentation, and failed to test according to performance requirements.  As with the freeware issue above, payments received by Lockheed for what was, in fact, improper testing constituted false claims - because the payments were for services in violation of contract requirements.  And, they were material because the United States could have refused to pay, and could have terminated the contract.

Lockheed's Motion misstates the applicable standard of proof for liability under the FCA, and further misstates the facts.  Evidence submitted by Hooper controverts the facts as stated by Lockheed.  Lockheed's Motion for Summary Judgment should be denied.

## II.   HOOPER'S STATEMENT OF RELEVANT FACTS

### A. Hooper's Allegations that Loral Underbid the Original Contract and that Lockheed Underbid Subsequent Changes to the Contract Have Been Confirmed by Testimony and Documentary Evidence.

Loral's Best and Final Offer ("BAFO") was $433.9 million. UF 96. Lockheed (Loral's successor-by-acquisition on the contract) has now been paid over $1 billion for its work on RSA IIA.  UF 96, 97.  The Air Force analyzed Loral's cost proposal and concluded that it was under bid. UF 98.  The Air Force stated that part of the underbid was based on "unrealistically optimistic assumptions about productivity." UF 99.  The Air Force made certain adjustments for this underbidding, but those adjustments were not enough to quantify the true nature of the underbid since the cost of the RSA IIA contract has now grown to twice the original corrected estimate.

Lockheed argues that its bid was only an estimate, and that an estimate can never be the basis for a false claim.  This argument is factually at odds with the record, and legally wrong.  If a bid can be characterized as "unrealistically optimistic," the bid *must* have been made with either actual knowledge that it was false, or at least with reckless disregard for its falsity.  "Unrealistically optimistic" is a polite term for a false bid.

Here, Loral compounded its false statements about its cost estimate by providing a risk estimate that claimed that its "proposal is low risk, and that the expected value of the final cost distributions are from 1.7% to 3.3% higher than our cost proposal."  UF 101.  And, Loral (Lockheed) falsely assured the United States that its proposal was not a mere "estimate," but instead a number that the United States could rely upon to determine the cost of product with some certainty, going so far as to label its bid as low risk, and to put small percentage deviation expectations on the difference between Lockheed's cost proposal and the expected final costs.

The Control and Display Segment ("CDSEG") component of the RSA IIA program is software intensive. UF 102.  Loral's bid for the CDSEG component was based on an average of 2.27 lines of code ("SLOC") per hour productivity rate.  UF 103.  It contains among other products Flight Operations ("FO") and Flight Analysis ("FA") UF 104.   After Lockheed took over the contract from Loral, Hooper and Allen were asked to do a "should cost" analysis on the cost to produce FO and FA.  UF 105.  The result was an output file from a software cost estimation model, System Evaluation and Estimation of Resources - Software Estimation Model ("SEER-SEM").  That analysis showed that the realistic productivity rate varied between 98 and 169 LOC per month, or 0.61 to 1.06 LOC per hour based on a 160 hour month.  UF 106.

As explained above and in even greater detail in Hooper's Statement of Material facts, Lockheed overstated its productivity rate by 2.2 to 3.8 times its actual rate.  The higher the productivity rate -- stated in terms of LOC per hour – indicates that the software will cost less to produce. UF 107.   This confirms Hooper's allegations of underbidding or at a minimum creates a disputed fact regarding underbidding.

Loral used the REVIC model for estimating portions of the software development which contains many of the same parameter settings as the SEER-SEM model.  Comparing the REVIC parameter settings with the SEER-SEM settings demonstrates why Loral's false productivity rate supporting BAFO cost proposal was so much higher than the rate based on realistic parameter settings. UF 105.

| Parameter | REVIC Setting | SEER-SEM Should Cost Setting |
| --- | --- | --- |
| Analyst Capability | High | Nominal |
| Application Experience | High | Nominal |
| Modern Program Practices | High | Nominal |

Security Requirements             Unknown             Very High

And, Requirements Volatility was set at Nominal.  Hooper alleged in the TAC that this requirement should have been High+.  Lockheed has confirmed that there is a high degree of requirements volatility on the RSA IIA contract.  UF 6.

In addition to adjusting the parameter settings to achieve higher productivity rates - cutting LOC estimates - the divisions of Loral that were responsible for parts of the bid were instructed to cut their bids by an arbitrary amount. UF 109.  The effect of underbidding a contract was that Lockheed would not have the resources necessary to produce the product to contract specification.  UF 110.  Lockheed would solve the problem of an underfunded program by going back to the government and negotiating a cost increase.  UF 111.

Lockheed rebid most of the components of the RSA IIA program UF. These rebids were contained in Contract Change Proposals ("CCP") or Engineering Change Proposals ("ECP") UF 116.  In developing its rebids Lockheed first used SEER-SEM to generate estimated hours and schedule for its bids.  UF 112.  SEER-SEM also produces an estimated cost for the entire project. UF 105.   Hooper has sought all of the SEER-SEM output files for the rebids, but Lockheed has refused to produce them in a useable format. UF 113.  Lockheed maintains that they are no longer available, even though they are required to be maintained by the contract and Lockheed's internal policy.  UF 114.  Further, internal Lockheed documents indicate that a "SEER run" was maintained in a software estimation archive for all bid proposals. UF 115.

The SEER-SEM outputs are highly relevant to the question of whether Lockheed underbid their estimates for the rebids made after the contract was awarded. UF 112.  These contracts were non-compete, but Lockheed was aware that the Air Force only had limited funds and that if Lockheed's bid was too high that the Air Force might not fund the project. UF 116.   According to one witness,

when one project was bid correctly to include all costs, the Air Force refused to fund the project because the bid was too high.  UF 117.

The SEER-SEM model outputs are crucial because they form the basis for estimating the software development costs.  Hooper alleges that some of the parameter inputs to the cost model were set falsely to produce a falsely low estimate.  Lockheed, however, could not reduce the cost estimate sufficiently by merely manipulating the parameters.  UF 118.   Indeed, Lockheed also made further adjustments to its bids to reduce the estimates to a level that Lockheed thought the government would accept. UF 118.  These reductions to the bid were not based on engineering judgment.  UF 118.  Instead, they were based on Lockheed's estimate of the level of funding that the Air Force was willing to accept.  UF 118.  As an example, the FOV1 Contract Change Proposal was underbid by 50 percent.  UF 119.  The FOA replan (rebid) was similarly underbid. UF 119.

### B. Lockheed Used Freeware and FOSS Items in the Development of the RSA IIA Program Without First Disclosing, or Fully Disclosing, Their Use to the Air Force.

During October 2001 Mr. Hooper was tasked with investigating the use of freeware and shareware issue at Lockheed.  UF 122.  The issue was whether the use of freeware[3] on the RSA IIA program violated Lockheed corporate policy and contract requirements.  UF 122.  As part of his investigation Mr. Hooper sought to find out how much freeware had been incorporated into RSA IIA products.  He gathered a preliminary list by May 2002 and put together a list of products.

Lockheed knew its freeware was not allowed for among other reasons the "rights" as evidenced by contemporaneous e-mails referenced in the TAC.  For example, an Air Force official advised a Lockheed Software/Architect/Manager

_____

[3] Hooper uses the generic term "freeware" to describe software that is obtained at no cost.  It includes shareware and Free and Open Source Software ("FOSS").

(Paul Usavage ) that: "The Air Force forbids the use of software acquired directly from non-DoD electronic bulletin boards."  UF 125.  Nonetheless, Usavage ordered Hooper to "Get over it," and find a way to use freeware. UF 126.

Lockheed's in-house intellectual property attorney (Katherine Good) advised that using freeware would result in Lockheed losing its ownership rights and not being able to transfer property rights to the government.  UF 127.  She stated, presciently, that "THIS IS A BIG SHOW STOPPER."  (emphasis in original)  UF 127.  She also told the business unit that Lockheed's legal office "routinely" counsels its business units that violating contract requirements should be viewed as "risk that is ultimately accepted as a cost of doing business."   UF 128.

Hooper was terminated in July 2002, following his self-described "whistleblower status."   Lockheed, fearing that Hooper would initiate a qui tam action, began in March 2003 to make limited disclosures to the government about its use of freeware.   UF 129.  Hooper's qui tam case was partially unsealed in March. 2006. UF 130.   After that, Lockheed made two additional disclosures in 2006.   UF 131.  These disclosures addressed only the intellectual property rights issue.  They were not complete, however, as they did not include all of the freeware identified by Hooper during his investigation of the freeware issue.  UF 132.

In response to Hooper's Complaint, the Air Force began asking questions about security and safety issues. UF 133.   Lockheed put together a team to answer the Air Force's questions.  UF 134.   The result of that effort was to put together a spread sheet that identified 131 FOSS products that Lockheed claimed were either incorporated into RSA IIA products or used in conjunction with the development of RSA IIA products.  UF 134.  This final report was made on May 13, 2007 and, *for the first time*, disclosed freeware products that Hooper identified as having been incorporated in deliverables in 2001.  UF 135.

During the process of responding to Air Force's questions, Lockheed attempted to assess the risk that the Air Force might force Lockheed to remove FOSS from RSA IIA products.  The cost of that risk (that Lockheed would be required to remove FOSS and use non-free software code) was initially estimated at $20,656,376.  UF 136.  Lockheed's Chief Engineer on the RSA IIA program, Paul Usavage,  and a Lockheed risk manager, Sonja Streuber,  "got together and sanitized the risk write-up and the estimate."  UF 137.  After sanitization, the risk was reduced to zero.   UF 137.

During the process of responding to the Government, Usavage stated that Lockheed was just making a "'best effort' which is really getting as much done in as little time as we can."  UF 138.  Lockheed either did not have a process, or there was a failure to follow a process to track the incorporation of freeware into deliverables.  UF 138.  All software, whether freeware or other, has to be approved by a Technical Review Board ("TRB").   But, 99.9 percent of software approvals at Lockheed (in this program) occurred outside the formal process, and the incorporation of that software was not properly documented.  UF 138.  The existence of freeware, or FOSS products, was not always recorded on the Software Version Descriptions ("SVD").  UF 138.  The reason for this is that the software engineers did not consistently report the freeware that they were using to Configuration Management, the division that was responsible for maintaining the SVD.  UF 138.  Since freeware/FOSS was not properly documented, Lockheed has no way of knowing that its disclosures to the Air Force are complete.

Moreover, Hooper has identified additional software that appears to be freeware by reviewing test logs and purchase requests and requisitions.   UF 61.  Lockheed disputes that any of these products are either freeware or products that were not previously disclosed.  UF 63.  Hooper disputes Lockheed's claim because

- 10 -

eight of these items that were claimed to be developed, or purchased, by Lockheed are clearly either freeware or FOSS products.  UF 135.

Taken together, Lockheed's documents and employee testimony demonstrate that Lockheed did not disclose all freeware/FOSS products to the Air Force that were used on the RSA IIA program and were not capable of disclosing such products because such products were not consistently documented in Lockheed's configuration management system.

Hooper does not dispute that Lockheed could use FOSS products in developing the RSA IIA program.  There are, however, certain contractually mandated procedures that Lockheed was required to follow in the use of FOSS products which it failed to do.  The principal requirement related to intellectual property rights was that Lockheed was required to obtain the written approval of the Contracting Officer before incorporation of any copyrighted computer software into software products delivered to the government.  UF 138.  Further, Lockheed's performance on the RSA IIA contract is governed by MIL-STD 498 and all of the requirements of MIL-STD-498 were contractual requirements.  UF 140.  Lockheed failed to meet the requirements of MIL-STD-498 by failing to disclose the use of freeware/FOSS products (described as "reusable software products" in Gray Report). UF 141.

### C. Lockheed's Failure to Follow the Required Testing Procedures Resulted in Delivery of Defective Products to the Air Force.

The final deliveries of the RSA IIA products were made during November 2008, and placed into final testing by the Western Range.  UF 142.   The products in this delivery were collectively called Mission Flight Control Center ("MFCC").  The MFCC consisted of several component products  (FO, FA, CTPS, Infrastructure, and Timing, and TEMS).   UF 142.

Problems with testing developed immediately.  UF 143.  ACTA (Air Force testing and analysis contractor) personnel concluded that the testing failures " call[] into question the basis on which related performance requirements were tested and passed [by Lockheed]."  UF 143.  By February 6, 2009, the testing failures had reached a point that the Air Force General in charge ordered that the testing be stopped.  UF 143.  He concluded: "In light of the concerns of both the operations and test communities, we believe the system is not mature enough in its development to resume "final testing]."  UF 143.

Hooper alleged generally that "Lockheed failed to perform all unit tests and CQT tests in conformance with the standards and processes specified in the contract [,] Mil-Std-498 and EWR 127-1 on products delivered to the government. . . ."  UF 144.  TAC 96 and that "Lockheed's failure to test all products as required by the contract and to follow proper test procedures resulted in Lockheed's delivering defective products to the Air Force ."  UF 144.  More specifically, as examples of these failures, Hooper alleged that Lockheed did not complete all unit tests according to the proper procedure, UF 145; secretly disabled interfaces to enable the FO product to pass tests, UF 145; and falsified test procedures by changing expected results to conform with actual results.  UF 145.

The Air Force contracted with ACTA Inc. to monitor and review Lockheed's tests. UF 76.  ACTA was highly critical of Lockheed testing procedures during these reviews.  UF 146.  These criticisms identified additional testing fraud.  While these criticisms were written for the Air Force, they apparently were not read by Air Force personnel.  UF 147.

Regarding Hooper's specific allegations, Allen testified that when heading into CQT (testing) for the FOV-1 product, the required 300 unit test had not been completed. UF 148.  Failure to complete unit tests before CQT is a violation of requirements  (Mil-Std 498).  UF 148.  Had Allen not raised the issue of the

incomplete unit tests, the matter would not have been disclosed by Lockheed to the Air Force.  UF 149.   Failure to complete unit tests was a common practice at Lockheed.  UF 150.  The failure to complete all required unit tests before CQT raises the cost of developing a software product.  The cost of fixing a problem discovered after unit test is up to ten times greater than if it were discovered at unit test.  UF 151.  Lockheed's solution to this increased cost was to go back to the Air Force and negotiate cost increases.  UF 152.

Lockheed also falsified its test results by changing the expected results that were set out in its test plans to match the actual results that were achieved during the test.  UF 153.  The result would be an invalid test.  UF 154.  The procedure would introduce additional risk into the product and make it unreliable. UF 153.  Lockheed's decision to turn off an interface also resulted in invalid test.  UF 155.  The reason the test was invalid was that Lockheed was not testing the product in the same environment defined by the product requirements -and in which it was intended to be used on the range. UF 156.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where there is a showing that "there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of identifying the evidence which demonstrates the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Rouser v. Tilton,* 2010 WL 2942687  (E.D. Cal. 2010) .  In the endeavor to establish the existence of a factual dispute, the party opposing summary judgment need not establish a material issue of fact conclusively in its favor.  "It is sufficient that the 'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Rouser,* 2010 WL 2942687 *3,

citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626,630 (9th Cir. 1987).  The evidence of the party opposing the motion is to be believed. *Rouser,* 2010 WL 2942687 *3, citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *Rouser,* 2010 WL 2942687 *3, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  It is the opposing party's obligation to produce facts from which the inference may be drawn. *Rouser,* 2010 WL 2942687 *3.

## V.   LOCKHEED'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ON ALL COUNTS.

### A.   The Invoices and Award Fee Applications Are False Claims Because Lockheed Underbid the Contract.

Lockheed argues that false statements made in its formal written offer (underbid of the cost proposal) cannot form the predicate for subsequent false claims (invoices and award fee applications).   Lockheed also claims that a cost "estimate" cannot be sufficiently false to trigger FCA liability.  As the DOJ points out in its *amicus* brief, Lockheed is wrong in its statement of the law, and Lockheed's misstatements and misunderstanding of applicable law both underlie and are fatally flaws in its Motion for Summary Judgment.  Furthermore, the facts (and logical inferences from those facts) presented by Hooper – and which are largely undisputed by Lockheed – reasonably establish beyond doubt the falsity of the bids for the RSA IIA contract.

Lockheed's liability for false statements, made to obtain the contracts at issue, is a straightforward application of the FCA.  *United States v. United Technologies Corporation,* ---- F.3d ----, 2010 WL 4643244 (6th Cir. November 18, 2010)(false statements in cost estimates submitted to secure contracts constituted violation of FCA); *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)

(collusive bid rigging); *United States ex rel. Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005) (false statement in application that University would not pay contingent fees to recruiters); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999) (courts have consistently found FCA violations "in other bid-rigging situations; when a contract was originally obtained based on false information or fraudulent pricing; or when a contract was obtained by a false representation about the ability to perform the contract."); *United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 513 F.Supp.2d 866 (S.D. Tex. 2007) (discussing fraudulent inducement theory of False Claims Act violation) (false representations regarding qualifications); *United States ex rel. Ubl v. IIF Data Solutions*, 2007 WL 2220586 (E.D. Va. 2007) (denying motion to dismiss where plaintiff adequately alleged fraudulent inducement in that defendant obtained a government contract through fraud); *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F.Supp. 292, 298 (D.D.C. 1996) (false statements in bid proposal regarding business ethics and availability of key personnel to complete contract on time); *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218, 223 (D. Md. 1995) (regulations specifically prohibit underbidding and cost-shifting).

The Supreme Court set forth the logical connection between a false bid to obtain the contract and the false claims for payment:

> The government's money would never have been [paid] ... to respondents had its agents known the bids were collusive.  This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government]. . . . The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

goal-payment of government money to persons who had caused it to be defrauded.

*Hess*, 317 U.S. at 543-44.

Contrary to Lockheed's argument, there is no "underbid" exception to FCA liability. (This point is well-made and explored in the DOJ's *amicus* brief.) The *United Technologies* decision is instructive. The Sixth Circuit held that the FCA provides for liability stemming from contracts obtained through an underbid based upon false price estimates, despite the fact that the Government subsequently benefited from revisions to the original contract.

The scheme in *United Technologies* was intended to drive up the cost of split-award contracts for jet engines, and then to offer a reduced price if the Air Force awarded a greater percentage of the engine contracts to defendant. *United Technologies,* 2010 WL 4643244 *1. In effect, the scheme produced an underbid for a sole source contract. *Id.*\*3. The original contract obligated the Air Force to purchase a minimum number of engines in each of six succeeding years.

In each of six years over which the original contract was in effect, the Air Force negotiated modifications for improvements, and each revision was considered on a "stand alone" basis rather than a formal competition. *Id.* \*2. This is similar to the RSA-IIA contract were the Contract Change Proposals were not bid competitively. UF 14. These revisions resulted in an award of an increasing percentage of engines to the defendant. *Id.* \*3. The improvements, however, provided some benefit to the Government on engine and warranty prices. *Id.* \*2. Regardless, the Sixth Circuit found that the defendant had violated the FCA.

The Court found that the contract revisions related back to the false statements in the defendant's bid, which secured the original contract award. *Id.* \*5. In discussing how the original fraud infected the negotiated revisions, regardless of

the resulting terms, the Sixth Circuit noted that the contracts were not rebid, or subject to open competition, and concluded:

> The Air Force designed the process to benefit itself -- to seek "improvements" to the contract from the government's perspective, an opportunity to sweeten a deal *that happened only because the Air Force entered into the contract based on fraud in the first place.* The Air Force never issued a new request for proposal; it sought only improvements from parties to the existing jet engine contracts.

*Id.* *5 (emphasis added). The Sixth Circuit explained the basis for FCA liability in this circumstance:

> *Hess* establishes that an invoice, which itself does not contain a falsity, may supply the premise for a false claim if submitted in connection with a fraudulently obtained contract. 317 U.S. at 542-44. Why? The invoices "caused the government to pay claims…under contracts found to have been executed as the result of …fraudulent bidding." *Id.* at 543. One variety of fraud is a knowingly false statement that has the "natural tendency to influence, or is capable of influencing" a government decision maker to pay the related invoice. [*United States ex rel. A+Homecare, Inc. v. Medshares Mgmt. Grp., Inc.,* 400 F.3d 428, 445 (6th Cir. 2005)]. *False statements underlying multi-year contracts generate a stream of related invoices and cause the government to pay all the invoices related to the contract.*

*United Technologies*, 2010 WL 4643244 *4 (emphasis added).

The Sixth Circuit's conclusion is supported by the legislative history to the 1986 amendments to the FCA. Congress emphasized that the scope of false or fraudulent claims should be broadly construed to include technically accurate billings or other claims for payment that were the fruit of an earlier fraudulent act:

> The False Claims Act is intended to reach all fraudulent attempts to cause the Government to pay out sums of money or to deliver property or services. Accordingly, a false claim may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation. . . . [S]uch claims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program, or though payments on the Government loan are current, if by means of false statements the Government was induced to lend an inflated amount. . . . [E]ach and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim. For example, all claims submitted under a contract obtained through collusive bidding are false and actionable under the act . . . as are all Medicare claims submitted by or on behalf of a physician who is ineligible to participate in the program.

S.Rep. No. 99-345, at 9-10 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274-75.

The Ninth Circuit has ruled consistently, finding that where the contract was obtained by promissory fraud or fraud in the inducement, each claim submitted is a false claim in itself. *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166 (9th Cir. 2006). The *Hendow* Court held:

> [L]iability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct. See, e.g., [*Harrison v. Westinghouse Savannah River Co*],

176 F.3d at 787; *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542, 63 S.Ct. 379, 87 L.Ed. 443 (1943).  In *Hess*, the Supreme Court found contractors liable under the False Claims Act for claims submitted under government contracts that the defendants obtained via collusive bidding.  *Id*.  The Court determined that "[t]his fraud did not spend itself with the execution of the contract," and so each claim submitted under the contracts constituted a false or fraudulent claim. *Id*. at 543, 63 S.Ct. 379.  In other words, subsequent claims are false because of an *original fraud* (whether a certification or otherwise).

*Id*. at 1173 (emphasis in original).

The *Hendow* Court relied upon the Seventh Circuit's findings in *United States ex rel. Main v. Oakland City University*, 426 F.3d 914. In *Main* the Court held that FCA liability was clear:  "The university 'uses' its phase-one application (and the resulting certification of eligibility) when it makes (or 'causes' a student to make or use) a phase-two application for payment. No more is required under the statute."  *Id*. at 916; *Hendow*, 461 F.3d at 1173-74.  The two Circuits have further ruled consistently with the Sixth Circuit finding that the FCA requires a "causal, rather than temporal connection between the fraud and payment." *Hendow*, 461 F.3d at 1174, citing *Main*, 426 F.3d at 916.  It is the original fraud which is material to the claim on the government fisc, with the logistical details as to how the claim is made with respect to timing or the number of stages involved being immaterial.  *Id*. "'if a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork.'" *Id*.

Here Lockheed made false statements during the bidding process at least two separate times.  The first was during the original bid process when Loral underbid the original contract by overstating its productivity rate, understating the lines of

code necessary to produce the software product and by arbitrarily reducing the bid. UF 110.  The second time this occurred was when Lockheed was required to rebid parts of the contract under the Contract Change Proposals.  There the evidence shows that Lockheed did not bother falsifying the parameter setting, as they were never shown to the Air Force during the rebid process.  UF 24.  It merely cut the bids by an arbitrary amount to conceal its original underbid and mounting cost overruns and delays.   UF 26, 121.  When Lockheed received contract modification on this basis, it could not produce the products for the amount bid.  UF 111. Lockheed would then go back to the government and negotiate a cost increase to secure more funding to complete the project.  UF 112.

Lockheed relies on *United States ex rel. Laird v. Lockheed Martin Engineering & Science Services Co.*, 491 F.3d 254, 259 (5th Cir. 2007) and *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,* 297 F.Supp.2d 272 (D.D.C. 2004) *aff'd on other grounds,* 393 F.3d 1321 (D.C. Cir. 2005) for the proposition that underbids can never represent false claims under the FCA absent proof of a subsequently fraudulent claim.  Both cases are distinguishable, and Lockheed's reliance on them is misplaced.

Significantly, in *Laird,* NASA dictated the essential components of the cost proposal (labor hours, skill mix) thus requiring bidders to submit what would turn out to be underbids for this open-ended level-of-effort contract.  Lockheed's bid was not technically false because NASA dictated the labor hours and skill mix.  491 F.3d at 260.

Here, Lockheed was not instructed to restrict any components that made up its bid.  It was completely free to bid at any cost that it believed was accurate.  The nexus between the underbid and the claim for payment missing in *Laird*  --  a knowing false statement in the bid which secured the contract award and consequent payment for performance  --  is present here.  Lockheed grossly

understated the projected software cost by falsely claiming its productivity rate in writing, understating the lines of code necessary to build the software and by arbitrarily reducing its bid knowing that the Government would not award the contract based upon an accurate estimate.  UF 110, 118.  Lockheed subsequently billed the Government, and was paid by the Government, for work it performed, the cost of which far exceeded its original bid.  UF 97.

Under *Hendow, Main and United Technologies,* it is no defense that the invoices for the work performed were accurate.  The Government paid the stream of invoices  *only because the Air Force entered into the contract based on a false underbid in the first place*.

In *Bettis,* although the district court concluded that an underbid could not trigger FCA liability "without proof that one or more requests for payment under the contract were fraudulent in themselves," the Court of Appeals rejected such a gaping loophole and affirmed only on the alternative factual ground:

> We conclude that the evidence presented by Bettis would not permit a reasonable jury to conclude that Odebrecht fraudulently induced the Government to award it the contract.  We therefore affirm the judgment of the District Court on this ground alone. . . . [W]e do not address whether a fraud-in-the-inducement claim based on a fraudulent low bid can succeed absent proof that one or more requests for payment under the contract induced by the low bid were false in themselves.

*Id*. at 393 F.3d at 1323, 1327.  Indeed, the Court acknowledged the fraud-in-the-inducement theory adopted in *Hess* and *Harrison,* and endorsed by Congress in the 1986 legislative history.  *Id*. at 1326.

1      Moreover, in *Bettis*, as in this case, the United States filed a strong *amicus*

2 *brief*, arguing that a false underbid can form the basis of an FCA action.[4]

3 Therefore, Lockheed's argument, that a false underbid does not violate the FCA,

4 has no basis in the law.

5      Lockheed also argues that estimates are merely predictions, not statements of

6 fact.  Lockheed further notes that the contract here was repeatedly revised.

7 Lockheed's "estimates defense" was rejected  in *United Technologies*, where the

8 defendant's bid was based on manipulated cost *estimates* for jet engines (the prices

9 for the engines were renegotiated over the life of the original contract.)  2010 WL

10 4643244 *4-5.  The contract revisions resulted in more favorable terms for the

11 Government under an "improvements" program.   Still, the Sixth Circuit found that

12 the false statements in the original bid were sufficient to find liability under the

13 FCA. "False statements underlying multi-year contracts generate a stream of related

14 invoices and cause the government to pay all of the invoices related to the contract.

15 . . . Pratt's false statements had the potential to influence the government's decision

16 to sign the contract and thus to pay the invoices under it." *Id.*

17      Lockheed ignores the obvious:  estimates are false when they are based on

18

19

20

21    [4]   The court noted:

22       The Government argues that there is no basis in the text of the FCA
for distinguishing between a fraudulently inflated bid and a
23       fraudulently deflated one, and maintains that FCA liability should
attach to claims under any fraudulently induced contract.  The United
24       States further claims that there are at least two reasons why the
Government might reject a low bid if it knew it was fraudulent. First,
25       the Government has an interest in preserving the integrity of the
bidding process.  Second, a low bid carries the risk of the bidder's
26       default if it wins the contract.

27 *Bettis* 393 F.3d at 1327.  In this case the poor performance on the contract can be
attributed to the fact that it was underfunded.  It was underfunded because
28 Lockheed failed to honestly inform the Air Force what it would cost to develop the
RSA IIA products.

knowingly-false inputs to the model that's used to generate the estimates.  The facts in this case establish just that circumstance.

### B.     Lockheed's False Statements Were Material As They Had the Potential When Made to Affect the Government's Decisions Relating to the Contracts

As the DOJ also point out, Lockheed misstates the standard regarding the necessary materiality of a false statement under the FCA. (Lockheed Memo at 13-14).  The DOJ shines a light on Lockheed's misstatement of this area of law in its *amicus* brief as well.  Contrary to Lockheed's argument, no proof is necessary that the Government actually relied upon the falsity or that the falsity directly caused the Government to make payments it might not otherwise have made.  A materially false statement actionable under the FCA is one that has the potential of affecting the government decision making process.  It is an objective standard, not a subjective one.  The relevant question is *could* the false statement have affected the decision making process; nor *did* it affect the decision.

In 2009, the Fraud Enforcement and Recovery Act of 2009 ("FERA") was signed into law, among other purposes, amending the False Claims Act, 31 U.S.C. §§3729-3733 ("AFCA").  FERA amended the FCA to codify a definition of "material" to mean "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. §3729(b)(4).  Prior to FERA, there was split in the Circuits as to the meaning and application of "materiality" under the FCA.  The definition adopted by FERA was the standard already applicable in the Ninth,[5] Fourth,[6] and Sixth[7] Circuits.  The Fifth Circuit

---

[5]   *United States v. Bourseau,* 531 F.3d 1159, 1171 (9th Cir. 2008).

[6]   *U.S. ex rel Harrison v. Savannah River Co.,* 352 F.3d 908, 913, 916-17 (4th Cir. 2003).

noted that in adopting this standard, Congress stated one purpose was "to reflect the original intent of the [FCA]." *U.S. ex rel Longhi v. Lithium Power Technologies, Inc.,* 575 F.3d 458, 470 (5th Cir. 2009), citing, Pub. Law No. 111-21, §4, 123 Stat. 1617 (2009).

In *United States v. Bourseau,* 531 F.3d 1159, the Ninth Circuit found the standard for materiality to be the natural tendency test.  The *Bourseau* Court first quoted the Supreme Court's statement of materiality that "[i]n general, a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decision-making body to which it was addressed." *Bourseau,* 531 F.3d at 1171, citing *Neder v. United States,* 527 U.S. at 19.  The Court then noted that both the Fourth and Sixth Circuits had adopted a natural tendency test that focused on the *potential effect* of a false statement when made rather than the *actual effect* of the statement when discovered.  *Bourseau,* 531 F.3d at 1171.  The Ninth Circuit then held:

> We agree with the Fourth and Sixth Circuits that the natural tendency test is the appropriate measure for materiality because it is more consistent with the plain meaning of the FCA.  Applying the natural tendency test to this case, we hold that Appellant's cost report entries were material because they had the potential effect, or natural tendency, to decrease the amount CPMS owed Medicare in overpayments, despite the fact that the cost reports were never audited.

*Id.*

The Fifth Circuit applied the "natural tendency" materiality test as adopted by FERA in *U.S. ex rel Longhi v. Lithium Power Technologies, Inc.,* 575 F.3d 458.

---

[7] *U.S. ex rel A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.,* 400 F.3d 428, 445 (6th Cir. 2005).

The *Longhi* Court held that materiality under the FCA requires proof only that the defendant's false statements could have influenced the government's payment decision or had the potential to do so. *Id.* at 470.  The Fifth Circuit relies on Ninth, Fourth and Sixth Circuit opinions in reaching its conclusion, noting in particular that those courts had focused on "the potential effect of the false statement when it is made rather than on the false statement's actual effect after it is discovered."  *Id.* Finally, the Fifth Circuit notes the adoption of the natural tendency standard in defining material under FERA. The *Longhi* Court explains that:

> If Congress had intended materiality to be defined under the more narrow outcome materiality standard, it had ample opportunity to adopt the outcome materiality standard in FERA.  Instead, Congress embraced the test as stated by the Supreme Court and several courts of appeals. . . . A legislative body may amend statutory language to make what was intended all along even more unmistakably clear. [8]

575 F.3d at 470 (citations omitted).

The Sixth Circuit, in holding that the natural tendency test was more consistent with the plain meaning of the FCA, explained that "the United States Supreme Court has broadly interpreted the [FCA] to cover 'all fraudulent *attempts* to cause the Government to pay out sums of money.'" *U.S. ex rel A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.,* 400 F.3d at 446, citing *United States v. Neifert-White Co.,* 390 U.S. 228, 233 (1968)(emphasis in original).  The Sixth Circuit further reasoned that it had previously held that "recovery under the FCA is not dependent upon the government's sustaining monetary damages." *Medshares Mgmt,* 400 F. 3d at 446 (citation omitted).  The Sixth Circuit pointed out that while the statute requires the intent to conceal, it is silent on the result.  *Id.*  Further, the Sixth Circuit noted that violations of the FCA are punishable by a civil penalty,

---

[8]   *Neder v. United States,* 527 U.S. 1, 19 (1999).

which reinforces the conclusion that the actual result is not dispositive of liability under the FCA. *Medshares Mgmt*, 400 F. 3d at 446. The Court Circuit concludes:

> These holdings are consistent with the FCA's principal goal of ensuring the integrity of the Government's dealings, which is embodied in the maxim that [m]en must turn square corners when they deal with the Government, *United States ex rel Compton v. Midwest Specialities, Inc.,* 142 F.3d 296 302 (6th Cir. 1998) . . . . Therefore we hold that the natural tendency test is the appropriate standard by which materiality should be reviewed.

400 F. 3d at 446.

## C.   Invoices and Award Fee Applications Were False Claims Because They Were Submitted Prior to Freeware Disclosure and Approval.

Lockheed's invoices and award fee applications were false claims for a second reason completely independent from the false cost proposals.  Lockheed billed the Air Force for software development prior to disclosure and approval of freeware in violation Mil Std. 498 (software development) specifically incorporated into the contract and the prohibition in Section 252.7013 on delivering software with less than unlimited rights (i.e. containing freeware) without prior approval. They were also false for a third independent reason, i.e. failure to follow required testing procedures.  Lockheed argues that the Government knew and approved of its use of software products containing freeware in its performance of the contract, and that that knowledge precludes liability under the FCA for nondisclosure. (Lockheed Memo at 20, 24).  Lockheed's contention is just a repackaging of the outcome materiality standard rejected by the Courts and by Congress in the recently enacted FERA. Its argument attempts to engraft into materiality the requirements for proof of government reliance on the falsity and causation of injury as a result of the falsity. One California court rejected this contention, and instead highlighted the

proper focus on the potential effect, not the actual effect of a false statement. *U.S. ex rel Oliver v. The Parsons Corporation,* 498 F. Supp. 2d 1260 (C.D. Cal. 2006). The court noted that sometimes government agencies do not function as effectively as they should, so

> Evidence of the government's actual *conduct* is less useful for FCA purposes than evidence of the government's legal *rights*. . . . Materiality must turn on how [the government] was *authorized* to respond to such failures, or else violation of identical provisions in separate cases could have different materiality results based on the predilections of particular program or accounting staff.

*Id.* at 1289-90, citing *United States v. President and Fellows of Harvard College,* 323 F. Supp. 2d 151, 186 (D. Mass. 2004)(emphasis in original)(the question of what constitutes a false claim turns not on how the government chooses to process a claim, but on the conduct of the defendant). The Seventh Circuit in *United States v. Rogan,* 517 F.3d 449 (7th Cir. 2008), explained the commonsense, practical necessity for an objective rather than subjective standard for materiality. "A statement or omission is 'capable of influencing' a decision even if those who make the decision are negligent and fail to appreciate the statement's significance." *Id.* at 452. Judge Easterbrook reasoned:

> Another way to see this is to recognize that laws against fraud protect the gullible and the careless-perhaps *especially* the gullible and the careless-and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests. The United States is entitled to guard the public against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does

this by insisting that persons who send bills to the Treasury tell the truth.

*Id.*

Most recently, the Sixth Circuit arrived at the same conclusion in *United Technologies:*

> [A] false statement must be material to the government's decision to pay, meaning that it must have the *objective*, natural tendency to influence a government decision maker.  *Liability does not depend on whether the government relied in fact on the false statement* to pay out the claim.  *A+Homecare*, 400 F.3d at 445.  The False Claims Act, unlike the Truth in Negotiations Act, does not contain an affirmative defense if the government does not rely on a false statement.

2010 WL 4643244 at *6.

In this context, the Government's understanding and acceptance of the delivered software is relevant only to Lockheed's knowledge of the falsity of its disclosures regarding freeware in the products delivered to the Government under the contract. "What constitutes the offense is not the intent to deceive, but knowing presentation of a claim that is fraudulent or simply false." *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991); *United States ex rel. Becker v. Savannah River Co.,* 303 F.3d 284, 288-89 (4th Cir. 2002); *United States ex rel. Durcholz v. FKW, Inc.,* 189 F.3d 542, 544-45 (7th Cir. 1999).

Government regulations, MIL-STD 498, DFAR 252.227-7014(b)(1) (formerly 7013(c)(2)) and Eastern and Western Range Safety Requirements (EWR 127-1), all required that Lockheed obtain prior permission and approval from the Air Force before incorporating the freeware in software deliverables.  Lockheed knew when it presented claims for payment under the contract that it had not complied with

Government regulations, and did not have the ability to comply. Lockheed's documents and employee testimony demonstrate that Lockheed did not disclose all freeware/FOSS products to the Air Force that were used on the RSA IIA program and were not capable of disclosing such products because such products were not consistently documented in Lockheed's configuration management system. Evidence establishes:

- An Air Force official advised Paul Usavage, a Lockheed Software/Architect/Manager, that: "The Air Force forbids the use of software acquired directly from non-DoD electronic bulletin boards." UF 125.  Nonetheless, Usavage ordered Hooper to "Get over it," and find a way to use freeware. UF 126.

- Katherine Good, Lockheed's in-house intellectual property attorney advised that using freeware would result in Lockheed losing its ownership rights and not being able to transfer property rights to the government.  UF 127.  She indicated that "This is a big show stopper." UF 127.  Nonetheless, she later relented and told the business unit that Lockheed's legal office "routinely" counsels its business units that violating contract requirements should be viewed as "risk that is ultimately accepted as a cost of doing business."   UF 128.

- Lockheed made piecemeal disclosures of freeware in March 2003 and again in January 2006. UF 130. These disclosures were incomplete as documented by Hooper. UF 135.

- In response to an Air Force inquiry prompted by this lawsuit, Lockheed identified 131 FOSS products that Lockheed claimed were either incorporated into RSA IIA products or used in conjunction with the development of RSA IIA products.  UF 134.  This final report was made on May 13, 2007 and for the first time disclosed freeware

products that Hooper identified as having been incorporated in deliverables in 2001.  UF 135.

- Lockheed made an initial risk assessment as to the cost if the Air Force required removal of FOSS from RSA II A products. The cost of that risk was initially estimated at $20,656,376.  UF 136.  Lockheed personnel then "got together and sanitized the risk write-up and the estimate," reducing the risk to zero.  UF 137.

- Software engineers did not consistently report freeware they were using to managers responsible for maintaining the Software Version Descriptions, nor properly document the use of freeware, with the result that Lockheed had no way of knowing that the disclosures to the Air Force were complete.  UF 138.

Despite its knowing failure to comply with the specifications and regulatory requirements which governed the contract, Lockheed sought payment for the software products delivered to the Government. Claims for payment submitted to the government represent an implied certification of the contractor's continued adherence to requirements for participation; non-compliance renders the claims false, and liability attaches under the FCA.  *Ebeid ex rel. United States v. Lungwitz,* 616 F.3d 993, 996-97 (9th Cir. 2010).   To establish materiality in this context, the term "certification" has no special significance. *Ebeid,* 616, F.3d at 997, citing *Hendow,* 461 F.3d at 1173. "Rather, 'the question is merely whether the false certification – or assertion, or statement – was relevant to the government's decision to confer a benefit." *Id.; Hendow,* 461 F.3d at 1173 ("So long as the statement is knowingly false when made, it matters not whether it is a certification, assertion, statement or secret handshake;  False Claims Act liability can attach); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1168 (10th Cir. 2010).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Government regulations and contract specifications all required that Lockheed obtain prior permission and approval from the Air Force before incorporating the freeware in software deliverables. The inclusion of those products in the software delivered to the Air Force was material to the Government's decision to accept and pay for the products because, based on the regulations and specifications, the Government could have refused.  Lockheed knew when it presented claims for payment under the contract that it had not complied with Government regulations, and did not have the ability to comply, but did not disclose those facts.

At a minimum, there are facts in dispute related to Counts II and III. Lockheed is wrong on the law.  Lockheed has not carried its burden to prove that it is entitled to summary judgment.

## VI.    CONCLUSION

For the foregoing reasons Plaintiff Hooper respectfully requests the Court to deny Lockheed's Motion for Summary Judgment.

Dated:      December 13, 2010            THE CULLEN LAW FIRM, PLLC


By: /S/ Joseph A. Black
JOSEPH A. BLACK
(*admitted pro hac*)

Attorney for Relator
NYLE J. HOOPER


MOTLEY RICE, LLP

By: /S/ Mark I. Labaton
MARK I. LABATON (SBN 159555)

Attorney for Relator
NYLE J. HOOPER