CROWELL & MORING LLP
Mark R. Troy (CSB No. 120418, mtroy@crowell.com)
Jeffrey H. Rutherford (CSB No. 181695, jrutherford@crowell.com)
Nathanial J. Wood (CSB No. 223547, nwood@crowell.com)
Mana Elihu Lombardo (CSB No. 228846, mlombardo@crowell.com)
515 South Flower St., 40th Floor
Los Angeles, CA 90071
Telephone: 213.622.4750
Facsimile: 213.622.2690

Attorneys for Defendant
LOCKHEED MARTIN CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| UNITED STATES *ex rel*. NYLE HOOPER,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LOCKHEED MARTIN CORPORATION,<br><br>　　　　Defendant. | Case No. CV 08-00561-DSF (FMOx)<br><br>**REPLY IN SUPPORT OF LOCKHEED MARTIN CORPORATION'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:　　January 10, 2011<br>Time:　　1:30 p.m.<br>Crtrm:　　840<br>Judge:　　Hon. Dale S. Fischer |

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF REPLY ................................................................. 1

II.  HOOPER CANNOT SHOW MATERIALITY UNDER ANY ARTICULATION OF THAT STANDARD ...................................... 3

III. THERE IS NO EVIDENCE OR LEGAL AUTHORITY IN SUPPORT OF HOOPER'S FALSE ESTIMATE ALLEGATION ............................. 5

   A.   There Is No Competent Evidence of "False Estimates" ....................... 5

   B.   Regardless Of Hooper's Evidence (Or Lack Thereof), Cost Estimates Are Judgmental and Not Actionable Under The FCA ........................ 7

        1.   Procurement Laws and Regulations Exempt Contractors From Liability For Their Judgments ...................................... 8

        2.   FCA Liability Can Be Imposed Only For Statements that Are Objectively False, Not For Expressions of Opinion ................... 9

        3.   A Low Bid Is Not Actionable Absent a Fraudulent Overcharge ....................................................... 11

IV.  HOOPER HAS NO EVIDENCE TO DISPUTE THE FACT THAT LMC'S USE AND DISCLOSURE OF FOSS WAS APPROPRIATE ................... 15

   A.   LMC's FOSS Disclosures Were Complete ................................ 15

   B.   Hooper Has No Admissible Evidence Of "Untimely" Disclosure ...... 17

   C.   There Is No Competent Evidence That LMC Knowingly Made Any False Claims In Connection With Its Use Of FOSS ..................... 17

V.   HOOPER HAS NO EVIDENCE OF FALSE TESTING .......................... 19

VI.  CONCLUSION ..................................................................... 20

# TABLE OF AUTHORITIES

**Page**

### CASES

*Boisjoly v. Morton Thiokol, Inc.*,
706 F. Supp. 795 (D. Utah 1988) ................................................................. 9

*Chu Assocs., Inc.*, ASBCA No. 15004, 73-1 BCA ¶ 9906 at 46,459 ................... 9

*Litton Systems, Inc., Amecon Div.*,
ASBCA No. 36509, 92-2 BCA ¶ 24,824 ....................................................... 8

*Marx & Co., Inc. v. Diners' Club Inc.*,
550 F.2d 505 (2d Cir. 1977) ....................................................................... 17

*Presidio Enters, Inc. v. Warner Bros. Distributing Corp.*,
784 F.2d 674 (5th Cir. 1986) ....................................................................... 9

*United States ex rel. Aflatooni v. Kitsap Physicians Service*,
314 F.3d 995 (9th Cir. 2002) ................................................................. 3, 13

*United States ex rel. Anderson v. Northern Telecom, Inc.*,
52 F.3d 810 (9th Cir. 1995) ......................................................................... 3

*United States ex rel. Bettis v. Odebrecht*,
297 F. Supp. 2d 272 (D.D.C. 2005) ................................................. 12, 13, 14

*United States ex rel. Butler v. Hughes Helicopters, Inc.*,
71 F.3d 321 (9th Cir. 1995) ......................................................................... 5

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
176 F.3d 776 (4th Cir. 1999) .......................................................... 9, 10, 11, 12

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) (*Harrison II*) ........................................... 10, 11

*United States ex rel. Hendow v. University of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ................................................................ 4, 11

*United States ex rel. Laird v. Lockheed Martin Engineering & Science Services*,
*Co.*, 491 F.3d 254 (5th Cir. 2007) ....................................................... 11, 12, 15

*United States ex rel. Lamers v. City of Green Bay*,
168 F.3d 1013 (7th Cir. 1999) .................................................................. 4, 5

*United States ex rel. Lindenthal v. General Dynamics Corp.*,
61 F.3d 1402 (9th Cir. 1995) ....................................................................... 4

*United States ex rel. Roby v. Boeing Co.*,
100 F. Supp. 2d 619 (S.D. Ohio 2000) ......................................................... 9

*United States ex rel. Steury v. Cardinal Health, Inc.*,
625 F.3d 262 (5th Cir. 2010) ....................................................................... 4

*United States v. United Technologies Corp.*,
2010 WL 46543244 (6th Cir. Nov. 18, 2010) .............................................. 11

*Wang v. FMC Corp.*,
975 F.2d 1412 (9th Cir. 1992 ....................................................................... 9

CROWELL
& MORING LLP
ATTORNEYS AT LAW

**STATUTES**

10 U.S.C. § 2306a ................................................................................................ 8

10 U.S.C. § 2306a(a)(2) ..................................................................................... 8

10 U.S.C. § 2306a(e)(1)(B) ............................................................................... 9

41 U.S.C. § 254b ................................................................................................ 8

**OTHER AUTHORITIES**

Defense Contract Audit Manual § 14-104.5 ..................................................... 8

Restatement [(Second) of Torts] § 542 ........................................................... 10

**RULES**

Fed.R.Civ.P. 12(b)(6) ...................................................................................... 10

**REGULATIONS**

48 C.F.R. § 16.301-2 ...................................................................................... 14

48 C.F.R. § 2.101 .............................................................................................. 8

## I.     SUMMARY OF REPLY

*Qui tam* plaintiff Nyle Hooper does not identify a single witness or piece of competent evidence establishing that defendant Lockheed Martin Corporation ("LMC") made any knowingly false statements or claims to the United States government in connection with the RSA IIA contract.

LMC's evidence establishes that no such wrongdoing occurred and that it worked side-by-side with the Air Force on each of the matters about which Hooper complains.  This began when Loral provided the Air Force with documents detailing the basis of its cost estimates.  UF 10-11 (*see also* Usavage Decl. ¶ 5).  When work began, LMC held weekly project meetings with the Air Force and its consultants.  Herr Decl. ¶ 7; Pike Decl. ¶ 3.  Tests were transparent, with the Air Force and its consultants involved from the design of the testing plans and procedures, to observation of the tests and participation in post-testing reviews.  UF 76-79.  So too was LMC's use of FOSS (free and open source software), with discussions of the use of FOSS beginning in the early stages of the contract, and continuing through a series of formal disclosure letters and approval.  UF 45-54.

The undisputed facts showing this high level of transparency preclude any finding that LMC sought to lie, cheat, or deceive the government in any way.  Hooper's opposition and the Department of Justice ("DOJ") amicus brief (which at fn.1 takes no position on the merits of the Motion) misconstrue LMC's argument and claim that government knowledge does not necessarily excuse a contractor's wrongful conduct.  This puts the cart before the horse – LMC does not assert that it asked the Air Force to excuse or ratify any wrongful conduct, but that no wrongdoing occurred.  This is supported by the declarations of four Air Force officials with principal oversight of the contract.  No jury could find a contract violation when the contracting parties agreed on how to perform the contract.

***Count One***:  There is no evidence that Loral falsified the cost estimates in its bid (prepared prior to Hooper's employment).  Nor has Hooper provided any

competent evidence that LMC falsified cost estimates it submitted later.  LMC's evidence demonstrates that the Air Force fully understood the basis of the estimates and sometimes even directed LMC to *lower* its estimates.  UF 10, 15-16, 24.

**Counts Two & Three**:  LMC has established that the Air Force not only directed LMC to use FOSS on the RSA contract, but formally approved all FOSS products used in contract deliverables.  Hooper, who had never even heard of FOSS when the events about which he complains began (UF 44), offers no evidence to controvert these facts, and he admits that LMC "could use FOSS products in developing the RSA IIA program."  Opp. at 11:8-9.  Hooper cites no admissible evidence to support his claims that LMC's disclosure was untimely (which the Air Force's Contracting Officer refutes) and incomplete (UF 58-64, HUF 138).

**Count Four**:  LMC has provided multiple declarations establishing that it conducted all required tests.  UF 75-95.  Even the witness Hooper relies on as the basis of this allegation agrees that all tests had been conducted.  UF 82.  Hooper has no evidence that tests were not conducted, quibbling instead with how, or the order in which, tests occurred.  He does not dispute that the Air Force approved of the order of the tests, knew of LMC's testing procedures and practices, and could have required LMC to revise those procedures had it desired to do so.

Hooper's failure to offer evidence is striking.  He does not submit a single declaration from a percipient witness, *including himself*, to support his allegations. He does not authenticate or otherwise provide any context or explanation for *any* of the documents he submitted.  Although he accuses LMC of violating the contract and various regulations, he fails to introduce these items into evidence, and he fails to specify any particular false invoices (UF 68).  Likewise, the claims Hooper makes in his opposition that LMC delayed completing the contract and delivered products that were rejected by the Air Force, resulting in the Air Force "descoping" some tasks and transferring other tasks to other contractors (Opp. at 1:22-2:3; 11:23-12:8), are not only unsupported, they are total fabrications.  *See* LMC's

1   Response to HUF 143.  The picture Hooper tries to paint is also completely at odds

2   with LMC's annual award fee "grades," in which the Air Force gave LMC

3   consistently high ratings.  UF 19.  Hooper makes a futile effort to dispute that fact

4   by noting that one year LMC's grade was "satisfactory."

5          Even if admissible, the testimony and documents Hooper cites fall far short

6   of creating a disputed issue of fact, and do not give rise to any inference that LMC

7   made any knowingly false statements or claims to the government.  Rather, they

8   consist of hearsay, rumor, speculation, wild conjecture and the unfounded assertion

9   that the Air Force personnel who refute his claims simply do not understand their

10   own contract requirements and were duped by LMC.  UF 57-58, 74.  This is not

11   evidence that can be used to defeat summary judgment.  *See United States ex rel.*

12   *Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995) (to survive

13   summary judgment, relator must produce sufficient evidence to support an

14   inference of knowing "fraud"); *United States ex rel. Aflatooni v. Kitsap Physicians*

15   *Service*, 314 F.3d 995, 997 (9th Cir. 2002) ("Because [relator] did not point to a

16   single, specific false claim or a sufficiently detailed description of one, he failed to

17   create a triable issue of fact").

18   **II.     HOOPER CANNOT SHOW MATERIALITY UNDER ANY
             ARTICULATION OF THAT STANDARD**

19

20          Hooper and the DOJ attempt to draw a distinction in the materiality standard

21   necessary to examine the claims at issue.  However, based on the state of the

     evidence, the distinction makes no difference to the resolution of LMC's motion.

22

23          The premise of LMC's motion is not that wrongdoing was somehow excused

24   by the government – it is that no wrongdoing occurred.  As evidence of this, LMC

     has shown that, as issues arose, LMC and the Air Force arrived at the solutions

25

26   together.  The government's concurrence with those solutions – accepting an

     estimate or asking for a lower one, approving FOSS, and approving modifications

27

28   to test procedures – means "[l]ogically, then, any claims for payment based on work

that satisfied [the contractor's] contractual obligations to the [government] could not have been 'false or fraudulent' within the meaning of the FCA. *United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1412 (9th Cir. 1995).

Courts use different terminology in describing the elements of the FCA, often blending the concepts of falsity, knowledge, materiality, reliance, causation and condition of payment. "It is impossible to meaningfully discuss falsity without implicating the knowledge requirement." *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999). At base, there must be a "lie" and the lie must matter to the government. Here, Hooper has neither evidence of a lie nor evidence that any purported lie mattered to the government. In other words, whether materiality is measured by the subjective standard (requiring proof that the falsity actually mattered), or by the objective standard (requiring proof only that the falsity is of a kind that would have a natural tendency to matter), the evidence here is that: (a) nothing false or fraudulent occurred in the first place, and (b) the views posited by Hooper were not, in fact, shared by the government and therefore could not possibly have been material. As such, DOJ's disagreement with the materiality standard articulated by LMC presents nothing more than an academic exercise.

DOJ's suggestion that "reliance" is no longer a factor in any FCA claim is misplaced. Allegations of non-compliance with contractual provisions or regulations require proof that compliance is an actual prerequisite to getting paid. *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006). This requirement is *in addition* to establishing materiality. *See United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 269 (5th Cir. 2010). The terms "prerequisite" or "condition" of payment effectively mirror the concept of "reliance" that DOJ attempts to brush aside.

Even assuming the "natural tendency" standard applies and that it abrogates *Hendow's* "prerequisite of payment" requirement, LMC has presented direct proof that the views posited by Hooper did not actually matter to the Air Force. *See*

1    *generally* Decls. of Air Force personnel Washington, Pike, Sussex, and Cather.

2    This uncontroverted evidence of non-materiality would still make it impossible for

3    Hooper to prove materiality even under DOJ's suggested standard.

4           As for the "government knowledge" defense, LMC does not take issue with

5    DOJ's position that a defendant who has committed wrongdoing is not

6    automatically exempt from liability merely by pointing to the fact that the

7    government knew of the wrongdoing.  Indeed, LMC cited the same limitation on

8    that defense that DOJ recites – that proof of such knowledge may negate the

9    element of scienter.  *See* LMC's brief at 13:15-24.  Here, the facts demonstrate not

10   only that LMC lacked the requisite scienter but that LMC satisfied its contractual

11   obligations precisely in accordance with the contract and with the government's

12   knowledge and approval of any issues that may have been open to contractual

13   interpretation.  Even if a claim had been submitted on the basis of a difference in

14   the interpretation of a contract provision or legal question, that difference of

15   opinion, by itself, would not be actionable.  *Lamers*, 168 F.3d at 1018.

16          Here, with all of these matters out in the open, there was no dispute over

17   performance and no underlying wrongdoing to be excused.  *See United States ex

18   rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 328 (9th Cir. 1995)

19   (government's concurrence with out of order testing meant no false claim); LMC's

20   brief at 31-32.  The facts disprove falsity and fraud, making it unnecessary to reach

21   LMC's state of mind.  Nevertheless, if that threshold were reached, the litany of

22   cases cited by DOJ (at 21:20-24:4) would negate the scienter element here.

23   ## III.  THERE IS NO EVIDENCE OR LEGAL AUTHORITY IN SUPPORT OF HOOPER'S FALSE ESTIMATE ALLEGATION

24

25   ### A.    There Is No Competent Evidence of "False Estimates"

26   Hooper asserts two instances of "false statements" regarding LMC's cost

27   estimates: first, as part of the original Loral bid, and second, in connection with

28   change proposals submitted after the contract was awarded.  Opp. at 19-20.  There

is no evidence to support either claim.

*Loral's Proposal.*  Hooper has not presented testimony from a single witness who was involved in preparing Loral's bid.  He instead relies on Michael Allen, who testified that he saw draft portions of Loral's bid only after the contract was awarded, and he did not consider any of the inputs into those estimates to be false.  UF 29.  Although Allen does not believe the estimates were false, Hooper relies heavily on his hearsay testimony that one of Loral's subcontractors was asked to lower its component of the bid.  But Allen did not assert that this request (even if it had occurred) was in any way fraudulent, instead testifying that it "is typical in any bid process."  LMC's Response to HUF 109.

Hooper also devotes much time in a convoluted argument that Loral purportedly "overstated its productivity rate by 2.2 to 3.8 times."  Opp. at 6:12-14.  The irrelevance of this claim is best illustrated by the flawed methodology Hooper used to generate this number.  In an "apples to oranges" comparison, Hooper compares a productivity estimate generated in 1995 for one RSA product ("C&D Segment") using a particular estimating methodology ("M&DS Costing Method") against another productivity estimate created in *1997* for a *different* RSA product ("FOA replan") using a *different* estimating methodology (SEER-SEM software).  *See* LMC's response to HUF 107.  It is no surprise that the resulting productivity estimates are different, and Hooper's analysis provides no indication that Loral's 1995 estimates were false.[1]

Lacking a single piece of direct evidence to support his claim, Hooper invites the Court to speculate that Loral's estimates were fraudulent simply because the costs incurred on the contract exceeded Loral's bid – an allegation for which he submitted no admissible evidence.  *See* Opp. at 5:5-13.  But there is no evidence to

---

[1] Hooper's analysis misrepresents the documents he cites.  The chart at Opp. at 6-7, refers to HUF 105 which references document HOO002627.  The "settings" column in the chart often does not match the settings in the cited document.

refute the fact that the Air Force made numerous changes to the RSA program *after* the contract was awarded which renders any such comparison meaningless.  UF 21, 22; *see* LMC's Response to HUF 97, 100.  Notably, this is the same theory Hooper employed unsuccessfully in his last *qui tam* suit.  UF 30.

**Subsequent Proposals**.  Hooper's evidence about false estimates submitted after contract award boils down to testimony by Michael Allen that he was asked by an LMC employee to lower cost estimates on two RSA products.  HUF 119. Neither of these instances supports Hooper's accusation of fraud.  First, Allen testified that for one product (called "command generation," which was part of the "FOA replan"), he declined to lower the estimate, and LMC presented Allen's estimate to the government.  UF 25, LMC's Response to HUF 118.

Second, for the FOV1 product, Allen testified that he did not have any personal knowledge regarding what cost estimate was provided to the government, because he was involved only in generating the initial estimate.  *Id*.  Although Allen speculated at his deposition that LMC presented a cost estimate to the Air Force lower than the one he prepared, he admitted that he was not involved in the estimating process beyond preparing his initial estimate, and thus his speculation is irrelevant and inadmissible.  *See* LMC's Response to HUF 118.

Finally, Hooper has no evidence to dispute the fact that the Air Force often directed LMC to *lower* its cost estimates.  UF 16.  There is no basis for asserting that lowering an estimate, particularly at the government's direction, is deceitful. LMC's Response to HUF 117.

> **B.    Regardless Of Hooper's Evidence (Or Lack Thereof), Cost Estimates Are Judgmental and Not Actionable Under The FCA**

Hooper does not dispute the fact that Loral's proposal explained that its estimates were based on engineering judgment.  UF 10.  There are no FCA cases holding a defendant liable for making a false statement about a matter that is judgmental or an expression of opinion.  DOJ asserts that "where an estimate,

judgment or opinion is shown to be knowingly false, it is no less actionable than a false misrepresentation of fact." Amicus at 9:27-28. DOJ's incorrect statement of law presumes that an estimate, judgment or opinion can have the attribute of truth or falsity, which contrasts with the plain meaning of those terms. DOJ also conflates "estimate" with "proposal." LMC does not contend that all statements in proposals are exempt from FCA liability, only the judgmental components of proposals, which in this case are the estimates that Hooper claims were false. As shown below, there is no support in government contracting statutes and regulations, the common law, or in FCA case law for DOJ's view.

### 1. Procurement Laws and Regulations Exempt Contractors From Liability For Their Judgments

DOJ's notion that an estimate can be false cannot be squared with the well-established discretion contractors have over judgments included in their contract proposals. The statutes and regulations governing pricing and estimating – which DOJ and Hooper completely ignore – clearly distinguish between facts and judgments. This distinction is a prominent feature of the Truth In Negotiations Act ("TINA") and its implementing regulations. TINA requires contractors to submit cost or pricing data (*e.g.*, actual historical costs or current vendor quotes), certified to be accurate, complete and current at the time it is submitted in the proposal process. 10 U.S.C. § 2306a(a)(2). If this factual information is not accurate at the time it is submitted, then TINA affords the government a price reduction but precludes government recovery for allegedly defective estimates or judgments. *See* 10 U.S.C. § 2306a; 41 U.S.C. § 254b; 48 C.F.R. § 2.101; *Litton Systems, Inc., Amecon Div.*, ASBCA No. 36509, 92-2 BCA ¶ 24,824, at 123,944-45; *see also* Defense Contract Audit Manual § 14-104.5 ("Judgments are not cost or pricing data and do not become cost or pricing data when intertwined with facts").

One of Hooper's persistent misconceptions is that any discrepancy between proposed costs and actual costs is evidence of fraudulent pricing. First, Hooper has

no evidence of any discrepancy and cannot identify any particular task that took longer than proposed.  *See* UF 22; LMC's Response to HUF 96-97.  His count fails on that ground alone.  Second, because the Air Force exempted this contract from TINA, Loral never certified the accuracy of anything in its cost proposal.  UF 12.  Finally, even if TINA had been applicable here, the statute only prescribes disclosure of costs existing *prior* to price agreement (10 U.S.C. § 2306a(e)(1)(B)); therefore, costs actually incurred in performing the contract are legally irrelevant.  *See Chu Assocs., Inc*., ASBCA No. 15004, 73-1 BCA ¶ 9906 at 46,459.

Even if 20/20 hindsight showed that actual costs of a task far exceeded an earlier estimate (which Hooper has not done), only the proposal's false statements of fact can give rise to TINA liability.  It follows, then, that only factual representations can give rise to the more severe sanctions of the FCA.  This principle is reflected, not refuted, in the cases cited by DOJ.

## 2. FCA Liability Can Be Imposed Only For Statements that Are Objectively False, Not For Expressions of Opinion

Only a statement of fact – or in other words, a statement about a verifiable fact – can have the attributes of truth or falsity.  *See Presidio Enters, Inc. v. Warner Bros. Distributing Corp*., 784 F.2d 674, 679 (5th Cir. 1986) ("Expressions of opinion are not actionable [as fraud];" fraud may be found only in an expression of fact that "(1) admits of being adjudged true or false in a way that (2) admits of empirical verification"). [2]  Estimates or predictions of future events are as incapable of empirical verification as predicting whether it will rain tomorrow.  *Id. at* 680.

DOJ's desired expansion of the FCA to expressions of judgment is

_____

[2] This deeply imbedded common law principle (*id*. at 679), also applies in FCA cases.  *See Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 810 (D. Utah 1988) (no FCA liability for a statement which is "clearly not a statement of fact that can be said to be either true or false"; *United States ex rel. Roby v. Boeing Co.,* 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) (false statement must be "an objective falsehood" . . . . "Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false"), citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992).

1  unsupported.  DOJ highlights *United States ex rel. Harrison v. Westinghouse*

2  *Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999), as the leading case on this

3  point.  But, as with each of DOJ's cited cases, liability in *Harrison* was premised on

4  statements about matters of fact, not judgment.  Such cases do not apply here.  The

5  relator alleged that defendant's proposal contained two false statements of fact

6  which it used to convince the government to allow defendant to award a subcontract

7  for a training project rather than perform the project itself, thereby increasing the

8  government's costs.  *Id*. at 790.  The first was that defendant lacked the in-house

9  personnel to perform the task, when it in fact employed those personnel.  The

10 second alleged falsity was defendant's understatement of what it would cost to have

11 the work performed by a subcontractor.  *Id*. at 791.  Although this might appear on

12 its face to be a statement about what future costs would be, it was not based on false

13 cost estimates.  Rather, it was based on a series of underlying false statements of

14 *fact* about the duration of the project, the need to purchase computers, and whether

15 the subcontract would be a fixed-price or a cost-reimbursement contract.  *Id*. at 781.

16     The relator alleged, and the court accepted as true for purposes of Rule

17 12(b)(6), that these were false statements of fact; *i.e.,* that defendant knew that the

18 training would not be a one-time event but would take several years, that computers

19 would need to be purchased, and that defendant intended the subcontract to be a

20 cost-reimbursement contract despite telling the government that it would be a fixed-

21 price contract.  *Id*. at 781, 791.  Despite the court's mischaracterization of these

22 statements as estimates, [3] they were representations of verifiable facts.  *Harrison II*

23

24     [3] Acknowledging the general rule that "[e]xpressions of opinion are not actionable
    as fraud" (*id*. at 792), the court identified a narrow common law exception, applicable
25  only when the defendant has a "special knowledge" advantage over the plaintiff.  It
    typically applies to the opinions of specialized experts -- such as jewelers, lawyers,
26  physicians, scientists and dealers in antiques -- where their opinions are based on
    concrete, specific information and objective, verifiable facts.  *See Restatement [(Second)*
27  *of Torts]* § 542, comment f [(1977)].  This "special knowledge" exception is misplaced
    where the customer is the U.S. Government.

28

1   notes that the trial court granted defendant's motion for judgment as a matter of law

2   on this claim (352 F.3d 908, 912 (4th Cir. 2003)), so ultimately the defendant was

3   never held liable for what *Harrison I* mislabeled as "estimates."

4       The other cases cited by DOJ are even more clearly based on statements of

5   objective, verifiable facts, notwithstanding that some of the defendants incorrectly

6   characterized their statements as estimates.[4]  In *United States v. United*

7   *Technologies Corp.*, 2010 WL 4643244 (6th Cir. Nov. 18, 2010), the issue was not

8   whether the judgments underlying the cost estimates were true or false; rather, the

9   trial court found that the three alleged false statements were statements of a factual

10  nature about what information was used to prepare the estimates.  *Id.* at *1 (*e.g.*,

11  alleged lies as to which inflation index was used).  Other than *UTC*, the cases cited

12  by Hooper do not even mention cost estimates but concern a variety of promissory

13  fraud allegations concerning the defendant's qualifications.  Opp. at 15:1-16; 18:20-

14  19:24.  For example, in *Hendow*, the allegation concerned false representations

15  about compliance with rules prohibiting recruiters from being compensated on the

16  basis of the number of students they enrolled.  The court reiterated its long-standing

17  rule that FCA liability requires "a palpably false statement, known to be a lie when

18  it is made."  461 F.3d at 1172.  An estimate can hardly be characterized that way.

19      **3.  A Low Bid Is Not Actionable Absent a Fraudulent Overcharge**

20      DOJ asserts that "the case law makes it clear that an intentional low bid in

21  fact may trigger FCA liability under the so-called 'fraud in the inducement'

22  theory."  Amicus at 9:9-12.  DOJ cannot cite a single case for this proposition.

23  DOJ completely fails to mention a case relied upon by LMC that is directly on

24  point – *United States ex rel. Laird v. Lockheed Martin Engineering & Science*

---

25      [4] *See* Amicus at 5-8, citing *Loughren* (applicants for disability benefits lied about
26  their ability to work); *UMC* (court refused to accept defendant's characterization that false
    statements about past actual costs were merely estimates); *White* (lies about actual costs
27  which had been incurred in the past)*; Hartness* (lies about mortgage applicant's current
    employment).

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-11-

1  *Services, Co.*, 491 F.3d 254 (5th Cir. 2007) – and it offers nothing to refute the

2  decision in *United States ex rel. Bettis v. Odebrecht*, 297 F. Supp. 2d 272 (D.D.C.

3  2005).  These decisions stand for the common sense proposition that "the FCA

4  should not be used to penalize a party for making claims for payment that seek less

5  money than what the government would have been asked to pay if the allegedly

6  fraudulent statement had never made been made."  *Id.* at 280.

7       Instead of addressing these cases or even acknowledging their holdings, DOJ

8  cites a variety of irrelevant fraudulent inducement cases involving a false statement

9  that induced the government to pay a *higher* amount (*Harrison*), collusive bid

10  rigging to obtain a higher contract price (*Marcus*), inducing the government to bill

11  defendant less than defendant was required to pay to the government (*Hagood*), and

12  false certifications of compliance with anti-kickback laws (*Pogue*), anti-

13  discrimination rules applicable to housing grants (*Village of Island Park*), and small

14  business set aside qualifications (*Ab-Tech*).  Amicus at 10:4-11:16.

15       The court in *Bettis* specifically noted the distinction between underbidding

16  and the type of fraudulent inducement in cases like *Marcus* and *Harrison*.  In those

17  cases, "the demands for payment furthered the original deceit by helping the

18  wrongdoer obtain money from the government to which he would not otherwise be

19  entitled . . . . [which] is not the case where the . . . claim involves only a low bid

20  and no attempt by the low bidder to obtain, via a false claim, monies to which he is

21  not legitimately entitled."  297 F. Supp. 2d at 281-82.

22       LMC does not take issue here with decisions holding that FCA liability can

23  be premised on a false statement in a proposal that fraudulently induced the

24  government to award a contract to an awardee that lied about its qualifications, had

25  no intention to perform the contract, or submitted inflated invoices.  LMC's

26  position is that the false statement on which a fraudulent inducement claim is based

27  must be an objective falsehood, and it must result in a contract award and payments

28  that it was not entitled to receive.  As stated in *Laird*, 491 F.3d at 260: "Without

more, a contract underbid is not a false claim.  For FCA liability, there must be a nexus between the underbid and a request for payment that the contractor would not have been entitled to absent the contract."  *See also Aflatooni,* 314 F.3d at 997 ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim").  Hooper cannot establish any objective falsehood in any proposal or any invoices containing costs that were not actually incurred.

Acknowledging that none of its cited cases involved a "deflated bid," DOJ asks the Court to reach the unprecedented and illogical conclusion that "a deflated bid should be treated just like an inflated one, so that the former, like the latter, can be actionable under the [FCA] even though none of the payment requests is inconsistent with the original bid . . . . [and] even if the specific request is not an overcharge in any way."  Amicus at 12:2-11.  This statement stands in sharp contrast with DOJ's position in *Bettis*, where it filed a statement of interest asserting: "not every false statement is actionable under the FCA, for 'there must be a nexus between the falsity and the defendant's request for payment . . . . In other words, the falsehood must relate to the claimant's eligibility for payment with respect to the amounts paid.'"  297 F. Supp. 2d at 282, n.15 (court quoting DOJ).

DOJ's and Hooper's plea that the Court should fashion a punishment for contractors who do nothing more than offer a low-cost proposal to the government is misplaced.  DOJ and Hooper suggest that underbids are problematic to the government because they give rise to the possibilities that the contractor will either: (a) default on the contract, or (b) go back to the government and negotiate a cost increase.  *See* Amicus at 13:10-14:2; Opp. at 7:8-11; 21:4-6.  Hooper alleges cost growth during the 15-year history of the RSA contract.  HUF 97.  But Hooper's attempt to establish the required nexus simply by asserting that the actual contract costs have exceeded the costs estimated in the 1995 proposal comes up empty.  UF 17-18 (admission of no knowledge of any "linkage between" Loral's bid and any award fees paid to LMC); HUF 97.  Hooper admitted he has no evidence of any

1  overcharging on the contract (UF 3); therefore, there is no evidence that any invoice

2  contained costs that were not actually incurred.

3      *Bettis* identified and rejected the precise speculative argument that Hooper

4  makes in comparing the original proposal with the costs to date:

5          The fact that a deflated bid alone cannot suffice to impose

6      liability under the FCA is not, however, cured by merely adding a

7      claim that defendant sought monies above and beyond the bid price.

8      Such a proposition completely ignores the reality of government

9      contracting where it is common for a contract that was bid at one price

10      to ultimately cost far more. . . . [I]t is perfectly acceptable for the

11      government to modify the scope of work or to change the design

12      specifications.  Alternatively, the final price can be increased if the

13      government's representations about the nature of the project turn out to

14      be inaccurate.  Since there are a myriad of legitimate adjustments that

15      can increase a contract price beyond the bid price, it necessarily

16      follows that plaintiff cannot rest only on proof of a fraudulently

17      induced contract by means of a low bid and an attempt by the bidder to

18      obtain monies in excess of the bid price.  Rather, there must be a claim

19      "for money to which . . . [the contractor] is not *legitimately* entitled."

20  297 F. Supp. 2d at 281.

21      The long history of the RSA contract began with Loral's bid, which was not

22  the lowest bid (UF 11) – a fact that renders irrelevant DOJ's assertion (at 13:10-13)

23  that low bids are particularly risky when they are "significantly lower than the next

24  lowest bid."  The Air Force made RSA a cost-reimbursement contract because

25  "specific requirements cannot be adequately defined in advance" and "uncertainties

26  in contract performance do not permit costs to be estimated with sufficient

27  accuracy."  UF 6; 48 C.F.R. § 16.301-216.301-2.  As is typical in government

28  contracts, especially multi-year development contracts, the ultimate cost increase

beyond the original bid resulted from numerous incorrect assumptions and estimates by both the Air Force and LMC, as well as from many changes to the scope of work directed by the Air Force.  UF 22; LMC's Response to HUF 97, 100. Notwithstanding the overall expansion of the contract over 15 years, Hooper has no evidence that LMC ever submitted a claim for money to which it was not entitled. As *Laird* held, without more – in this case, without any evidence of fraudulent invoices – an underbid is not a false claim.

## IV.   HOOPER HAS NO EVIDENCE TO DISPUTE THE FACT THAT LMC'S USE AND DISCLOSURE OF FOSS WAS APPROPRIATE

Hooper concedes that "Lockheed could use FOSS products in developing the RSA program" (Opp. at 11:8-9), but speculates that LMC's disclosure was incomplete and untimely.  The uncontroverted evidence is that:

(1)   DoD strongly encourages the use of FOSS products.  UF 41-42.

(2)   DoD's position is that the use of FOSS does not violate contractual data rights provisions.  UF 38.

(3)   The Air Force's Contracting Officer testified that none of the provisions of the contract prohibited the use of FOSS.  UF 37.

(4)   The Air Force directed LMC to use certain FOSS products.  UF 36.

(5)   LMC discussed the use of FOSS with the Air Force from the planning stages of the RSA program.  UF 46.

(6)   LMC disclosed its use of FOSS to the Air Force.  UF 33-34, 43, 45-47, LMC's Response to HUF 134-135, 141.

(7)   The Air Force formally approved LMC's use of FOSS.  UF 55, 58, 65-67, 69-71, LMC's Response to HUF 139.

### A.   LMC's FOSS Disclosures Were Complete

There is no evidence to support Hooper's contention that LMC's disclosure of FOSS was incomplete.  Hooper has claimed that there were 71 FOSS items used by LMC on the RSA contract that were not disclosed to the Air Force.  UF 59.  In

1  the Motion, LMC conclusively refuted Hooper's assertion through the declaration

2  submitted by Dr. Edward Avila, an LMC employee who worked on the RSA

3  contract, who analyzed each of these 71 items identified by Hooper and determined

4  that none of them were undisclosed FOSS items used on the RSA contract.  UF 64.

5       Although Hooper does not dispute that his allegation regarding the 71 items

6  is based on guesswork and "Google" searches (UF 60), rather than personal

7  knowledge or any expertise in the field, Hooper's attorneys (in their untimely

8  "Errata") purport to take issue with Dr. Avila's declaration, and claim that eight of

9  these 71 items are indeed undisclosed FOSS.  *See* Hooper's Notice of Errata

10  (Docket Item No. 176).  To support this assertion, Hooper's attorneys have done

11  nothing more than submit a series of unauthenticated printouts from the internet,

12  with no explanation of their relevance or even what the documents are.  This is not

13  evidence, and certainly does not controvert Dr. Avila's declaration.  *See* LMC's

14  Response to HUF 138.

15       Thus, there is no evidence (admissible or otherwise) establishing that LMC's

16  disclosures were incomplete.  As a fallback, Hooper invites the Court to speculate

17  that the disclosures were incomplete because "software engineers" purportedly "did

18  not consistently report freeware they were using to managers responsible for

19  maintaining the Software Version Descriptions [or] properly document the use of

20  freeware."  Opp. at 30:8-12.  This argument is a *non sequitur*.  Even if true, Hooper

21  has not offered any evidence that FOSS would not have been reported to the Air

22  Force if software engineers did not report the freeware to individuals responsible

23  for maintaining the "Software Version Descriptions" or did not otherwise "properly

24  document" the use of FOSS.  To the contrary, the documents cited by Hooper in

25  support of this proposition demonstrate that when LMC prepared its disclosures, it

26  did not simply rely on the documentation or the Software Version Descriptions, but

27  also canvassed the software engineers to ensure that the disclosure would be

28  complete.  HUF 138 (LMC-1595574).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

REPLY IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT; CASE NO. CV 08-00561-DSF (FMOx)

**B.**     **Hooper Has No Admissible Evidence Of "Untimely" Disclosure**

There is not a shred of evidence to support Hooper's allegation that LMC was required to disclose the use of FOSS at any particular point in time.  LMC submitted declarations from *two* key Air Force officials – RSA Contracting Officer Washington and RSA Deputy Program Manager Pike– stating that there was no such requirement.  UF 58.  While Hooper claims that "government regulations, MIL-STD 498, DFAR 252.227-7014(b)(1) . . . and EWR 127-1" required LMC to obtain approval of the use of FOSS "before incorporating the freeware in software deliverables" (Opp. at 28:23-26), he has not put these provisions into evidence, nor offered any testimony establishing that these provisions required the disclosure and approval of FOSS prior to "incorporation" into software deliverables.  This is not surprising, given the Air Force's testimony contradicting Hooper's claim.  UF 58.

Hooper's only "evidence" on this point is a report from his expert witness, Lewis Gray.  Notably, Hooper's expert report does not state that the RSA contract required the disclosure of FOSS at any particular time (the report offers only the enigmatic opinion that "Appendix B of MIL-STD-498 required that any issues with the licenses for the reusable software products be *handled* during preparations for software use and preparations for software transition, before delivery." Black Decl., Ex. A at Opinion 5 (emphasis added)).  But even if Hooper's expert is purporting to offer an opinion on the subject of the RSA contract's terms, such an opinion is improper – experts may not offer opinions regarding the interpretation of contracts. *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (error for district court to admit testimony by expert witness regarding interpretation of contractual terms and whether defendants breached those terms).

**C.**     **There Is No Competent Evidence That LMC Knowingly Made Any False Claims In Connection With Its Use Of FOSS**

Lacking any support for his theory that LMC's disclosures were untimely, Hooper offers a series of unauthenticated documents that he claims demonstrate

that LMC purportedly "knew" that "it had not complied with Government regulations." Opp. at 28:26-29:1. This alleged non-compliance relates to Hooper's now withdrawn claim that FOSS was not permitted because it violated the DoD's data rights requirements. DoD refutes this view. UF 38. In any event, none of Hooper's cited documents refutes DoD's view or supports his claim.

(1) Hooper cites to an e-mail that he purports establishes that the Air Force prohibited the use of FOSS on the RSA contract. Opp. at 29:7-10. However, this e-mail does not state that LMC was prohibited from using FOSS on the contract (a fact that Hooper concedes), but instead discusses a particular Air Force Instruction ("AFI") and states that "we need to determine if this AFI really applies to RSA." HUF 125. This e-mail from LMC's Mr. Usavage is immaterial, because as Mr. Usavage states in his declaration, LMC determined that the AFI *did not apply to the RSA program*. LMC's Response to HUF 125.

(2) Hooper also mischaracterizes e-mails by LMC's Katherine Good, claiming that she advised LMC that using FOSS would violate contract requirements, but to do so was accepted as a "cost of doing business." Opp. at 29:12-19. None of the documents cited by Hooper supports this contention. While Ms. Good cautions that *improper* use of freeware could result in problems, she does not state that using freeware would necessarily result in LMC losing its ownership rights or prevent LMC from complying with the contract's data rights clause. LMC's Response to HUF 127-128. And Ms. Good clearly states that "contractual breach" is an "unacceptable outcome." *Id*.

Because Hooper has backed away from his allegation that FOSS was impermissible, these documents have no relevance. After two years and nearly three million pages of discovery, Hooper cannot identify a single FOSS item that should have been, but was not, disclosed to the Air Force or a single instance in which LMC knowingly made a false statement regarding its use of FOSS.

## V.   HOOPER HAS NO EVIDENCE OF FALSE TESTING

Hooper has not created a triable issue of fact with respect to his false testing claims.  LMC's evidence conclusively establishes that LMC completed all required testing.  Hooper has not offered any evidence to controvert the declarations submitted with the Motion – from both LMC and Air Force personnel – establishing that LMC performed all of the required testing.  UF 75.  Nor has he disputed that the Air Force and its technical consultants were intimately involved in the testing process from reviewing and commenting on testing procedures, to observing all levels of testing, and participating in post-testing reviews.  UF 78-79.  Instead, Hooper offers unsupported and speculative contentions.

(1)   Hooper contends that there were problems with the "FDE" operational testing conducted by the Air Force *after* LMC delivered the products.  But Hooper has not provided any evidence suggesting that LMC's testing procedures (or any other action by LMC) were responsible for the problems that the Air Force experienced.  *See* LMC's Response to HUF 143.  In fact, the document Hooper relies upon, purportedly authored by an Air Force general, does not mention test failures or defects; nor does it mention the RSA IIA contract or LMC.  In contrast, LMC submitted a declaration from an Air Force official stating that problems occurring during the Air Force's operational tests were *not* caused by LMC.  *Id*.

(2)   Hooper contends that the Air Force's technical advisor, Acta, was occasionally critical of LMC.  Opp. at 12:19-23.  Notably, however, Hooper does not have a declaration or deposition testimony from a single Acta employee substantiating these claims (or authenticating any of the exhibits).  Moreover, Hooper has not identified a single document in which Acta stated that LMC failed to conduct required tests.  Given that the documents were prepared by the Air Force's technical consultant, such "criticism" of LMC would have been known to the Air Force.  Hooper does not dispute that the Air Force could have requested that LMC change its procedures or take other remedial action if it desired to do so.  UF

95.  Criticism of LMC by Acta is not evidence of fraud; rather it reflects the complex organizational structure needed for successful completion of a sophisticated development program.

(3)   Hooper contends that LMC "fail[ed] to complete unit tests."  Opp. at 12:24-13:7.  There is no evidence that LMC failed to complete required unit tests. Hooper relies on Michael Allen for this statement, but it is undisputed that Allen testified that all unit tests *were* completed.  UF 82.  Although Allen identified one instance in which unit tests were completed after CQT testing, the Air Force approved conducting the tests in this order.  UF 84.

(4)   Hooper contends that some of LMC's tests were purportedly "invalid." Opp. at 13:8-15.  But there is no competent evidence to support this assertion. Hooper's only "evidence" is Allen's inadmissible opinion testimony.  Allen's opinion is irrelevant because the Air Force was aware of these allegedly objectionable test procedures and could have directed LMC to alter them or repeat the tests.  UF 95; LMC's Response to HUF 153-156.  Thus, there was no deception and nothing false about the tests.

The evidence is clear that LMC worked side-by-side with the Air Force and its consultants to design and implement its testing procedures, and that all required testing was completed.  Hooper was not involved with testing on the RSA contract and has no personal knowledge to support his allegations.  UF 80.  His criticism of LMC's testing procedures falls far short of stating a claim under the FCA.

## VI.   CONCLUSION

For the reasons set forth above, and in the moving papers, LMC respectfully requests that the Court grant summary judgment in its favor on all Counts.

Dated:        December 27, 2010               Crowell & Moring LLP

                                             */s/   Mark R. Troy*
                                             Mark R. Troy
                                             Attorneys for Defendant
                                             LOCKHEED MARTIN CORPORATION

LAACTIVE-600719670.3