1  CROWELL & MORING LLP
   Mark R. Troy (CSB No. 120418, mtroy@crowell.com)
2  Jeffrey H. Rutherford (CSB No. 181695, jrutherford@crowell.com)
   Nathanial J. Wood (CSB No. 223547, nwood@crowell.com)
3  Mana Elihu Lombardo (CSB No. 228846, melombardo@crowell.com)
   515 South Flower St., 40th Floor
4  Los Angeles, CA 90071
   Telephone: 213.622.4750
5  Facsimile: 213.622.2690

6  Attorneys for Defendant
   LOCKHEED MARTIN CORPORATION
7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11  UNITED STATES *ex rel,* NYLE          Case No. CV 08-00561 BRO (PJWx)
    HOOPER,
12                                        **SEPARATE STATEMENT OF**
                    Plaintiff,            **UNCONTROVERTED FACTS AND**
13                                        **CONCLUSIONS OF LAW IN**
         v.                               **SUPPORT OF LOCKHEED**
14                                        **MARTIN CORPORATION'S**
    LOCKHEED MARTIN                        **MOTION FOR SUMMARY**
15  CORPORATION,                          **JUDGMENT, OR IN THE**
                                          **ALTERNATIVE, PARTIAL**
16                  Defendant.            **SUMMARY JUDGMENT**

17                                        Date:      December 9, 2013
                                          Time:      1:30 p.m.
18                                        Place:     Courtroom 14
                                                     Los Angeles – Spring Street
19                                        Judge:     Hon. Beverly Reid O'Connell

20                                        Discovery
                                          Cutoff:    November 4, 2013
21

22                                        Trial
                                          Date:      March 18, 2014

23

24

25

26

27

28

Pursuant to Local Rule 56-1 of the United States District Court, Central District of California, Defendant Lockheed Martin Corporation ("Defendant" or "LMC") hereby submits its separate statement of uncontroverted facts and conclusions of law in support of LMC's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment on Plaintiff Nyle Hooper's False Claims Act ("FCA") Underbidding Count and Whistleblower Retaliation Count under 31 U.S.C. § 3729(a)(1)-(2), 31 U.S.C. § 3730(h).

## I. SEPARATE STATEMENT OF UNCONTROVERTED FACTS

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| **I.  HOOPER CANNOT PROVE RETALIATORY DISCHARGE** | |
| 1.  Prior to working for LMC, Hooper worked for Delco, a division of General Motors.  He was terminated from that job in 1994 and brought a *qui tam* suit against General Motors under the federal False Claims Act. | Declaration of Mark R. Troy ("Troy Decl."), ¶ 4, Ex. A. |
| 2.  Hooper was hired by LMC in April 1996.  In December 1996, Hooper was tasked with collecting process and technical metrics for the Control & Display ("C&D") Segment of the RSA IIA program. | Relator's Second Amended Complaint[1] ("SAC") ¶¶ 16-21, 36 (Troy Decl., Ex. W); Deposition of Nyle Hooper ("Hooper Depo.") at 933:5-8; Hooper's Answers to LMC's Second Set of Interrogatories, served July 15, 2013 ("Hooper Discovery Responses"), |

---

[1] Hooper filed a third amended complaint in this matter, but that complaint was filed after the District Court dismissed on Statute of Limitations grounds the employment retaliation count, therefore that count is not included in it. Because the Ninth Circuit later reversed the dismissal of the employment retaliation count, the Second Amended Complaint remains the operative complaint with respect to the employment retaliation count.

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | Response no. 9, p. 7 (Troy Decl., Ex. O); Declaration of Barbara Humpton ("Humpton Decl.") ¶ 5, Ex. A at LMC-2728888-89; Declaration of Jeff Allen ("Allen Decl.") ¶ 3. |
| 3.   In 1999, Hooper's manager ranked the 58 employees working that segment, and despite having given Hooper a generous evaluation of "satisfactory," he ranked Hooper second-to-last. | *See* Deposition of Brian Kelly ("Kelly Depo.") at 164:16-17, 186:20 – 187:11 (Troy Decl., Ex. L), and Kelly Depo. Ex. 111 (Kelly Ranking Sheet) (Troy Decl., Ex. N). |
| 4.   In January 1999, Hooper was tasked with establishing a common Source Line of Code ("SLOC") counting methodology. | Hooper Depo. at 918:5-7, 933:5-8 (Troy Decl., Ex. B); Humpton Decl., Ex. A at LMC-2728888-89; Allen Decl. ¶ 3; Declaration of Henry Johnston ("Johnston Decl.") ¶ 4. |
| 5.   Hooper did not understand the metrics data he was reporting, creating confusion within the team. | Humpton Decl., Ex. A at LMC-2728961, 2728888; Allen Decl. ¶ 4; Declaration of Stuart Ballard ("Ballard Decl.") ¶ 7-8, ¶12 & Ex. B (Hooper Performance Evaluation), ¶15 & Ex. D (Hooper Performance Evaluation); Declaration of Bret Walberg ("Walberg Decl.") ¶¶ 9-10; Johnston Decl. ¶ 5; Hooper Depo. Ex. 122 at HO002188 ("Nyle, don't you provide the metrics? Get with your management and |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | resolve.") (Troy Decl., Ex. G). |
| 6.  Hooper reported to the LMC team his unfounded belief that certain SLOC counts were inaccurate, but he never said or implied any sort of fraud on the government or that he was investigating or concerned about that possibility. | Discovery Responses, Response no. 2, p. 3 at HO002188; (Troy Decl., Ex. O); Hooper Depo. Ex. 122 at HOO002188 (Troy Decl., Ex. G). |
| 7.  In October 2000, Hooper was tasked to determine the proper procedures for using freeware (open source software available to the public at no charge) on the program. | *See* Hooper Depo. at 859:7-8, 10-12; 860:1-4, 6-7; 865:6, 15-16; 870:24-25; 880:16 – 881:1; 890:20-25 (confirming freeware task); Hooper Discovery Responses, Response no. 8, p. 7 (Troy Decl., Ex. O); *See* Kelly Depo. at 52:25 – 53:2 (Troy Decl., Ex. L). |
| 8.  Hooper knew nothing about freeware and had never even heard of it before he was assigned this task. | *See* Hooper Depo. at 870:25 – 871:1-3: ("And at the time I was given that [freeware] assignment, I didn't even know what freeware was.") (Troy Decl., Ex. B). |
| 9.  In a series of meetings and emails, Hooper expressed his "concern" and "raised consciousness" about the freeware issue. | Hooper Discovery Responses, Response no. 1, p. 3 (citing emails at HO002616-18, LMC-2728778-83, LMC-2728805, LMC-2728806-07,   LMC2728537-39) (Troy Decl., Ex. O); *See* Hooper Depo., Exs. 118 – 121 (Troy Decl., Exs. C-F). |
| 10. Hooper never intended his | *See* Hooper Depo. 870:7-16 ("I wasn't |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| statements of concern to inform anyone at LMC or the government that he believed LMC's freeware use was fraudulent or otherwise violated the FCA, as he consistently confirmed in his deposition. | claiming that Lockheed was committing fraud at that time."); 870:25 – 871:3; 884:1-4; 885:18-25 ("I was trying to educate. . . ."); 890:13-22; 891:1-7 (Hooper was not threatening to report fraud); 903:1 –905:20 (confirming he is concerned with freeware "disclosure" not "fraud"); 951:14-25; 952:1-2; 963:15-20; 964:20 – 965:15 (explaining that his concerns were "meant to educate people . . . not as a threat or an accusation that there is wrong doing"); 1048:8 – 1049:7 (confirming that freeware tasks were meant to "raise consciousness" and not to report fraud) (Troy Decl., Ex. B); Declaration of Susanne MacTavish ("MacTavish Decl.") ¶ 7. |
| 11. In March 2001, Hooper was ranked last, 14 of 14, by his then-manager Lee Owens. | Humpton Decl. ¶ 5, Ex. A at LMC-2728891. |
| 12. Hooper's supervisors and co-workers consistently observed that Hooper did not work well in a team environment; failed to follow directions and complete assignments; lacked | *See* Kelly Depo. at 40:18-23, 41:5-10, 41:5-17, 58:20-21, 61:1-20 (Troy Decl., Ex. L), Kelly Depo. Ex. 109 (Troy Decl., Ex. M); Allen Decl. ¶¶ 4-6; Ballard Decl. ¶¶ 7-10; Johnston Decl. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| communication and interpersonal skills; was confrontational; and did not know how to use basic computer tools. | ¶¶ 5-6; MacTavish Decl. ¶ 5, Ex. A at LMC-2728267 – LMC-2728268; Declaration of Scott Smith ("Smith Decl.") ¶¶ 3-5; Walberg Decl. ¶ 11. |
| 13. In July 2001, Hooper complained to Human Resources about his performance reviews but not about any fraud on the government. This prompted an HR "Open Door" investigation by then HR Director Barbara Humpton, who worked out of Gaithersburg, Maryland. Lockheed Martin's "Open Door" policy was widely advertised as part of the Human Resources process, and it allowed an HR investigator outside an employee's management chain (Ms. Humpton, in this case) to advocate for an employee who raised a problem that was not being resolved by his/her manager. Ms. Humpton's responsibility with Hooper's complaint was to meet with Hooper, build an investigation plan, review that plan with Hooper's management team, conduct an investigation of Hooper's concerns, review the findings with | Humpton Decl. ¶¶1-5, Ex. A at LMC-2728886 – LMC-2728901. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| management, and then review the findings with the employee.   Ms. Humpton conducted the first investigation from July through September of 2001, and the investigation period covered Hooper's employment from June 1999 through June 2001. Following an investigation, Ms. Humpton found that there were some lapses in personnel management, such as incorrect job titles and untimely performance appraisals, but these problems were attributable to the fact that the team working in Santa Maria was not fully staffed with HR personnel. The mistakes related to Hooper's job title and the lack of a timely appraisal were inadvertent. There was no indication that anyone in the company was out to get Hooper or was retaliating against him for anything. | |
| 14. In February 2002, Hooper complained again about his latest below average rating, and again, he did not mention the possibility of fraud on the program. He told his manager, Stuart | Ballard Decl. ¶ 4, Ex. A (Ballard Notes on Hooper) at LMC-2729264 ("Nyle disclosed to me [Ballard] his history with [General Motors] as a whistleblower and that he had no |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| Ballard, that although he had been a whistleblower against his prior employer, he had no intention of being a whistleblower against LMC, and that he did not see any evidence that would lead him to "blow the whistle." | intention of being a whistleblower in Lockheed Martin (odd comment). . ."); ¶ 12, Ex. B at LMC-2728403; Humpton Decl. ¶ 5, Ex. B (February 2002 Hooper HR Investigation) at LMC-2728959. and ¶ 8. |
| 15. Hooper also initiated a second HR complaint in February 2002.  The independent investigator found that Hooper was appropriately rated as a "basic contributor" (a rating for below-average employees); that Hooper's managers had not retaliated against him for complaining about his rating; and that, at the time Hooper received his "basic contributor" evaluation, his managers had not been aware that Hooper had been a whistleblower against his former employer. | Humpton Decl. ¶ 5, Ex. B at LMC-2728956 – LMC-2728963, ¶¶ 8-9; *see also* Ballard Decl., ¶ 12, Ex. B. |
| 16. Hooper did not tell the HR representative that he was investigating or reporting fraudulent conduct. | Humpton Decl. ¶ 10. |
| 17. On June 6, 2002, Hooper received an "unsatisfactory" performance rating and was offered a Performance Improvement Plan ("PIP"), or in the | Ballard Dec. ¶ 15, Ex. D at LMC-2729184; ¶ 15, Ex. E (Hooper PIP) at LMC-2728413 – LMC-2728415, ¶ 16. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| alternative, a release and severance agreement. The PIP required Hooper to adhere to the "core work hours" defined under the plan; to notify Mr. Ballard upon arrival and departure from the facility; to meet with Mr. Ballard twice a week and to provide progress reports on his assigned tasks. The PIP also set forth the substantive tasks Hooper was to accomplish. The structure of the PIP was to provide Hooper discrete, accomplishable tasks and to ensure that he was in attendance at the workplace. | |
| 18. After receiving the PIP, Hooper complained to LMC's Ethics Office with essentially the same complaints. He added a threat to sue if he were terminated but never mentioned the FCA, qui tam, whistleblowing, or fraud. In fact, in the same conversation with the Ethics investigator, he said, "[h]e did not want to move into another whistleblower/court situation." The Ethics investigator investigated Hooper's allegations and found no evidence of retaliation against him. | MacTavish Decl. ¶ 5, Ex. A at LMC-2728258, LMC-2728267 – LMC-2728269; ¶ 7; Hooper Depo. Ex. 139 ("Nyle Hooper called me yesterday and left a voicemail: If Stuart follows through on the improvement plan on Thursday, . . . [Nyle] will involve 'attorneys, agencies and the corporation.") (Troy Decl., Ex. I); Hooper Depo. Ex. 140 ("If Stuart attempts to place me on a performance improvement plan on Thursday I will take action. . . . I will contact the |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | corporation and outside agencies.") (Troy Decl., Ex. J); *See* Hooper Depo. at 1100:25 – 1101:9 (Hooper confirming that he told LMC Ethics Investigator that he did not want to be a whistleblower) (Troy Decl., Ex. B). |
| 19. Hooper refused to sign the PIP and did not care whether that refusal would result in him being terminated.  Even after that, he was given several weeks to show he could perform in accordance with the unsigned PIP.  He failed again and was finally terminated on July 19, 2002, for failure to perform. | MacTavish Decl. ¶ 5, Ex. A at LMC-2728259; Ballard Decl. ¶ 16; Hooper Depo. at 1111:14 – 1115:15 (Troy Decl., Ex. B); Hooper Depo. Ex. 140 ("If Stuart attempts to place me on a performance improvement plan on Thursday I will take action.  I will not sign.") (Troy Decl., Ex. J). |
| 20. Hooper claims he was engaged in protected conduct through: (1) his oft-stated "concerns" and "consciousness raising" about the use of freeware and the need to disclose it to the Air Force; (2) his "zealous insistence" that SLOC counts were "inaccurate" and that lower productivity rates should have be disclosed to the government; and (3) his threats, made just prior to his termination, to sue if he were terminated. | SAC ¶¶ 93-120 (Troy Decl., Ex. W); Hooper Discovery Responses, Response nos. 1-3, p. 3-4; (Troy Decl., Ex. O); Hooper Depo. Exs. 118 – 123 (Troy Decl., Exs. C-H). |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| 21. In discovery, LMC asked Hooper to identify each instance in which he notified LMC of his concerns or investigation regarding the freeware issue. | Hooper Discovery Responses, Response no. 1, p. 3; (Troy Decl., Ex. O): "INTERROGATORY NO. 1: Identify each and every instance for which you claim that you notified Lockheed Martin of your concerns or investigation with required to improper or insufficient disclosure of freeware to the government under the RSA IIA contract. RESPONSE TO INTERROGATORY NO. 1: The information requested is contained in:<br><br>HO002616-2618<br>LMC-2728778-8783<br>LMC-2728805<br>LMC-2728806-8807<br>LMC-2728537-8539"; <br>Hooper Depo. Exs. 118 – 121 (Troy Decl., Exs. C-F). |
| 22. In discovery, LMC asked Hooper to identify each instance in which he notified LMC of his concerns or investigation regarding the source lines of code, productivity rates, or cost estimates. | Hooper Discovery Responses, Response no. 2, p. 3 (Troy Decl., Ex. O) "INTERROGATORY NO. 2: Identify each and every instance for which you claim that you notified Lockheed Martin of your concerns with or investigation of |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | inaccurate projections of source lines of code, productivity rates, or cost estimates to the government.<br><br>RESPONSE TO INTERROGATORY NO. 2: The information requested is contained in:<br><br>HO002188<br><br>LMC-2737319<br><br>LMC-2728537";<br><br>Hooper Depo. Exs. 121 – 123 (Troy Decl., Exs. F-H). |
| 23. In discovery, LMC asked Hooper to identify each instance he notified LMC of his belief that he was investigating fraud or that LMC was committing fraud against the government on the RSA IIA contract. | Hooper Discovery Responses, Response no. 3, p. 4 (Troy Decl., Ex. O):<br><br>INTERROGATORY NO. 3: Identify each and every instance for which you claim that you notified Lockheed Martin of your belief that you were investigating fraud or that Lockheed Martin was committing fraud against the government on the RSA IIA contract.<br><br>RESPONSE TO INTERROGATORY NO. 3: The information requested is contained in:<br><br>HO002188<br><br>HO002616-2618<br><br>LMC-2728778-8783 |

-11-

| UNDISPUTED FACT | EVIDENCE |
|---|---|
|  | LMC-2728805 LMC-2728806-8807 LMC-2728537-8539"; Hooper Depo. Exs. 119 – 122 (Troy Decl., Exs. D-G). |
| 24. During Hooper's October 10, 2013 deposition, he consistently testified that the documents on which he is relying as evidence of his whistleblower claim showed that he was merely performing assigned tasks. | *See* Hooper Depo. at 859:7-12; 860:1-7, 14 ("I was tasked to investigate freeware."); 861:22 – 863:10; 863:25 – 864:21; 865:6-16 ("It shows right there that I was tasked to do it"); 870:24-25 ("I was assigned in October of 2000 by Glenn Wilson to investigate the use of freeware."); 880:16 – 881:1 ("It was my job."); 890:20-25; 918:5-7 (Hooper confirming productivity rates were within the scope of his responsibility); 933:5-8 (same); 961:11-15 (Hooper admitting that he and others were tasked with "looking at freeware") (Troy Decl., Ex. B). |
| 25. During Hooper's October 10, 2013 deposition, he consistently testified that the documents on which he is relying as evidence of his whistleblower claim showed that he was merely expressing concern about "compliance." | *See* Hooper Depo. at 942:6-12 (Hooper confirming that "many people had issues with the SLOC counts," and that "there was a concern across management and across the engineers."); 942:17 – 943:1 (Hooper confirming that there were |

-12-

| UNDISPUTED FACT | EVIDENCE |
|---|---|
|  | "various ways to develop SLOC counts," and that "a number of people in management [] were discussing the best way to count code"); 975:25 – 976:7 (Hooper explaining that he was concerned about copyright compliance and LMC getting sued by freeware developers) (Troy Decl., Ex. B). |
| 26. During Hooper's October 10, 2013 deposition, he consistently testified that the documents on which he is relying as evidence of his whistleblower claim showed that he was trying to work within the LMC "system" to address what he considered to be "professional differences" and other "personnel matters." | *See* Hooper Depo. at 882:7-16 ("I want to make it clear that I was always trying to work within the Lockheed corporate world. . . . It shows that I was trying to work within the system."); 919:2-13 (Hooper confirming that his supposed "whistleblower evidence" actually involved "personnel matters"); 970:7-11 (Hooper explaining he did not disclose anything to the government because "he was trying to work within the system"); 1007:22 – 1008:9 (Hooper agreeing that co-workers found him counterproductive and argumentative); 1011:17 – 1012:5 (Hooper explaining that he was trying to keep everything within LMC); 1017:7-20 (Hooper explaining that his beliefs |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | regarding productivity rates were "professional differences"); 1020:22 – 1023:13 (Hooper explaining that his claims of "professional differences" were not meant to indicate fraud); 1024:23 – 1026:8 (Hooper confirming that complaints to HR investigator dealt with "personnel issues") (Troy Decl., Ex. B). |
| 27. During Hooper's October 10, 2013 deposition, he consistently and unequivocally testified that in the documents on which he is relying as evidence of his whistleblower claim he had *not* claimed that fraud was occurring. | *See* Hooper Depo. at 870:7-16 ("I wasn't claiming that Lockheed was committing fraud at that time."); 870:25 – 871:3 ("I wasn't claiming any fraudulent act that Lockheed was committing."); 884:1-4 ("It's trying to be informative."); 885:18-25 (Hooper acknowledging that he was "just trying to educate," and that he was "very concerned"); 889:9-14 (Hooper confirming he sought LMC corporate review of his analysis on the freeware issue); 890:13-25 (Hooper confirming he didn't use the word "fraud" and that he was *not* threatening to report "fraud"); 891:1-7 (Hooper confirming that he was *not* threatening to report the freeware issue but was just |

-14-

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | raising his "concerns"); 893:3-13 (Hooper confirming he was just helping people "becom[e] more aware . . . of the issue"); 894:2-14 (Hooper saying the documents on their own do not indicate that he was investigating fraud); 903:1 – 904:3 (Hooper confirming he did not express a concern about "fraud"); 904:20 – 905:18 (Hooper confirming he did not put LMC on notice that he was investigating fraud); 905:19-20 (Hooper confirming he did not use the word fraud); 912:13-24 (Hooper stating that he did not claim "fraud" but was just "taking issue" with certain productivity rates); 914:3-9 (Hooper confirming he did not claim LMC was engaged in fraudulent conduct); 917:4-6 (Hooper confirming he was "just trying to get them to do the right thing, without being overly forceful"); 922:21 – 923:4 (Hooper confirming he did not allege "fraud"); 927:6-12 (Hooper confirming that the documents did not say he was investigating "fraud" or "whistleblowing"); 936:25 – 937:8 |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
|  | (Hooper confirming there were "a lot of methodologies" for SLOC counting "because everything wasn't settled); 938:9-18 (Hooper admitting he was not objectively alleging fraud); 951:14 – 952:2 (Hooper admitting document he relies on does not indicate his concerns regarding freeware); 962:25 – 963:1 (Hooper explaining that freeware was "an evolving process); 963:15-20 (Hooper confirming that email does not say "fraud" but just shows "concern"); 963:24 – 964:2 (Hooper explain that freeware was an "evolving process"); 964:20 – 965:15 (Hooper explaining that email does not show "fraud" but just "gives guidelines" and is "not a threat or an accusation that there is wrong doing"); 1002:21 – 1003:18 (Hooper confirming former manager not engaging in fraud); 1018:21 – 1019:3 (Hooper confirming that email does *not* claim fraud, and he cannot identify any specific documents where he *does* claim fraud); 1020:1-4 (Hooper confirming that he did not use the word "fraud"); |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| | 1048:8 – 1049:7 (Hooper confirming that freeware tasks were meant to "raise consciousness" and not to report fraud) (Troy Decl., Ex. B). |
| 28. During Hooper's October 10, 2013 deposition, he consistently and unequivocally testified that in the documents on which he is relying as evidence of his whistleblower claim he had *not* claimed that he was blowing the whistle and that he had no intention of doing so. | *See* Hooper Depo. at 868:18-22 (Hooper confirming that he was not a "whistleblower" and was not "thinking about being a whistleblower at that time"); 882:10-13 ("I wasn't trying to be a whistleblower."); 883:6-19 (Hooper was just "trying to inform the engineers" that there were issues"); 977:12 – 978:7 (Hooper was just seeking information and not "blowing the whistle" on the freeware issue); 979:19-23 (same); 1101:3-9 (same) (Troy Decl., Ex B). |
| 29. Prior to his termination in July 2002, Hooper never claimed that LMC's freeware policies were fraudulent. He did not report any "fraud" to the Government until three years after his termination. | Hooper Depo. Ex. 119 at LMC-2728780 ("I hope my analysis helps to understand LM/Missions System's freeware policy and I am trying to draw awareness to this freeware issue so I am including other product leads and personnel on this email distribution list trusting that others will adhere to the policy in the future."), LMC-2728781 (To help comply with the Lockheed |

| UNDISPUTED FACT | EVIDENCE |
| --- | --- |
| | Martin freeware policy, I will write a work instruction . . . .") (Troy Decl., Ex. D); Hooper Discovery Responses, Response nos. 6-7 p. 6 (Troy Decl., Ex. O): |
| 30. With respect to productivity rates, Hooper's evidence reflects only that he stated a concern that source lines of code counts were inaccurate, which in turn affected productivity-rate accuracy. | Discovery Responses, Response no. 2, p. 3 at HO002188; (Troy Decl., Ex. O); Hooper Depo. Ex. 122 at HOO002188 ("It is very important to correct the above mentioned issues because it is doubtful that the productivity chart matches the proposal BOE that we have sent or will send to our customer.") (Troy Decl., Ex. G). |
| 31. Co-workers and supervisors consistently found that he: 1) was not a team player; 2) was argumentative, disruptive and confrontational; 3) did not understand the metrics reporting that he was tasked to provide; 4) sought to have others do his work for him; 5) did not have basic computing skills expected of someone at his level; 6) refused to take direction from management and refused to take direction unless it was in | Ballard Decl. ¶¶ 4-16 (commenting on Hooper's overall poor performance), 15 & Ex. D ("Sustained inability to work in a team[] environment."); Johnston Decl. ¶¶ 5-6 ("Virtually everyone on the CDSEG team that interfaced with Hooper found it very difficult to work with him. . . . Hooper was not a valuable member of the RSA IIA program. Hooper had poor technical skills, exhibited a lack of initiative and |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| writing; and 7) did not complete assignments in a timely manner. | did not work effectively with his team or peers. In fact, his presence on the team was often counterproductive."); Smith Decl. ¶¶ 3-5 ("I felt that he was being dishonest by taking credit for work that I had done for him. . . . I believe that the quality of Nyle's work was poor."); Humpton Decl. ¶ 9 (stating that Hooper's performance of assessment of "basic contributor" was valid, if not generous."); Walberg Decl. ¶¶ 9-11 (including stating that Hooper was "very difficult and time-consuming to deal with," and that "his work product added no value to the RSA IIA program."); MacTavish Decl. ¶ 5, Ex. A at at LMC-2728261, LMC-2728266; Allen Decl., ¶¶ 4-6. |

## II.   HOOPER'S ALLEGATIONS ABOUT UNDERBIDDING IN THE INITIAL CONTRACT ARE TIME-BARRED

| | |
|---|---|
| 32. Hooper has alleged that Loral fraudulently induced the government to award it the RSA IIA contract in 1995 by purportedly using "false productivity rates" when bidding on the contract. On that basis, Hooper contends that all | Relator's Third Amended Complaint ("TAC") ¶¶ 16-21, 36 (Troy Decl., Ex. X). |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| invoices for the entire project "represent false claims for payment." | |
| 33. Hooper concedes that he learned of the purported false productivity rates in "late 1996 and early 1997," yet waited until July 2005 – over eight years – to file this action. | Relator's Complaint, filed July 18, 2005 (Docket #1); TAC ¶ 22 (Troy Decl., Ex. X). |
| 34. Hooper has also alleged that after Loral was awarded the contract, there were subsequent "contract updates and modifications" for which Lockheed purportedly prepared false productivity estimates. | TAC ¶ 25 (Troy Decl., Ex. X). |

### III.   HOOPER CANNOT PROVE HIS UNDERBIDDING CLAIMS

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| 35. The RSA contract, awarded nearly 20 years ago, is an ongoing effort to replace the aging software and hardware used to support launch operations in the field at Vandenberg Air Force Base and Cape Canaveral. | Declaration of Paul Usavage ("Usavage Decl.") ¶ 9; Declaration of Colonel Joseph Boyle (ret.) ("Boyle Decl.") ¶ 1; Declaration of Judith Peach ("Peach Decl.") ¶ 1. |
| 36. The contract is a cost-reimbursement plus award fee type contract, under which the contractor, instead of being paid a fixed price, is reimbursed for its actual costs and may receive periodic award fees based on its | Troy Decl., Ex. R at LMC-AF-0000336; *see also* Boyle Decl. ¶ 4; Usavage Decl. ¶ 6; Declaration of Les Mikkelsen ("Mikkelsen Decl.") ¶ 11. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| overall performance, including spending less money than previously estimated. | |
| 37. Hooper admitted in his deposition that he is not alleging mischarging. | *See* Deposition of Nyle Hooper ("Hooper Depo.") at 781:15-19 (Troy Decl., Ex. B). |
| 38. Before the government issued the RFP on the RSA IIA contract, the Air Force developed a program office (cost) Estimate (POE) and projected that the RSA IIA program would cost approximately $981 million dollars. Because the government was not going to be able to allocate that amount of money to the program at that time, the Air Force group tasked with preparing the RFP for the RSA IIA program was asked to find a way to scale down the program. They removed some options and programs, and developed another estimate. An Independent Cost Estimate (ICE) was conducted by the government's support contractor, Tecolote, and projected that the RSA IIA contract would cost approximately $729 million and would take 10 years | Boyle Decl. ¶ 3. |

-21-

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| to accomplish. Again, this amount was more than the government could appropriate for the program at that time (i.e. at the beginning if the contract), so the government asked Tecolote to conduct a final ICE, which projected that the contract would cost approximately $562 million dollars. That version of the ICE was the basis for the Request for Proposal (RFP) that was put out for bid.  The Air Force was aware and understood that the contract would likely cost more than Tecolote's estimate.  The Air Force knew that the amount of "source lines of code" ("SLOC") was highly unpredictable. | |
| 39. In the original contract competition in 1995, the Air Force issued to potential bidders a Request for Proposal ("RFP") which laid out five factors the Air Force would consider in deciding what company would win the competition.  The first four factors (management, systems engineering, systems integration and product development) were first and equal in | Troy Decl., Ex. R at LMC-AF-0000337; Troy Decl., Ex. P at LMC-AF-0000503; Boyle Decl. ¶ 5, Ex. A at LAX024080. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| importance. | |
| 40. The fifth factor – cost – was of lesser importance to the Air Force.  The Air Force "informed the offerors that it may select an offer that is not the lowest priced technically acceptable offer, but may instead select a higher priced offer that represents the 'Best Value' to the Government."  The Air Force informed potential bidders that "[n]o advantage will be given to a [sic] offeror who submits an unrealistically low cost proposal.  In fact, the offeror may be downgraded . . . to the degree that the proposed costs indicate inadequate comprehension of the tasks." | Troy Decl., Ex. Q at LMC-AF-0000083; Troy Decl., Ex. P at LMC-AF-0000501, 503; Boyle Decl. ¶ 5, Ex. A at LAX024080. |
| 41. The Air Force determined that the contract would be a cost-reimbursement type contract because "[f]ixed-price contract types are inappropriate for this effort because specific requirements cannot be adequately defined in advance" and the "uncertainties inherent in the requirements render attempts to establish a fixed-price | Troy Decl., Ex. R at LMC-AF-0000336; *see also* Boyle Decl. ¶ 3. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| unrealistic." | |
| 42. Three companies responded to the RFP. | Troy Decl., Ex. S at LMC-AF-0000474; Boyle Decl. ¶ 5. |
| 43. The Air Force hired independent consultants to create an "Independent Government Estimate" to compare with the three companies' bids. | *See* Troy Decl., Ex. R at LMC-AF-0000339; Boyle Decl. ¶ 3. |
| 44. The Air Force performed a "cost realism analysis" in which it "evaluated [the bids] to ascertain whether the offeror's proposed costs were complete and realistic . . . and whether the proposed price was reasonable."  If that evaluation indicated that a portion of the bid did not seem "complete" or "realistic" in the Air Force's opinion, the Air Force adjusted the bid to reflect the Air Force's assessment of the "most probable cost" ("MPC"). | Troy Decl., Ex. R at LMC-AF-0000339-40; Ex. S at LMC-AF-0000474; Ex. P at LMC-AF-0000502, 507; Boyle Decl. ¶¶ 6-7, Exs. B & C. |
| 45. As part of Loral's response, it provided a detailed "basis of estimate" ("BOE") for each of the cost estimates in the response.  The Air Force specifically analyzed Loral's estimates regarding the number of hours it would take to develop the software.  The Air | Troy Decl., Ex. R at LMC-AF-0000340; Usavage Decl. ¶ 4; Hooper Depo at 210:12-17 (Troy Decl., Ex. B); Boyle Decl. ¶ 6; *see also generally* Usavage Decl., Exs. A and B. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| Force was of the belief that Loral was too "optimistic" regarding its estimated "productivity (*i.e.*, hours per line of code)." The Air Force then adjusted Loral's bid upward in accordance with that belief. | |
| 46. Loral did not submit the lowest bid, but the Air Force determined that Loral's bid provided the "best overall value," knowing that it was possible that there were "risks" which might "lead to cost growth beyond target cost." The Air Force concluded that "the risk potential is acceptable . . . and . . . determined that a fair and reasonable price was obtained without reliance on certified cost or pricing data."   The Air Force considered Loral to be "by far the most superior in the management and technical evaluations" so even though "Loral did not submit the lowest offer, it was by far the best value offer, because it exceeded some of the requirements on the technical and management side." | *See* Troy Decl., Ex. S at LMC-AF-0000474-76; Troy Decl., Ex. R at LMC-AF-0000341; Boyle Decl. ¶ 7, Ex. C at LMC-AF-0000496 – 497. |
| 47. Loral's estimated productivity was | Boyle Decl. ¶ 6. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| "not a significant enough factor to be capable of influencing which bidder [the Air Force] selected as the awardee." | |
| 48. The Air Force did not require bidders to submit a certification that their historical costs used in their proposals were accurate. | Troy Decl., Ex. P at LMC-AF-0000502. |
| 49. Loral was eventually awarded the RSA contract.  After Loral was awarded the contract, the division of Loral handling the RSA contract was purchased by Lockheed Martin. | Troy Decl., Ex. R at LMC-AF-0000334; Usavage Decl. ¶ 3. |
| 50. After contract performance began, LMC was not required to "re-bid" (*i.e.,* compete) for newly requested components of the RSA program or modifications directed by the Air Force. The Air Force never indicated that it might award any part of the contract to another company if it was unsatisfied with LMC's cost estimates. | Usavage Decl. ¶¶ 5-7; Hooper Depo. at 245:12-16 (Troy Decl., Ex. B); Boyle Decl. ¶ 10 ("change proposals were not put out for competitive bid."). |
| 51. For the FOV1, Flight Operations ("FO") and Flight Analysis ("FA") products, LMC's actual productivity rate was better than the estimated | Declaration of Scott Smith ("Smith Decl.") ¶¶ 6-9. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| productivity rate that was submitted to the government.  In other words, LMC personnel produced the code for these products at a faster rate than what was estimated. | |
| 52. Hooper did not work for Loral or LMC when Loral's proposal was prepared. | Hooper Depo. at 206:12-22, 210:7-11 (Troy Decl., Ex. B). |
| 53. LMC and the Air Force collaborated when developing cost estimates for the RSA program.  These estimates were often prepared in conjunction with "engineering change proposals" ("ECPs") pursuant to which the Air Force changed requirements for the RSA products.  As part of the ECP process, LMC and the Air Force would have detailed discussions regarding requirements for the product being proposed, then LMC would develop a cost estimate.  These estimates would be presented to the Air Force at meetings where the estimate, including the underlying basis for the estimate, would be discussed.  Often, the Air Force would ask LMC to re-run its | Declaration of Jeffrey Sussex ("Sussex Decl.") ¶ 13 (attached as Ex. U to the Troy Declaration); Usavage Decl. ¶ 11; Mikkelsen Decl. ¶ 11; Boyle Decl. ¶¶ 8, 10-11; Peach Decl. ¶¶ 4-5; Declaration of Amy Baxter ("Baxter Decl.") ¶¶ 4-6; see Hooper Depo. at 231:25 – 232:6 (Troy Decl., Ex. B). |

S SEPARATE STATEMENT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW RE MSJ;
CASE NO. CV 08-00561 BRO (PJWX)

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| projections to see if the product could be developed for less money, or to determine how changing the scope of the product could impact the costs.  For example, the government directed Lockheed Martin to reduce the estimate for the FOA product. | |
| 54. The change proposal process was formally documented in a protocol called the "Business Memorandum of Agreement" ("BMOA").  The BMOA outlined the "process by which the Air Force, its support contractors, government auditors, Lockheed Martin and its primary sub-contractors would work as a team to jointly develop all of the contract change proposals during contract performance." | Boyle Decl. ¶¶ 10-11, Ex. D; Walberg Decl. ¶ 3, Ex. A. |
| 55. The protocol set up in the BMOA was in fact implemented on the RSA IIA contract.  As part of the process outlined in the BMOA, before a change proposal was officially submitted to the Air Force, the Air Force would have "pre-reviewed" them, including the "estimated source lines of code | Boyle Decl. ¶¶ 10-11; Baxter Decl. ¶¶ 4, 6; Peach Decl. ¶ 5; Walberg Decl. ¶¶ 4-6. |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| ("SLOC") and projected man hours." Additionally, "typically at least three . . . government experts" would "vet[] the technical process" used to prepare the change proposal.  If the Air Force representative thought something was wrong with the estimates, it would go back and forth with LMC to seek clarification as necessary, and there would be an escalation and increased review of the information with more IPT meetings.  It was somewhat of an accepted frustration that it would take a while to get a proposal approved because the BOEs were so thoroughly vetted and reviewed."  Thus, in essence, the contract change proposals were not just Lockheed Martin's work product, but the Air Force's own work product. | |
| 56. The Air Force was in regular communication with LMC personnel, through phone calls, emails and in-person meetings.  Air Force personnel had access to LMC's facilities and used offices at LMC's facilities.  The Air Force also had access to LMC's | Boyle Decl. ¶ 9; Baxter Decl. ¶ 5; Declaration of Major Cory Pike ¶ 3 (attached as Ex. V to the Troy Declaration); *see also* Sussex Decl. ¶ 6 (Troy Decl., Ex. U). |

S SEPARATE STATEMENT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW RE MSJ;
CASE NO. CV 08-00561 BRO (PJWX)

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| document database for the RSA IIA program, which at the time was "groundbreaking" access. | |
| 57. In the Mike Allen deposition testimony cited in the Ninth Circuit decision, Allen was testifying about "Command Generation" and an RSA IIA component called "FOV1." The Ninth Circuit quoted testimony that Allen "'was simply asked [by management] to change the cost . . . .'" This testimony related to Command Generation.<br><br>The Ninth Circuit also quoted Allen's testimony that "on another contract, he was told to lower the cost. . . . Allen told his supervisors, 'We can't. This is the real cost. This is what it's going to cost, if not more . . . .'" This testimony related to a meeting regarding FOV1. | Allen Depo. at 214:8-19, 224:2-12 (Troy Decl., Ex. K) |
| 58. Command Generation was not part of the scope of work for RSA IIA.  It was an "option" for the program. | Usavage Decl. ¶ 16. |
| 59. Allen testified that for Command Generation, he did not reduce the cost | Allen Depo. at 223:17-224:1; 76:3-10 (Troy Decl., Ex. K); *see also* Usavage |

S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW RE MSJ; CASE NO. CV 08-00561 BRO (PJWX)

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| estimate, and LMC presented Allen's estimate to the Air Force but the Air Force declined to fund the project. | Decl. ¶ 16. |
| 60. Allen further testified that for FOV1, he had no personal knowledge regarding what cost estimate was presented to the government, or even whether LMC had provided his estimate to the government, only to have the government *direct* LMC to lower the estimate. | *See* Allen Depo. at 215:18-216:7; 229:5-23; 230:13-16 ("I don't know what discussions took place between the customer [the Air Force] and Lockheed."); 226:5-9 (admitting that he only sat in on cost presentations for Command Generation). (Troy Decl., Ex. K) |
| 61. Hooper did not interface with the Air Force customer. | Walberg Decl. ¶ 9. |
| 62. After the RSA IIA contract was awarded to Loral, changes to the program initiated by the Air Force increased the contract cost. Much of the cost growth was due to disagreements between the Air Force group managing the contract and the Air Force personnel who were the ultimate end users of the program. These disputes "often resulted in changed requirements, schedule delay, and additional costs." Cost growth was also caused by "budget instability" in | Boyle Decl. ¶¶ 12-13; Usavage Decl. ¶¶ 7, 10, 14; Mikkelsen Decl. ¶¶ 9-10; Walberg Decl. ¶¶ 7-8. |

S SEPARATE STATEMENT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW RE MSJ;
CASE NO. CV 08-00561 BRO (PJWX)

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| government funding for the program. | |
| 63. A comparison of the RSA IIA's originally proposed costs with the final cost is a meaningless apples-to-oranges comparison. | Mikkelsen Decl. ¶ 10. |
| 64. The RSA IIA program was substantially revamped by the Air Force in the first two years after the contract was awarded. Overall, there were over 313 formal modifications to the contract, and many other informal changes. Ultimately, because of internal disagreements among Air Force personnel, LMC had to create two variants of the RSA IIA products, which significantly increased costs. For example, the government directed LMC to conduct a study for the Flight Operations and Analysis product that cost over a million dollars. | Usavage Decl. ¶ 9; Walberg Decl. ¶ 7; Boyle Decl. ¶ 12. |
| 65. The scope of work originally proposed was substantially different from what the Air Force ultimately required in the final contract. By the close of the contract, the government had so significantly changed and | Usavage Decl. ¶¶ 9-10, Ex. C. |

S SEPARATE STATEMENT OF UNCONTROVERTED
FACTS AND CONCLUSIONS OF LAW RE MSJ;
CASE NO. CV 08-00561 BRO (PJWX)

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| expanded the requirements on the RSA IIA contract, that only about 20% of it was identical to the original contract requirements in Loral's BAFO. | |
| 66. A cost overrun occurs when the cost of the project exceeds the Contract Value provided.   The cost incurred on RSA IIA never exceeded the contract value or awarded cost of the contract. In fact, at the close of the contract, the there was a $2,059,000 positive variance on the program overall, meaning that LMC completed the program having spent less than the budgeted amount awarded on the contract.  The Government can ultimately de-obligate that $2,059,000 from the RSA IIA contract and use it for other purposes. | Mikkelsen Dec. ¶¶ 5(h), 6-7, Ex. A. |
| 67. If there were significant overruns on the RSA IIA contract, the government would have identified them, and would not have continually increased the contract value or issued high award fees to LMC. | Mikkelsen Decl. ¶ 9; Boyle ¶ 4. |
| 68. Award fees made annually during | Boyle Decl. ¶ 4; Usavage ¶ 6; Mikkelsen |

| **UNDISPUTED FACT** | **EVIDENCE** |
|---|---|
| contract performance are based in part on cost savings incurred when compared with earlier estimated costs. Therefore, if a cost estimate is lower than actually incurred costs, the award fee would be lower.  Award fees are determined by an independent government team based on review of LMC's performance. | Decl. ¶ 11;  *see also* 48 C.F.R. § 16.405-2(a)(2). |
| 69. LMC consistently received high ratings from the Air Force when being rated for award fees for the RSA contract. | Usavage Decl. ¶ 17; Mikkelsen Decl. ¶ 11, Ex. B. |
| 70. The final Contractor Performance Assessment Report issued by the Air Force regarding LMC's overall performance on RSA IIA found that LMC's ratings for Schedule and Cost Control were "Very Good" and noted that LMC came in approximately 1.3% under budget on the contract overall. | Mikkelsen Dec. ¶ 12, Ex. C. |
| 71. The former Air Force RSA IIA Program Manager testified:<br>• "Based on my experience as the SSET co-chair, I have no reason to believe that Loral falsely underbid in | Boyle Decl. ¶¶ 14-15; *see also* Sussex Decl. ¶ 13 (Troy Decl., Ex. U); Declaration of Gregory Braun ¶ 5 (attached as Ex. T to the Troy Declaration). |

-34-

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| its proposal to win the RSA IIA contract." <br> • "Based on my experience working with Lockheed Martin employees during performance of the RSA IIA contract, I do not have any reason to believe that Lockheed Martin falsely underbid in its proposals to develop specific products." <br> • "In my opinion, Lockheed Martin employees could not have submitted false estimates that were lower than what it intended to charge for a particular product. I don't see how Lockheed Martin could have submitted low estimates in proposals without the government knowing about it given the 'shoulder to shoulder' proposal development and review process that the government and Lockheed Martin employees participated in together. If any proposal estimates were low, it was because a group of intelligent people, including employees of the government and Lockheed Martin, | |

| UNDISPUTED FACT | EVIDENCE |
|---|---|
| reasonably believed that that's what it would have cost – not because of any fraudulent or deceitful conduct." | |
| 72. When the Air Force conducted its final "Contractor Performance Assessment Report" at the end of the RSA contract, the Air Force official tasked with independently reviewing LMC's performance stated that "[g]iven what I know today about the Contractor's ability to execute what they promised in their proposal, I definitely would award to them today given that I had a choice." | Mikkelsen Decl. ¶ 12, Ex. C. |

## II.    CONCLUSIONS OF LAW

1.    Lockheed Martin is entitled to summary judgment on Count V for Wrongful Termination under the FCA, 31 U.S.C. §3730(h) in Hooper's Second Amended Complaint because:

a.  There is no evidence that Hooper was engaged in any protected conduct;

b.  There is no evidence that Hooper notified management of any protected conduct;

c.  There is no evidence that Hooper was retaliated against because of any protected conduct; and

d.  LMC terminated Hooper's employment for legitimate, non-retaliatory reasons.

2.     Lockheed Martin is entitled to summary judgment on Count I for
Fraudulent Underbidding under the FCA, 31 U.S.C. §3729, in Hooper's Third
Amended Complaint because:

     a. Hooper's claim that Loral Systems Company (the predecessor to
        LMC) fraudulently induced the Air Force to award it the RSA IIA
        contract is barred by the statute of limitations in 31 U.S.C. § 3731(b);

     b. There is no evidence that LMC submitted to the government any false
        estimates or false claims for payment to obtain the contract award or
        during contract performance;

     c. There is no evidence that proposed productivity rates or estimates
        contained in the RSA IIA contract proposal were material to the
        government's decision to award the contract; and

     d. There is no evidence that any allegedly false statement about
        productivity rates or other information about estimates made during
        performance of the contract was material to the government's decision
        to award any contract modification or make any particular payments
        under the contract.

Dated:  October 21, 2013

Respectfully submitted,

CROWELL & MORING LLP


By: */s/ Mark R. Troy*
    Mark R. Troy
    Mana Elihu Lombardo

Attorneys for Defendant
**Lockheed Martin Corporation**

LAACTIVE-601262007.1